# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHAEL GOETTING, KIMBERLY WEBB,    :
TERRI EDGELL, and KIMBERLY CHILDS,    :
*on behalf of themselves and all*    :
*individuals similarly situated,*    :
     :
               Plaintiffs,    :
     :
v.    :   Civil Action No. _____
     :
SAMUEL ADRIAN SPRATT, RCOFIII    :
SPEC-FIN CREDIT 1, LLC, R&R SPE LLC,    :
JAMIE AZURE, CRAIG LUNDAY,    :
KENNY MALATERRE, JON JON KEPLIN,    :
RON TROTTIER SR., ELMER    :
DAVIS JR., LYNN GOURNEAU, CHAD    :
COUNTS, BLAINE DAVIS,    :
and JOHN DOES Nos. 1-15,    :
     :
               Defendants.    :
_____:

## CLASS ACTION COMPLAINT

Plaintiffs Michael Goetting, Kimberly Webb, Terri Edgell, and Kimberly Childs, *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.     Five years ago, a federal court granted final approval a nationwide class settlement that created a common fund of $18.5 million and canceled $170 million dollars of illegal loans originated in the name of BlueChip Financial d/b/a Spotloan ("Spotloan"). *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va.

July 9, 2020). Despite this settlement, Defendants have continued to originate new loans, which impose triple digit interest rates in blatant violation of usury laws.

2.    Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020).  And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition."  *Id.*  This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as a "rent-a-tribe" scheme, a "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

3.    Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions on usurious lending go searching for a small, easily dominated tribe that will be willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs.  The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections created by state usury and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

2

4.      Federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation of state usury restrictions. On the contrary, it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). Nonetheless, the tribal leaders and employees named as Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

5.      In this case, Spotloan holds itself out as a tribal lending entity owned and operated by the Turtle Mountain Band of Chippewa Indians ("Tribe"). Spotloan issued a loan to Plaintiffs at rates far higher than the usury caps of their respective states of residence. For example, Spotloan issued loans to Mr. Goetting and Ms. Webb—both residents of North Carolina—with interest rates of 378% and 490%, respectively, ***more than 47 times*** North Carolina's 8-percent interest-rate cap and ***more than 23 times*** North Carolina's cap for payday loans of 16%. N.C. Gen. Stat. § 24-1, 24-1-1(c).

6.      The Tribe is controlled and directed by a Tribal Council. Defendants Jamie Azure, Craig Lunday, Kenny Malaterre, Jon Jon Keplin, Ron Trottier Sr., Elmer Davis Jr., Lynn Gourneau, Chad Counts, and Blaine Davis (collectively, the "Tribal Council Defendants") are members of the Tribe's Tribal Council and are sued here in their individual and official capacities, as outlined below. The Tribe's Constitution established the Council as the Tribe's "governing body" with the power to, in relevant part to: "engage in any business that will further the economic well-being of the members of the tribe, or to

3

undertake any programs or projects designed for the economic advancement of the people";

and "make and perform contracts and agreements of every description . . . ."  Tribe Const.

art. IX.[1]  Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Council

Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe—

even though it has essentially delegated the control of Spotloan to the Non-Tribal

Defendants.

7.     Although holding itself out as an entity wholly owned and operated by the

Tribe, Spotloan is in fact funded, managed and operated by Defendants Spratt, RCOFIII

Spec-Fin Credit 1 LLC ("RCOF"), and R&R SPE, LLC ("R&R").  Defendant Spratt was

installed as the CEO of the entity behind Spotloan (BlueChip Financial also known as

Mikinok Enterprises) in 2017, and, in that position, directs Spotloan's operations along

with yet-to-be identified non-tribal coconspirators (the John Doe Defendants).  Defendants

RCOF and R&R are in turn the funders and operators of Spotloan's lending operation and

derive nearly all of the profits from the scheme, while the Tribe makes very little in

comparison.  Collectively, Defendants Spratt, RCOF, R&R and their coconspirator John

Doe Defendants (collectively, the "Non-Tribal Defendants") are the true operators of

Spotloan's usurious lending scheme and provide the day-to-day management, operation,

investment, and customer service functions of the enterprise from California and other

locations far from the Tribe's reservation in North Dakota.  In return, the Non-Tribal

Defendants reap nearly all of the profits from the usurious lending scheme.

---

[1] https://law.tmchippewa.com/us/nsn/tmchippewa/council/constitution.

8. Defendants have actively participated in the scheme and have conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the members of the class described below.

9. Defendants and others not yet known to Plaintiffs have been knowingly participating in the illegal lending enterprise, which has made and is making and has collected and is collecting on grossly usurious loans. This lawsuit challenges the legality of Spotloan's high-interest loans and seeks damages and declaratory relief against co-conspirators participating in this illegal scheme, including those whose identities have been deliberately concealed. More specifically, Plaintiffs seek relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and state common law. Defendants and others have likely collected tens of millions of dollars on void loans in violation of federal and state usury, licensing, and criminal statutes.

## JURISDICTION

10. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

5

12.     The Court also has personal jurisdiction over Defendants because they have conducted business in this District and Division, including the issuance of the high-interest payday loans that gave rise to Plaintiffs' claims.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in North Carolina, including in this District and Division, where Mr. Goetting and Ms. Webb reside and applied for, obtained, and received the funds for the loan giving rise to her claims, and where the some of the activities of the alleged RICO enterprise occurred.

14.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Defendants transacted their affairs in North Carolina through their participation in a conspiracy and a lending enterprise targeting North Carolina consumers. In the alternative, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are residents of different states and there is no single district where this action could otherwise be brought.

## PARTIES

15.     Plaintiff Michael Goetting is a natural person and resident of Kannapolis, North Carolina.

16.     Plaintiff Kimberly Webb is a natural person and resident of Greensboro, North Carolina.

17.     Plaintiff Terri Edgell is a natural person and resident of Indiana.

18.     Plaintiff Kimberly Childs is a natural person and resident of Georgia.

6

19.    Defendant Samuel Adrian Spratt is a natural person and resident of California.  He is the CEO of Mikinok Enterprises, which also goes by the name BlueChip Financial—the entity that owns and operates Spotloan.  As detailed below, Mr. Spratt personally participated in and oversaw the illegal lending enterprise alleged herein, rendering him personally liable.

20.    Defendant RCOFIII Spec-Fin Credit 1, LLC is a Delaware limited liability company based in South Carolina.  Upon information and belief, RCOF funds Spotloan's lending operations and has a security interest in Spotloan's assets.  Upon information and belief, RCOF is also the business front used by Spratt and the John Doe Defendants to operate and direct Spotloan's usurious lending activities under the façade of the Tribe.

21.    Defendant R&R SPE, LLC is a Delaware limited liability company based in Texas.  Upon information and belief, R&R funds Spotloan's lending operations and has a security interest in Spotloan's assets.  Upon information and belief, R&R is also the business front used by Spratt and the John Doe Defendants to operate and direct Spotloan's usurious lending activities under the façade of the Tribe.

22.    Defendant Jamie Azure is a natural person residing in North Dakota.  He is the chairperson of the Tribal Council.  Both as chairperson and a general member of the Council, Defendant Azure's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Azure meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and

7

removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Azure only in his individual capacity.

23.     Defendant Craig Lunday is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Lunday's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Lunday meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Lunday only in his individual capacity.

24.     Defendant Kenny Malaterre is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Malaterre's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Malaterre meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Malaterre only in his individual capacity.

25.     Defendant Jon Jon Keplin is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Keplin's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Keplin meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Keplin only in his individual capacity.

26.     Defendant Ron Trottier Sr. is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Trottier's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Trottier meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Trottier only in his individual capacity.

27.     Defendant Elmer Davis Jr. is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Davis's duties include the chartering and oversight of Spotloan and the other lending operations chartered

9

by the Tribe. In performing these duties, Defendant Davis meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Davis only in his individual capacity.

28.    Defendant Lynn Gourneau is a natural person residing in North Dakota. He is a member of the Tribal Council. As a member of the Council, Defendant Gourneau's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe. In performing these duties, Defendant Gourneau meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Gourneau only in his individual capacity.

29.    Defendant Chad Counts is a natural person residing in North Dakota. He is a member of the Tribal Council. As a member of the Council, Defendant Counts' duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe. In performing these duties, Defendant Counts meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the

creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Counts only in his individual capacity.

30.     Defendant Blaine Davis is a natural person residing in North Dakota. He is a member of the Tribal Council. As a member of the Council, Defendant Davis's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe. In performing these duties, Defendant Davis meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Davis only in his individual capacity.

31.     The John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the Fineday enterprise. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL BACKGROUND

A.     **State usury and licensing laws protect consumers from usurious loans.**

32.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

11

33.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including North Carolina and Georgia, *i.e.*, the home states of Plaintiffs from which they each applied for, received, and made payments on their Spotloan loans.

### i.     North Carolina

34.     In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

35.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

36.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

37.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

38.     Unlicensed venders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor.  N.C. Gen. Stat. § 53-166(c).  Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

39.     Defendants were never licensed to make consumer loans in North Carolina.

**ii.     Indiana**

40.     "Indiana's first usury statutes were passed before the turn of the 20th century, and they were replaced by the [Indiana Uniform Consumer Credit Code (IUCCC)] in 1971." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009).

41.     Under the IUCCC, loans under $2,000 may include an interest rate of no more than 36%, and even then, such rate applies only if the loan is a "supervised loan," meaning that the lender of the loan is licensed under Indiana law to issue loans with interest in excess of 25% per year.  Ind. Code §§ 24-4.5-3-501, 24-4.5-3-508.

42.     For non-supervised loans, Indiana law limits the interest rate to no more than 25% per year on the unpaid principal balance of the loan.  Ind. Code § 24-4.5-3.201.

43.     Indiana law also criminalizes knowingly issuing of loans above 72% interest, which constitutes loansharking, a Level 6 felony in the state.  Ind. Code § 35-45-7-2.

**iii.     Georgia**

44.     Short-term loans of $3,000 or less fall under the Georgia Industrial Loan Act, Ga. Code §§ 7-3-1, *et seq.*

45.     The purpose of the Georgia Industrial Loan Act is "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (Ga. 2012).

13

46.     Unless expressly exempted by the terms of the Act, a lender must obtain a license from the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding 8%.  Ga. Code Ann. §§ 7-3-5, 7-3-6, 7-3-8.

47.     Pursuant to Georgia Code § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Act] by such person shall be null and void."

48.     Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate exceeding 8% unless licensed to make such loans under the Industrial Loan Act or other laws regulating financial institutions.  *See* Ga. Code Ann. §§ 16-17-1, *et seq.*

49.     A lender who violates the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both."  Ga. Code Ann. § 16-17-2(d).

50.     The Payday Lending Act further bars any lender of an unlawful loan from collecting any indebtedness and declares the loan "void ab initio."  Ga. Code Ann. § 16-17-3.

### iv. **Other State Usury Laws**

51.     Each state of residence of the putative class members in the below class definitions also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[2]

### B.     **Overview of the Tribal Lending Business Model.**

52.     Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

53.     Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially

---

[2] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ariz. Rev. Stat. Ann. § 44-1201-1204; Ark. Const. Art. XIX § 13; Cal. Civ. Code §§ 1916-2, 1916-3; Cal. Fin. Code §§ 22750, 22753, 22780; Colo. Rev. Stat. §§ 5-2-201, 5-5-201; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.904, 516.02; O.C.G.A. §§ 7-3-1, et seq.; O.C.G.A. § 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009); Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.J. Code §§ 31:1-1, 31:1-3; N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1); S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

15

vulnerable consumers."[3] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

54.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

55.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

56.     Over the years, payday lenders have used various schemes to evade applicable state and federal protections.  In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally granted power to make loans exceeding state usury rates.  Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by

_____

[3]  *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

a bank that, for its part, earned fess without assuming much, if any, financial risk for the lending.

57.     Because banks are insulated from state examination and regulation by virtue of federal bank preemption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like North Carolina, payday lending is illegal.  However, beginning in 2005, the Federal Deposit and Insurance Corporation began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders.  *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

58.     As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[4] the shadow payday loan industry turned to Native American tribes to replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers.

59.     Under this new "rent-a-tribe" model, the leadership of an economically impoverished tribe would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered.  In return, they would also agree to conceal the

---

[4] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams.  *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[5]

60.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

61.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

62.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

63.     Often at the table were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on

---

[5] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

18

March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

64.     Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received only a nominal amount of the proceeds from the loans.

65.     Upon information and belief, Rosette has represented the Tribe, including in the creation and implementation of its lending activities.

66.     To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights. Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

67.     Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving the unlawful, usurious loans. The loan agreements are typically structured to include a waiver of all state and/or federal rights, in favor of tribal law and dispute resolution provisions. That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

68.     Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected

19

in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

69. Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id*.[6]

70. During the last decade, federal and state law enforcement agencies have also taken various actions to combat tribal lending schemes, including by example:

> a. In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 2017 of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[7] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[8]

---

[6] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

[7] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[8] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

20

b.     The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc*., No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

71.     In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a

21

common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

72. One of these cases specifically revolved around Spotloan and its illegal lending practices. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million).

73. Despite all the litigation and enforcement efforts, including a class action specifically related to Spotloan's illegal lending practices, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

C.    **The Basic Structure of the Tribal Lending Model.**

74. The tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

75. This is accomplished primarily through a document dubiously labeled a "servicing agreement."

76. By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

77. Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.

78. By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

79. Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

80. Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

81. The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5.1.

82. As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶ 3.

83. This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. ¶ 4.

23

84.     By way of another example, the Rosette law firm also used this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

85.     Pursuant to a "Services Agreement" between NPA and Silver Cloud one of Upper Lake's lending entities, NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 3 at 2264–65.

86.     Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

87.     Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 4 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

88.     The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the

same time, disguising its role and creating the façade that the loans were from a tribal government.

89.    The Rosette law firm also setup the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 5.

90.    In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

91.    Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 6.

92.    According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

25

93.     Upon information and belief, the Rosette firm has represented the Tribe, including in its internet lending endeavors, to establish a nearly identical tribal lending model in this case.

**D.     The Tribe's Usurious Lending Enterprise.**

94.     The Spotloan lending enterprise is just another example of a rent-a-tribe scheme designed to circumvent state usury regulation while taking advantage of vulnerable consumers who are in such dire circumstances that they are willing to accept triple-digit interest rates on relatively small sums just to pay their bills.

95.     For several years, the Tribe has been openly inviting and accepting rent-a-tribe partnerships with the shadow payday loan industry under the auspices of its economic development arm, Mikinok Enterprises.

96.     The Tribe has neither the financial resources, the expertise, nor the technology needed to operate a national, multi-million-dollar lending enterprise such as Spotloan.

97.     Indeed, Spotloan operates in nearly every state in the United States and claims to have made over 1.8 million loans since its inception in 2012.[9]  Upon information

---

[9] *See* Frequently Asked Questions, Spotloan, https://www.spotloan.com/faqs (last visited Aug. 5, 2025) ("Spotloans are currently available to residents of the following states: Alaska, Alabama, Arizona, California, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, North Carolina, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, Wisconsin, and Wyoming.").

and belief, these loans are collectively worth hundreds of millions, if not billions, of dollars in principal and interest.

98.    Despite the apparent value of the Spotloan business that claims to be wholly owned and operated by the Tribe, the Tribe's own website does not identify Spotloan as part of its programs and departments, nor does it list any job opportunities related to Spotloan's business.[10]

99.    Historic domain registration information for Spotloan's website, spotloan.com, also shows that it was originally registered to ZestCash, a California-based entity associated with Douglas Merrill, a former Google executive and founder of Zest AI, LLC f/k/a Zest Finance, Inc. ("Zest AI"). In other words, a non-tribal entity, not the Tribe, has consistently owned and operated Spotloan's website—the sole medium through which Spotloan has conducted its lending operations since 2012, and the source of Plaintiffs' and the class members' loans in this case.

100.    According to Defendant Spratt's LinkedIn profile, he was previously the Head of Operations at Zest Finance (now Zest AI) before taking his role as CEO of Mikinok Enterprises (and thus Spotloan) in August 2017.[11]

---

[10] *See* Human Resources, Turtle Mountain Band of Chippewa Indians, https://tmchippewa.com/human-resources/ (last visited Aug. 5, 2025).

[11] https://www.linkedin.com/in/sam-spratt/ (last visited Aug. 5, 2025).

27

101. Upon information and belief, Defendant Spratt obtained and has maintained ownership and/or the ability to control the operations of spotloan.com and Spotloan through his prior association with Zest AI and Mr. Merrill.

102. The IP address for the server operating spotloan.com is also based in California, and where Mr. Spratt resides and where Zest AI is headquartered.

103. Zest AI also advertises its ability to provide automated credit underwriting and other services to lenders, which directly aligns with the business operations of Spotloan.[12]

104. Upon information and belief, therefore, Zest AI, Spratt, and other non-tribal coconspirators—not the Tribe—provides the operational support for Spotloan's business.

105. Based on the above information, the structure of nearly identical tribal lending businesses, and upon other information and belief, instead of receiving meaningful benefits from the lending operation, the Tribe sanctions the operations of Spotloan on behalf of nontribal participants, including the Non-Tribal Defendants, who design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.

106. These nontribal coconspirators include Defendants Spratt, RCOF, and R&R as well as their yet-to-identified officers, operators, and investors, who are the true drivers of Spotloan's lending operations.

---

[12] https://www.zest.ai/industry/specialty-lenders/.

107.   To engage in this extremely profitable, but illegal business, the Non-Tribal Defendants, including the deliberately concealed John Doe Defendants, have entered into agreements with the Tribe, the Tribal Council Defendants, Spotloan, and the Tribe's economic development corporation and others to make and collect on usurious loans in states across the country, including in North Carolina, and to keep their identity hidden from consumers and regulators.

108.   For example, as indicated by the prior domain ownership, non-tribal entities are the true operators of Spotloan's website, which is the sole avenue through which Spotloan accepts applications for, issues, and services its usurious loans.

109.   Defendant Spratt—a non-tribal member—is the CEO of Mikinok Enterprises, the owner of Spotloan, and thus directs and operates Spotloan's lending business, including, upon information and belief, through servicing and loan agreements entered between he, RCOF, R&R, and tribal representatives on similar terms to those outlined above with respect to the LVD lending enterprises.

110.   Upon information and belief, Defendants RCOF and R&R have provided most of the funding for Spotloan's operations and, in return, have entered into loan agreements that provided them with a security interest in all Spotloan's assets and grant them near complete control over Spotloan's operations.

111.   Upon information and belief, the Non-Tribal Defendants are also the primary—if not sole—source of funds for Spotloan's operations, and they produce all the leads for Spotloan; manage the technology and call centers that issue and service Spotloan's loans; collect payments on the loans; and sell off nonperforming debts.

29

112.     In return for their central role in Spotloan's ostensibly "tribal" lending business, the Non-Tribal Defendants reap nearly all of the benefits from the lending scheme, raking in, upon information and belief, millions of dollars a year from the triple-digit loans issued by Spotloan and other lending entities under their control to hundreds of thousands of low-income borrowers across the United States.

113.     Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

114.     Indeed, Spotloan's website states that it no longer offers loans in several jurisdictions, including Connecticut, Illinois, Maryland, New York, Virginia, Vermont, and West Virginia, each of which correlate to jurisdictions in which state attorneys general or private class actions have challenged tribal lending schemes.

115.     Spotloan and the Tribe have also been identified for illegal conduct by state regulators, including, for example, the Washington State Department of Financial Institutions, which issued a notice in December 2024 that the Tribe "may be operating as an online tribal lender," Spotloan, and that Spotloan and the Tribe "are not licensed by DFI and are not registered to conduct business in [Washington]."[13]

116.     Additionally, each of Defendants is aware that many consumers have complained about the abusive lending practices used by Spotloan and other tribal lenders.

---

[13] https://dfi.wa.gov/consumer/alerts/turtle-mountain-band-chippewa-tribe-not-licensed-washington-state.

117. For example, Defendants have received consumer complaints on Spotloan's Better Business Bureau profile that have cited Spotloan's practice of charging high interest on small-dollar loans.

118. Indicative of Defendants' knowledge of their unlawful conduct, the Non-Tribal Defendants have also taken steps to actively conceal their management structure and involvement in the Spotloan lending scheme. For example, since publicly starting spotloan.com under non-tribal ownership, the ownership of spotloan.com is now concealed behind a domain proxy service.

119. Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee and operate Spotloan to facilitate the issuance of high-interest, triple-digit loans that violate usury laws across the country.

120. Upon information and belief, Spotloan and other lending entities chartered by the Tribe operate under the oversight of the Tribal Council Defendants, without whose approval and legal sanction Spotloan could not operate.

121. The Tribal Council Defendants continue to facilitate the illegal lending scheme by allowing Spotloan to make and collect on usurious and void loans in multiple jurisdictions, including North Carolina.

122. Upon information and belief, none of the Defendants have applied for a consumer lending license any state with such laws.

123. Spotloan's website includes the following disclaimer:

Spotloan is a brand owned by BlueChip Financial ("BlueChip"), a tribally-owned entity organized under and governed by the laws of the Turtle Mountain Band of Chippewa Indians of North Dakota, a federally recognized

31

Indian tribe (the "Tribe"). BlueChip is located on, operates within, and originates and services loans from the Tribe's reservation. Though Spotloans are available to residents of certain states, consumers should know that BlueChip's lending license is issued by the Tribe's Lending Commission, and not by the states in which its consumers may reside. Although the visitation is electronic, consumers are coming on to the Tribe's reservation and subject to the Tribe's jurisdiction to obtain a Spotloan.

124.    Despite these representations, Plaintiffs are unable to locate any information regarding Spotloan's operations within the Tribe's reservation.

125.    Defendants' attempts to evade state usury protections also extend to the form Spotloan's consumer loan agreements, which prospectively waive the application of all state laws, including those that could challenge the application of the Tribe's laws under the choice-of-law provision, stating, *inter alia*, that "the laws of the Tribe will apply rather than the laws of [the borrower's] state or any other state" and explicitly states that only the law of the Tribe and federal law shall govern the agreement.

126.    As such, the form agreements purport to strip consumers like Plaintiffs of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including North Carolina, which have a long and robust history of precluding usurious lending operations like Spotloan's that burden their citizens with insurmountable debts.

127.    Further, the consumer loan agreement includes an arbitration provision that explicitly states that the arbitrator may award only remedies provided under tribal or federal law, without any right to seek remedies under state law.

128.    Thus, under the terms of their loan agreements, the putative class members prospectively waive any and all rights and remedies available to them under state law,

32

which violates the prospective waiver doctrine and nullifies the arbitration and choice-of-law provisions.

129.   Upon information and belief, the loan contracts issued to all putative class members by Spotloan were substantively identical and all included the same unlawful prospective waiver of the class members' state and federal rights.

**E.    Plaintiffs' Experience.**

130.   Taking advantage of the ostensible protections created by the tribal business model, upon information and belief, the interest rates charged on the loans issued to the putative class members were far more than twice the allowable interest rate permitted by state usury and licensing laws in Plaintiffs' and the class members' respective states of residence.

131.   For example, from his home in North Carolina, Plaintiff Michael Goetting applied for an obtained two loans from Spotloan for $1,500 and $600 respectively, which had a minimum interest rate of 378%, far exceeding North Carolina's 8-percent interest rate cap.  Mr. Goetting paid over $1,000 on the first loan and $500 on the second from his bank account maintained in North Carolina.

132.   From her home in North Carolina, Plaintiff Kimberly Webb applied for an obtained two loans from Spotloan in June 2022 and 2023 for $800 and $400, respectively, which had a minimum interest rate of 490%, far exceeding North Carolina's 8-percent interest rate cap.  Ms. Webb paid back more than she borrowed on these loans from her bank account maintained in North Carolina.

133.    From her home in Indiana, Plaintiff Terri Edgell applied for an obtained eleven loans from Spotloan between 2015 and 2024, which had a minimum interest rate of more than 100%, far exceeding Indiana's 36-percent interest rate cap.  Ms. Edgell paid back more than she borrowed on at least ten of these loans from her bank account maintained in Indiana.

134.    From her home in Georgia, Plaintiff Kimberly Childs applied for an obtained a loan from Spotloan in December 2023 for $800, which had an interest rate of 490%, far exceeding Georgia's 8-percent interest rate cap.  Ms. Childs paid back more than $2,000 on this loan from her bank account maintained in Georgia.

135.    Upon information and belief, none of the Defendants, nor the Tribe, the Tribal Council Defendants, or Spotloan has ever obtained a license to issue loans to consumers in any state, including North Carolina, let alone a license to issue the triple-digit interest loans to Plaintiffs and the putative class members.

136.    Plaintiffs and the putative class members applied for their loans on the internet while located in their respective states of residence. Upon information and belief, none of them ever traveled to the Tribe's reservation to obtain their loans.

137.    Plaintiffs and the putative class members all used their home addresses when applying for the loans, and they used bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits used to pay down the loans.

138.    As outlined above, the loans issued to Plaintiff and the putative class members violated the respective usury statutes of each of their home states and entitle Plaintiff and the class to the remedies provided under those states' laws, including

34

avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.[14]

139. Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and

---

[14] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiff.

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES)**

140.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

141.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loan.

Plaintiffs Webb, Edgell, and Childs are each a member of this class.

142.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

36

143. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

144. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

145. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

146.    Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3), and are being sued in their individual capacities.

147.    The Tribal Council Defendants, along with the Non-Tribal Defendants, Tribe and others, were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

148.    The Usurious Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

149.    The members and associates of the Usurious Lending Organization shared various common purposes, including the evasion of state usury and licensing law, the operation of the "Spotloan" website, the processing of applications from consumers across the United States, the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

150.    The Usurious Lending Organization assigned specific roles to the members and associates. The Non-Tribal Defendants designed and directed the Organization and distributed the revenues generated in accordance with the said written agreements.  The role of the Tribal Council Defendants was primarily to establish and organize the tribal façade for the Organization and to take various measures designed to reinforce the fiction that the Organization is a tribal-run business.

151.    The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

38

152. The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce. The Tribal Council Defendants perform their roles from the tribal lands in North Dakota but the Non-Tribal Defendants who are operating the Organization do so, upon information and belief, from locations in other states, including California. The Organization sends loan proceeds into and collects payments from locations throughout the United States.

153. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

154. Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the respective Enterprises' affairs in the collection of unlawful debt.

155. All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

156. As alleged, each of Defendants participated in the collection of unlawful debt.

157. Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Usurious Lending Enterprise, which money transfers would not have been made but for Defendants' conduct.

39

158.    Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL
## CAPACITIES)

159.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

160.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of the RICO Class defined in Count One.

161.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

162.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew

of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

163. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

164. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

165. Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(c).

166. Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

167. Plaintiffs and the RICO Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

41

168.    Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the respective Class Members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES)**

169.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

170.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs brings this claim for themselves and on behalf of the RICO Class defined in Count One.

171.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Webb also brings this claim for herself and the following subclass—the "North Carolina Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from North Carolina, and (3) repaid more than the principal balance of the loans.

Plaintiff Webb is a member of this subclass.

172.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Edgell also brings this claim for herself and the following subclass—the "Indiana Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Indiana, and (3) repaid more than the principal balance of the loans.

Plaintiff Edgell is a member of this subclass.

42

173.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Childs also bring this claim for herself and the following subclass—the "Georgia Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Georgia, and (3) repaid more than the principal balance of the loans.

Plaintiff Childs is a member of this subclass.

174.     **Numerosity.** **Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

175.     **Predominance of Common Questions of Law and Fact.** **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

43

176. **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

177. **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

178. As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

179. Plaintiff and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

44

180.    Accordingly, on behalf of herself and the classes defined above, Plaintiffs

seek to recover from Defendants, jointly and severally, all amounts repaid on any loans

issued by Spotloan.

### COUNT FOUR
### NORTH CAROLINA CONSUMER FINANCE ACT, N.C. GEN. STAT. § 53-166 (CLASS CLAIM AGAINST THE NON-TRIBAL DEFENDANTS IN THEIR PERSONAL CAPACITIES AND THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)

181.    Plaintiffs reallege and incorporates by reference the allegations set forth in

the preceding paragraphs.

182.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs

Goetting and Webb bring this claim for themselves and the following class—the "North

Carolina Injunctive Class"—and against the Non-Tribal Defendants in their individual

capacities and the Tribal Council Defendants in their official capacities, initially defined

as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from North Carolina, and (3) with an outstanding balance on their loan.

Plaintiffs Goetting and Webb are each a member of this class.

183.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief,

Plaintiffs allege that the class members are so numerous that joinder of all is impractical.

The names and addresses of the class members are identifiable through the internal

business records maintained by Spotloan and Defendants, and the class members may be

notified of the pendency of this action by published and/or mailed notice.

45

184.     **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether Defendants engaged in the offering, arranging, and making of loans of $25,000 or less to North Carolina consumers; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Defendants had licenses to issue loans to North Carolina consumers; and (4) the propriety of injunctive relief for Plaintiffs and the class members against each of Defendants.

185.     **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs Goetting's and Webb's claims are typical of the claims of each putative class member.  In addition, Plaintiffs Goetting and Webb are each entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

186.     **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs Goetting and Webb are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs Goetting and Webb and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs Goetting or Webb nor their counsel have any interests which might cause them to not vigorously pursue this action.

46

187.    Defendants have engaged in the business of lending or servicing loans in amounts of $25,000 or less, and have contracted for, exacted, and received—both directly and indirectly through their control of Spotloan—in connection with such loans charges in excess of those permitted by Chapter 24 of the General Statutes.

188.    Defendants have also issued loans of $25,000 or less to Plaintiffs Goetting and Webb and the North Carolina Injunctive Class members without first having obtained a licensed from the Commissioner of Banks.

189.    At all times relevant to this Complaint, Defendants have not conducted business under the authority of any law of North Carolina or of the United States related to banks, trust companies, savings and loan associations, cooperative credit unions, agricultural credit corporations or associations organized under the laws of North Carolina, production credit associations organized under the Farm Credit Act of 1933, pawnbrokers, industrial banks, real estate lenders, or installment papers defined in G.S. 105-83.

190.    Defendants' conduct constitutes a violation of N.C. Gen. Stat. § 53-166(a) such that the loans issued to the class members are void under § 53-166(d) and Defendants are further prohibited from "collect[ing], receiv[ing], or retain[ing] any principal or charges whatsoever with respect to the loan[s]."

191.    Accordingly, Plaintiffs Goetting and Webb and the North Carolina Injunctive Class are entitled to an injunction prohibiting the further collection and receipt of any amounts on their loans by Defendants, as well as restitution of the same.

**GEORGIA PAYDAY LENDING ACT, O.C.G.A. §§ 16-17-2, 16-17-3**
**(CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL**
**CAPACITIES FOR DAMAGES AND AGAINST THE NON-TRIBAL**
**DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES AND THE TRIBAL**
**COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR**
**INJUNCTIVE RELIEF)**

192.    Plaintiffs reallege and incorporates by reference the allegations set forth in the preceding paragraphs.

193.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Childs brings this claim for herself and the following class—the "Georgia Damages Class"—and against all Defendants in their individual capacities for damages, initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Georgia, and (3) repaid more than the principal balance of the loans.

Plaintiff Childs is a member of this class.

194.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Childs also brings this claim for herself and the following class—the "Georgia Injunctive Relief Class"—and against the Non-Tribal Defendants in their individual capacities and the Tribal Council Defendants in their official capacities for injunctive relief, initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Georgia, and (3) with an outstanding balance of their loans.

Plaintiff Childs is a member of this class.

195.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal

48

business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

196. **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether Defendants engaged in the offering, arranging, and making of loans of $3,000 or less to Georgia consumers; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Defendants are chartered banks, trusts, thrifts, or credit unions exempt from the Georgia Payday Lending Act; (4) the nature of the loans issued to Plaintiff Childs and the class members; (5) whether Defendants had licenses to issue loans to Georgia consumers; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

197. **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiff Childs's claims are typical of the claims of each putative class member. In addition, Plaintiff Childs is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

198. **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiff Childs is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff Childs and her counsel will fairly and

49

adequately protect the interests of the members of the class. Neither Plaintiff Childs nor her counsel have any interests which might cause them to not vigorously pursue this action.

199. Defendants have each engaged in a business transacted through at least mail, electronic, and internet means which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less.

200. Defendants are not chartered banks, trusts, thrifts, or credit unions subject to Chapter 1 of Title 7 of the Georgia Code, nor laws regulating state and federally chartered credit unions. Defendants are not insured by the Federal Deposit Insurance Corporation.

201. The subject loans issued to Ms. Childs and the class were not residential mortgages, open-credit plans, retail installment loans, motor vehicle finance loans, pawnbroker loans, or loans issued in anticipation of a tax refund. Moreover, the simple interest of the loans exceeded 16 percent per annum.

202. Neither Defendants nor Spotloan, nor any other coconspirators in the Usurious Lending Organization, obtained a license under the Georgia Industrial Loans Act or any other relevant provision of Georgia law.

203. Despite their lack of a license, Defendants, through their control of Spotloan, issued loans to Plaintiff Childs and the relevant class members of less than $3,000 each.

204. Defendants conduct constitutes a violation of O.C.G.A. § 16-17-2(a) that entitles Plaintiff Childs and the Georgia Damages Class to three times the amount of any interest or other charges paid by each of them, as well as their costs and attorneys' fees, under O.C.G.A. § 16-17-3.

205.    Plaintiff Childs and the Georgia Injunctive Class are further entitled to injunctive relief barring Defendants from collecting any indebtedness created by the relevant loan transactions under § 16-7-3.  *See Western Sky Financial, LLC v. State ex rel. Olens*, 300 Ga. 340, 367-68 (2016).

**COUNT SIX**
**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**
**(CLASS CLAIM AGAINST THE NON-TRIBAL DFEFENDANTS IN THEIR INDIVIDUAL CAPACITIES AND THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

206.    Plaintiffs reallege and incorporates by reference the allegations set forth in the preceding paragraphs.

207.    Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

208.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Goetting, Webb, and Childs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

Plaintiffs Goetting, Webb, and Childs are each a member of this class.

209.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Goetting and Webb also bring this claim for themselves and the following subclass—the "North Carolina Void Debt Subclass"—initially defined as:

51

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from North Carolina, and (3) have an outstanding balance on their loan.

Plaintiffs Goetting and Webb are each a member of this subclass.

210.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Childs also brings this claim for herself and the following subclass—the "Georgia Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Georgia, and (3) have an outstanding balance on their loan.

Plaintiff Childs is a member of this subclass.

211.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

212.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious and/or made without a license under the respective state laws governing the loans; (4) whether the loans are void under the respective state laws governing the loans; and (5) whether Plaintiffs are entitled to declaratory relief.

213.  **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

214.  **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

215.  Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

216.  None of the Defendants, nor Spotloan, were licensed to make loans in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

217.  Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

218. Plaintiffs and members of the classes are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

219. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

220. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

221. Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are void and invalid and the loans of the Void Debt Class and subclass members are uncollectable. Plaintiffs also seek to enjoin the Tribal Council Defendants, in their official capacity, from allowing collection on the loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged

herein;

D.     An Order declaring the loans issued to the Void Debt Class and Void Debt Subclasses to be void and unenforceable;

E.     An Order providing for any and all injunctive relief the Court deems appropriate;

F.     An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

G.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

H.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I.     An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

J.     Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Rashad Blossom*
Rashad Blossom (State Bar No. 45621)
**Blossom Law, PLLC**
126 N. McDowell St.

55

2nd Floor
Charlotte, NC 28204
rblossom@blossomlaw.com
*Local Rule 83.1(d) counsel for Plaintiff*

Kristi Cahoon Kelly*
Andrew J. Guzzo*
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Counsel for Plaintiff*

*\*Notice of Special Appearance forthcoming*