# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHAEL GOETTING, KIMBERLY WEBB,   :
TERRI EDGELL, and KIMBERLY CHILDS,   :
*on behalf of themselves and all*   :
*individuals similarly situated,*   :
  :
        Plaintiffs,   :
  :
v.   :   Civil Action 1:25-cv-794 (DAB/JLW)
  :
SAMUEL ADRIAN SPRATT, RCOFIII   :
SPEC-FIN CREDIT 1, LLC, R&R SPE LLC,   :
JAMIE AZURE, CRAIG LUNDAY,   :
KENNY MALATERRE, JON JON KEPLIN,   :
RON TROTTIER SR., ELMER   :
DAVIS JR., LYNN GOURNEAU, CHAD   :
COUNTS, BLAINE DAVIS,   :
and JOHN DOES Nos. 1-15,   :
  :
        Defendants.   :
_____:

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Michael Goetting, Kimberly Webb, Terri Edgell, and Kimberly Childs, *on behalf of themselves and all individuals similarly situated*, by counsel, and for their First Amended Class Action Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.    Five years ago, a federal court granted final approval a nationwide class settlement that created a common fund of $18.5 million and canceled $170 million dollars of illegal loans originated in the name of BlueChip Financial d/b/a Spotloan ("Spotloan"), which is an online lending company formed by the Turtle Mountain Band of Chippewa

Indians ("Tribe"). *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020). Just like this case, the *Turner* matter revolved around alleged violations of state usury laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which was expressly enacted to eradicate loan sharking. Despite this settlement, Spotloan has continued to originate new loans, which impose triple digit interest rates in blatant violation of state usury laws, such as those in North Carolina.

2.      By way of example, Spotloan issued loans to Plaintiffs Goetting and Webb— both residents of North Carolina—with interest rates of 378% and 490%, respectively. These interest rates are more than 47 times North Carolina's 8-percent interest-rate cap and more than 23 times North Carolina's cap for payday loans of 16%. N.C. Gen. Stat. § 24-1, 24-1-1(c). These loans not only violate North Carolina's usury laws, but over the last two decades, the Court of Appeals of North Carolina "has consistently held defendants who offer usurious loans to residents of North Carolina commit unfair and deceptive trade practices as a matter of law." *Wall v. Automoney, Inc.*, 284 N.C. App. 514, 527 (2022).

3.      Spotloan's illegal lending activities have been extremely profitable. In a declaration submitted in this case, the Tribe's chairman, Defendant Jaime Azure, asserted that Spotloan returned $46 million in 2024 to the Tribe. Doc. 27 at ¶ 13. Although these profits benefit programs for a federally recognized tribe (and non-tribal outsiders), the Tribe's effort to advance themselves exploit desperately poor people in other communities like North Carolina, which has enacted a statute that expressly states "[i]t is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1(g) (2021).

2

4.      Because of the possibility that a court might find that Spotloan is an arm of the Tribe, Plaintiffs commenced this case against multiple individuals and *non-tribal* entities who oversee, run, and control Spotloan.

5.      One set of these defendants comprises members of the Tribal Council, which is the Tribe's governing body. In particular, Defendants Jamie Azure, Craig Lunday, Kenny Malaterre, Jon Jon Keplin, Ron Trottier Sr., Elmer Davis Jr., Lynn Gourneau, Chad Counts, and Blaine Davis (collectively, the "Tribal Council Defendants") are members of the Tribe's Tribal Council and are sued here in their individual and official capacities, as outlined below.  The Tribe's Constitution established the Council as the Tribe's "governing body" with the power to, in relevant part to: "engage in any business that will further the economic well-being of the members of the tribe, or to undertake any programs or projects designed for the economic advancement of the people"; and "make and perform contracts and agreements of every description . . . ."  Tribe Const. art. IX.[1]  Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Council Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe—even though they have essentially delegated the management of Spotloan to non-tribal individuals, including Defendant Samuel Spratt, who is the chief executive officer of Spotloan. Doc. 26 at ¶ 17.

6.      In his capacity chief executive officer, Spratt is responsible for the day-to-day management and operations of Spotloan. In this capacity, Spratt has input, oversight, and responsibility over all of Spotloan's operations and policies, including loan

---

[1] https://law.tmchippewa.com/us/nsn/tmchippewa/council/constitution.

originations, marketing, funding, interest rate policies, and collections. Although Spratt manages the day-to-day operations of Spotloan, Spratt is admittedly and "ultimately" "subject to control" of the Tribal Council Defendants. Doc. 25 at pg. 14.

7.     The final set of Defendants in this case are two companies named RCOFIII Spec-Fin Credit 1 LLC ("RCOF"), and R&R SPE, LLC ("R&R"). RCOF and R&R are named as defendants in this case because they *knowingly* provide the capital used by Spotloan to make its illegal loans. With full knowledge of the impending use of the money in the usurious lending scheme, RCOF and R&R have provided millions of dollars to Spotloan to be used as the capital to make its illegal loans. As one court has explained, "[w]ithout a doubt, the capital buttressing a lending operation proves at least as essential to that operation as the day-to-day managers who direct the issuing and collecting of loans." *Blackburn v. A.C. Israel Enters.*, 2023 WL 4710884, at *18 (E.D. Va. July 24, 2023); *see also Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 932 (E.D. Va. 2019) ("without funding, the enterprise could not continue to grow its business or issue loans."). And just like the other Defendants, RCOF and R&R have handsomely profited from their backing of the illegal lending scheme, including payment of "approximately $6 million in interest and finance charges" paid to R&R <u>in 2024 alone</u>. Doc. 30 at ¶ 17.

8.     This lawsuit challenges the legality of the loans originated in the name of Spotloan, as well as the Defendants' liability for the same. Because of the possibility that a court might find that Spotloan is an arm of the Tribe (and, thus, immune from any lawsuit), Plaintiffs seek prospective relief against the Tribal Council Defendants in their official capacities to enjoin their ongoing violations of state law. The Tribal Council

4

Defendants—who admittedly control Spotloan according to their own submission—are the proper party for this claim because "tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014).

9.      In addition, Plaintiffs seek monetary damages against the Tribal Council Defendants, Spratt, RCOF, and R&R for violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. One of the express purposes of RICO was to eliminate loan sharking in its various forms. Pub. L. 91–452, § 1; *see also United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) ("The elimination of loansharking was one of Congress' principal aims in enacting the statute."). To accomplish this goal, RICO prohibits a person from participating in the affairs of an enterprise engaged in the collection of "unlawful debt," which is defined as a debt "where the usurious rate is at least twice the enforceable rate" under state or federal law.  18 U.S.C. § 1961(6). As detailed above, Spotloan's lending easily meets this definition as its loans are often 50 times higher than the enforceable rate.

10.      Plaintiffs Goetting and Webb also seek monetary damages against each Defendant for their violations of North Carolina's Unfair and Deceptive Trade Practices Act. As explained above, the Court of Appeals of North Carolina "has consistently held defendants who offer usurious loans to residents of North Carolina commit unfair and deceptive trade practices as a matter of law." *Wall*, 284 N.C. App. at 527. Defendants have not only participated in a scheme to offer usurious loans to residents of North Carolina, but those loans contain unfair and deceptive statements regarding the loans, such as

5

representation in the loan agreements that "**the laws of the Tribe will apply rather than the laws of your state or any other state**." Doc. 30-1 at. pg. 7 (emphasis in original). This is a misrepresentation because North Carolina law provides that "any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, or if such borrower accepts or makes the offer in this State to borrow." N.C. Gen. Stat. Ann. § 24-2.1. Based on the plain language of this statute, North Carolina courts have repeatedly rejected efforts to avoid application of North Carolina's usury laws. *Wall*, 284 N.C. App. at 528 ("Plaintiffs have alleged sufficient facts to show Plaintiffs' loan contracts are subject to the application of North Carolina usury law, to enforce the choice-of-law provision would violate the stated public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina usury laws.").

## <u>JURISDICTION</u>

11.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

6

13.     The Court also has personal jurisdiction over Defendants with respect to the claims of Plaintiffs Webb and Goetting because they have conducted business in this District and Division, including the issuance of the high-interest payday loans that gave rise to Plaintiffs' claims. They are also part of a usurious lending conspiracy that makes illegal loans over the internet to borrowers in North Carolina.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in North Carolina, including in this District and Division, where Mr. Goetting and Ms. Webb reside and applied for, obtained, and received the funds for the loan giving rise to her claims, and where the some of the activities of the alleged RICO enterprise occurred.

15.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Defendants transacted their affairs in North Carolina through their participation in a conspiracy and a lending enterprise targeting North Carolina consumers. In the alternative, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are residents of different states and there is no single district where this action could otherwise be brought.

## PARTIES

16.     Plaintiff Michael Goetting is a natural person and resident of Kannapolis, North Carolina.

17.     Plaintiff Kimberly Webb is a natural person and resident of Greensboro, North Carolina.

18.     Plaintiff Terri Edgell is a natural person and resident of Indiana.

7

19.     Plaintiff Kimberly Childs is a natural person and resident of Georgia.

20.     Defendant Samuel Adrian Spratt is a natural person and resident of California.  He is the CEO of Mikinok Enterprises, which also goes by the name BlueChip Financial—the entity that owns and operates Spotloan.  As detailed below, Mr. Spratt personally participated in and oversaw the illegal lending enterprise alleged herein, rendering him personally liable.

21.     Defendant R&R SPE, LLC ("R&R") is a Delaware limited liability company based in Texas. As detailed in Spratt's declaration, Spotloan has "a credit facility" with R&R, which is a type of loan agreement that allows Spotloan to borrow funds from R&R on an ongoing basis, up to a set limit, without reapplying each time. With full knowledge of the impending use of the money in the usurious lending scheme, R&R has provided millions of dollars to Spotloan to be used as the capital to make its illegal loans. In return for its funding of the loans, R&R makes millions of dollars a year, including "approximately $6 million in interest and finance charges" paid to R&R in 2024 alone. Doc. 30 at ¶ 17.

22.     Defendant RCOFIII Spec-Fin Credit 1, LLC ("RCOF") is a Delaware limited liability company based in South Carolina. Similar to R&R, Spotloan has a credit agreement with RCOF, which allows Spotloan to borrow funds from RCOF on an ongoing basis, up to a set limit, without reapplying each time. With full knowledge of the impending use of the money in the usurious lending scheme, RCOF has provided millions of dollars to Spotloan to be used as the capital to make its illegal loans.

8

23.     Defendant Jamie Azure is a natural person residing in North Dakota.  He is the chairperson of the Tribal Council.  Both as chairperson and a general member of the Council, Defendant Azure's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Azure meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Azure only in his individual capacity.

24.     Defendant Craig Lunday is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Lunday's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Lunday meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Lunday only in his individual capacity.

25.     Defendant Kenny Malaterre is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Malaterre's duties include the chartering and oversight of Spotloan and the other lending operations

9

chartered by the Tribe. In performing these duties, Defendant Malaterre meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Malaterre only in his individual capacity.

26.   Defendant Jon Jon Keplin is a natural person residing in North Dakota. He is a member of the Tribal Council. As a member of the Council, Defendant Keplin's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe. In performing these duties, Defendant Keplin meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Keplin only in his individual capacity.

27.   Defendant Ron Trottier Sr. is a natural person residing in North Dakota. He is a member of the Tribal Council. As a member of the Council, Defendant Trottier's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe. In performing these duties, Defendant Trottier meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval

of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Trottier only in his individual capacity.

28.     Defendant Elmer Davis Jr. is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Davis's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Davis meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiffs seek monetary damages against Defendant Davis only in his individual capacity.

29.     Defendant Lynn Gourneau is a natural person residing in North Dakota.  He is a member of the Tribal Council.  As a member of the Council, Defendant Gourneau's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe.  In performing these duties, Defendant Gourneau meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal

coconspirators. Plaintiffs seek monetary damages against Defendant Gourneau only in his individual capacity.

30. Defendant Chad Counts is a natural person residing in North Dakota. He is a member of the Tribal Council. As a member of the Council, Defendant Counts' duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe. In performing these duties, Defendant Counts meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Counts only in his individual capacity.

31. Defendant Blaine Davis is a natural person residing in North Dakota. He is a member of the Tribal Council. As a member of the Council, Defendant Davis's duties include the chartering and oversight of Spotloan and the other lending operations chartered by the Tribe. In performing these duties, Defendant Davis meets monthly with other members of the Council to review, perform, and implement high-level management of the Spotloan and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek monetary damages against Defendant Davis only in his individual capacity.

32. The John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue

12

from the Fineday enterprise. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL BACKGROUND

**A. State usury and licensing laws protect consumers from usurious loans.**

33. "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

34. Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including North Carolina and Georgia, *i.e.*, the home states of Plaintiffs from which they each applied for, received, and made payments on their Spotloan loans.

### i. North Carolina

35. In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

36. Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

Case 1:25-cv-00794-DAB-JGM    Document 52    Filed 03/11/26    Page 13 of 69

37.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest.  N.C. Gen. Stat. § 24-2.  If the interest has been paid, the borrower may recover twice the amount of interest paid.  *Id.*

38.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner.  N.C. Gen. Stat. §§ 53-166(a), 53-168.

39.     Unlicensed venders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor.  N.C. Gen. Stat. § 53-166(c).  Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan."  *Id.* § 53-166(d).

40.     Defendants were never licensed to make consumer loans in North Carolina.

**ii.     Indiana**

41.     "Indiana's first usury statutes were passed before the turn of the 20th century, and they were replaced by the [Indiana Uniform Consumer Credit Code (IUCCC)] in 1971."  *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009).

42.     Under the IUCCC, loans under $2,000 may include an interest rate of no more than 36%, and even then, such rate applies only if the loan is a "supervised loan," meaning that the lender of the loan is licensed under Indiana law to issue loans with interest in excess of 25% per year.  Ind. Code §§ 24-4.5-3-501, 24-4.5-3-502, 24-4.5-3-508.

14

43.     Indiana requires any "person" who "regularly engage[s]" in the "making of consumer loans" or "the direct collection of payments from or the enforcement of rights against debtors arising from consumer loans" to obtain a license under the IUCCC.  Ind. Code § 24-4.5-3-502(3).  A separate license is required for "each legal entity" that engages in the prescribed activities.  § 24-4.5-3-502(4).

44.     Neither Defendants, nor Spotloan, were ever licensed to make consumer loans in Indiana or to collect on those loans, as required by the IUCCC.

45.     For non-supervised loans, Indiana law limits the interest rate to no more than 25% per year on the unpaid principal balance of the loan.  Ind. Code § 24-4.5-3.201.

46.     For non-supervised loans that violate any provision of the Indiana Uniform Commercial Credit Code, moreover, "the loan is void and the debtor is not obligated to pay either the principal or loan finance charge."  Ind. Code § 24-4.5-5-202(2).  "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt."  *Id.*

47.     "Person" under the IUCCC "includes an individual or an organization."  Ind. Code § 24-4.5-1.-301.5(33).

48.     Indiana law also entitles debtors to "a refund" of "any charge in excess of that allowed by [the IUCCC]."  Ind. Code § 24-4.5-5-202(3).  Any person who fails to make a refund within a reasonable time after a demand for such refund is also assessed a

15

penalty "not exceeding the greater of the either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge."  § 24-4.5-5-202(4).

49.    Debtors are further entitled to their "reasonable attorney's fees incurred" to enforce a violation of the IUCCC.  § 24-4.5-5-202(8).  And any amounts to which the debtor is entitled under the Act "may be set off against the debtor's obligation."  § 24-4.5-5-205.

50.    A knowing violation of the Act, including the knowing issuance of loans without a license, constitutes a Class A misdemeanor.  Ind. Code § 24-4.5-5.301.  Any "person" who knowingly "engages in the business of making . . . consumer loans" and "undertakes the direct collection of payments or enforcement of these rights" without abiding by the Act's notification requirement or limitations on fees also commits a "Class A infraction."  *Id.*  And Indiana law criminalizes knowingly issuing of loans above 72% interest, which constitutes loansharking, a Level 6 felony in the state.  Ind. Code § 35-45-7-2.

51.    Indiana's lending and usury protections are a part of Indiana's clearly delineated public policy against usurious loans and predatory lending.

52.    It is unsurprising that so many states have enacted laws similar to Indiana's because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

53.     "Indiana's first usury statutes were passed before the turn of the 20th century. *Payday Today*, 903 N.E.2d at 1061. And Indiana's Small Loans Act was enacted in 2002 to specifically respond to the growth of predatory payday lenders like Spotloan. *Id.*

### iii.     Georgia

54.     Short-term loans of $3,000 or less fall under the Georgia Industrial Loan Act, Ga. Code §§ 7-3-1, *et seq.*

55.     The purpose of the Georgia Industrial Loan Act is "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (Ga. 2012).

56.     Unless expressly exempted by the terms of the Act, a lender must obtain a license from the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding 8%. Ga. Code Ann. §§ 7-3-5, 7-3-6, 7-3-8.

57.     Pursuant to Georgia Code § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Act] by such person shall be null and void."

58.     Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate exceeding 8% unless licensed to make such loans under the Industrial Loan Act or other laws regulating financial institutions. *See* Ga. Code Ann. §§ 16-17-1, *et seq.*

59.     A lender who violates the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be

17

punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both."  Ga. Code Ann. § 16-17-2(d).

60.     The Payday Lending Act further bars any lender of an unlawful loan from collecting any indebtedness and declares the loan "void ab initio."  Ga. Code Ann. § 16-17-3.

### iv.     Other State Usury Laws

61.     Each state of residence of the putative class members in the below class definitions also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[2]

---

[2] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ariz. Rev. Stat. Ann. § 44-1201-1204; Ark. Const. Art. XIX § 13; Cal. Civ. Code §§ 1916-2, 1916-3; Cal. Fin. Code §§ 22750, 22753, 22780; Colo. Rev. Stat. §§ 5-2-201, 5-5-201; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.904, 516.02; O.C.G.A. §§ 7-3-1, et seq.; O.C.G.A. § 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009); Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.J. Code §§ 31:1-1, 31:1-3; N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1); S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

**B.     Overview of the Tribal Lending Business Model.**

62.     Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

63.     Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[3] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

64.     Over the past two decades, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

---

[3] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

19

65.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

66.     Over the years, payday lenders have used various schemes to evade applicable state and federal protections.  In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally granted power to make loans exceeding state usury rates.  Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fess without assuming much, if any, financial risk for the lending.

67.     Because banks are insulated from state examination and regulation by virtue of federal bank preemption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like North Carolina, payday lending is illegal.  However, beginning in 2005, the Federal Deposit and Insurance Corporation began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders.  *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

68.     As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[4] the shadow payday loan industry turned to Native American tribes to

---

[4] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that

replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers.

69. Under this new "rent-a-tribe" model, the leadership of an economically impoverished tribe would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered. In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[5]

70. For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

---

rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

[5] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

71.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

72.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

73.     Often at the table were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

74.     Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received only a nominal amount of the proceeds from the loans.

75.     Upon information and belief, Rosette has represented the Tribe, including in the creation and implementation of its lending activities.

76.     To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights.   Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

22

77. Another central feature of the tribal business model are typically structured to include an express or effective waiver of state and/or federal rights, in favor of tribal law. That way, the participants running the scheme can claim that they have no liability for their violations of state or federal laws because the loan agreements waive the application of such laws.

78. Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

79. Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[6]

80. During the last decade, federal and state law enforcement agencies have also taken various actions to combat tribal lending schemes, including by example:

   a. In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had

---

[6] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

23

used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 2017 of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[7] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[8]

b.      The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

81.      In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470,

---

[7] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[8] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

82.     One of these cases specifically revolved around Spotloan and its illegal lending practices. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million).

83.     Despite all the litigation and enforcement efforts, including a class action specifically related to Spotloan's illegal lending practices, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

## C.     The Basic Structure of the Tribal Lending Model.

84.     The tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

85.    This is accomplished primarily through a document dubiously labeled a "servicing agreement."

86.    By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

87.    Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.

88.    By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

89.    Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

90.    Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

91.    The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5.1.

92.    As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that

26

all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶ 3.

93.     This declaration further stated that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. ¶ 4.

94.     By way of another example, the Rosette law firm also used this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

95.     Pursuant to a "Services Agreement" between NPA and Silver Cloud, one of Upper Lake's lending entities, NPA agreed to provide essentially all services to set up and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 3 at 2264–65.

96. Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

97. Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 4 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

98. The participation model, in other words, entitled NPA and its affiliated companies to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

99. The Rosette law firm also set up the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 5.

100. In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

101. Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8)

servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 6.

102.    According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

103.    Upon information and belief, the Rosette firm has represented the Tribe, including in its internet lending endeavors, to establish a nearly identical tribal lending model in this case.

**D.    The Tribe's Usurious Lending Enterprise.**

**i.    Defendants and Others Constitute an Association-in-Fact Enterprise.**

104.    Defendants are a group of people and legal entities working together for the common purpose of collecting usurious debt.

105.    The common purpose and goal of their association is to make money for—themselves or their communities—through the making and collection of unenforceable and usurious loans through the tribal lending scheme.

106.    Defendants have associated with each other and other nonparties from the common purpose of exploiting tribal sovereignty to engage in the practice of issuing millions of dollars of otherwise illegal loans.

29

107.    Defendants not only share a common purpose of making and collecting usurious loans, but they have coordinated their efforts, including through the operation of the Spotloan website, the processing of applications from consumers across the United States, the collection of payments from borrowers, and the division of revenues in accordance with written agreements.

108.    Defendants RCOF and R&R have also provided the necessary funding for the issuance of the payday loans, without which none of the loans could have been issued to Plaintiffs or the putative class members.

109.    Defendants have coordinated their efforts and been involved with the creation and development of Spotloan's key policies and procedures, such as Spotloan's policy to make loans with interest rates between 99% (for returning customers) and as high as 490%.

110.    Defendants' coordination has been ongoing for years, since its inception in 2012.

111.    Defendants and other members of the enterprise also have connected and coordinated roles to carry out the usurious lending scheme.

112.    To begin, the Tribal Council Defendants serve as the Turtle Mountain Band of Chippewa Indians' governing body and, by virtue of their official roles, have the power to make laws and ordinances pursuant to the Tribe's Constitution.

113.    The Tribe's Constitution established the Council as the Tribe's "governing body" with the power to, in relevant part to: "engage in any business that will further the economic well-being of the members of the tribe, or to undertake any programs or projects

30

designed for the economic advancement of the people"; and "make and perform contracts and agreements of every description . . . ."  Tribe Const. art. IX.

114.   Consistent with this, all directors of Spotloan and its parent company must be appointed by the Tribal Council. Doc. 26 at ¶ 20. Tribal Council also has the "final decision regarding removal of that director." Doc. 26 at ¶ 20.

115.   Tribal Council also receives and reviews annual budget and business plans for "review and comment." Doc. 26 at ¶ 23.

116.   The Tribal Council also has authority over the charter and bylaws for Spotloan and its parent company, which cannot be amended without approval of the Tribal Council Defendants.

117.   Although claiming to be a wholly owned and operated instrumentality of the Tribe, Spotloan is in fact largely operated by, managed, and funded by the Non-Tribal and John Doe Defendants at off-reservation locations and through internet servers located far from the Tribe's reservation.

118.   Indeed, Spotloan operates in nearly every state in the United States and claims to have made over 1.8 million loans since its inception in 2012.[9]

---

[9] *See* Frequently Asked Questions, Spotloan, https://www.spotloan.com/faqs (last visited Aug. 5, 2025) ("Spotloans are currently available to residents of the following states: Alaska, Alabama, Arizona, California, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, North Carolina, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, Wisconsin, and Wyoming.").

119.    In 2024, alone, Spotloan had a net profit of more than $44 million dollars—all from its illegal lending activities.

120.    Yet, despite the apparent value of the Spotloan business that claims to be wholly owned and operated by the Tribe, the Tribe's own website does not identify Spotloan as part of its programs and departments, nor does it list any job opportunities related to Spotloan's business.[10]

121.    Thus, although the Tribal Council Defendants have the ultimate authority and control over Spotloan, they have delegated the day-to-day responsibility over operations to Spotloan's chief executive officer, Defendant Spratt.

122.    Spratt has been the chief executive officer of Spotloan since August 1, 2017, and, thus, has overseen Spotloan's operations from close to a decade.

123.    Spotloan has offices in California, Minnesota, and Georgia, and the managers and employees at each of these offices ultimately report to Spratt.

124.    As the chief executive officer of Spotloan, Spratt is the highest-ranking executive with responsibility over Spotloan's success, including its corporate policies, strategic direction, performance, profitability, and allocation of resources.

125.    Although the Tribal Council Defendants have the ultimate authority and control over Spotloan, Spratt is responsible for, coordinates, and makes the final decisions regarding Spotloan's marketing operations, including the maintenance and content of its

---

[10]    *See* Human Resources, Turtle Mountain Band of Chippewa Indians, https://tmchippewa.com/human-resources/ (last visited Aug. 5, 2025).

website, agreements with lead generation firms, and mail and email advertising to prospective and return customers.

126. Spratt is further responsible for, coordinates, and makes final decisions regarding Spotloan's policies and procedures, including its algorithms, for deciding whether and on what terms to issue loans to consumers, including Plaintiffs, based on pre-determined criteria. He is also responsible for the policies and procedures regarding the underwriting of the loans issued to Plaintiffs and the class members.

127. Spratt establishes the annual budget and revenue distributions for Spotloan, with input from and the approval of the Tribal Council Defendants, and determines the amounts distributed to the Tribe, himself, and investors, including RCOF and R&R and the John Doe Defendants.

128. Spratt also makes ultimate decisions regarding the hiring, retention, and termination of Spotloan employees, and he enters into agreements with third-party vendors for the provision of services necessary to the operation of Spotloan, including its call center operations, website, software programs, and office administration.

129. Spratt is instrumental in obtaining the financing for Spotloan's operations, including entering agreements with RCOF and R&R to provide a "credit facility" for Spotloan's operations. Doc. 26 at ¶ 30. A "credit facility" is an open-end, flexible loan agreement between Spotloan and RCOF/R&R that allows Spotloan to access capital over an extended period to finance its operations, including the loans issued to Plaintiffs and the class members.

130.     A credit facility often includes covenants and legal obligations that the borrower (here, Spotloan) must adhere to.

131.     Commonly in rent-a-tribe schemes such as this, the credit facility will be lucrative for those willing to back an illegal lending scheme.  As Spratt concedes, R&R entered such an arrangement here, under which Spotloan made $6 million in interest payments to R&R in 2024, alone.  Doc. 26 at ¶ 30.

132.     As part of their credit facility, based on similar arrangements in rent-a-tribe schemes, RCOF and R&R would also have the right under their credit facility agreements to: (1) access to the books and records for Spotloan; (2) access monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities.

133.     Upon information and belief, and based on similar structures in other rent-a-tribe schemes, RCOF and R&R, and their officers, agents, and employees, also attended and participated in board of director or similar management meetings with Spratt and other executives of Spotloan at which decisions were made regarding Spotloan's ongoing operations, including the origination, marketing, underwriting, servicing, and collection of the loans.

134.    RCOF and R&R were thus fully aware of the practices of Spotloan and knew that those practices violated the law.

135.    Indeed, RCOF and R&R were both aware of the 2020 nationwide settlement involving the same lending operation in *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020).   Despite this knowledge, they have maintained and expanded their investment in Spotloan and have further exercised control over Spotloan's operations.

136.    RCOF, R&R, and the other John Doe investors decided to invest in Spotloan knowing that their funds would be used to support its usurious lending activities, and they knowingly maintained and continued to increase their investments despite knowledge that their funds aided, abetted, and supported the issuance of usurious loans to thousands of consumers nationwide, including in North Carolina.

137.    In fact, RCOF, R&R, and the other John Doe investors intentionally invested in Spotloan ***because*** it was issuing loans that they knew would provide a higher rate of return due to the exorbitant interest rates, thus making their investment more profitable than if Spotloan were issuing loans in compliance with state usury and licensing laws.

138.    Each Defendant is aware of—and has been aware of for a decade or more— the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

139.    Indeed, each Defendant has been aware of the 2020 nationwide settlement involving the same lending operation—not to mention the multiple other rent-a-tribe cases that have resulted in countless rulings that the very practices at issue in this litigation are

35

unlawful. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020). Despite this knowledge, Defendants have continued to actively sanction, operate, fund, and manage the usurious lending scheme that has harmed Plaintiffs and thousands of other low- and middle-income consumers.

140. Spotloan's website also states that it no longer offers loans in several jurisdictions, including Connecticut, Illinois, Maryland, New York, Virginia, Vermont, and West Virginia, each of which correlate to jurisdictions in which state attorneys general or private class actions have challenged tribal lending schemes.

141. Spotloan and the Tribe have also been identified for illegal conduct by state regulators, including, for example, the Washington State Department of Financial Institutions, which issued a notice in December 2024 that the Tribe "may be operating as an online tribal lender," Spotloan, and that Spotloan and the Tribe "are not licensed by DFI and are not registered to conduct business in [Washington]."[11]

142. Additionally, each of Defendants is aware that many consumers have complained about the abusive lending practices used by Spotloan and other tribal lenders.

143. For example, Defendants have received consumer complaints on Spotloan's Better Business Bureau profile that have cited Spotloan's practice of charging high interest on small-dollar loans.

144. Indicative of Defendants' knowledge of their unlawful conduct, the Non-Tribal Defendants have also taken steps to actively conceal their management structure and

---

[11] https://dfi.wa.gov/consumer/alerts/turtle-mountain-band-chippewa-tribe-not-licensed-washington-state.

involvement in the Spotloan lending scheme. For example, since publicly starting spotloan.com under non-tribal ownership, the ownership of spotloan.com is now concealed behind a domain proxy service.

145. Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee and operate Spotloan to facilitate the issuance of high-interest, triple-digit loans that violate usury laws across the country.

146. Upon information and belief, Spotloan and other lending entities chartered by the Tribe operate under the oversight of the Tribal Council Defendants, without whose approval and legal sanction Spotloan could not operate.

147. The Tribal Council Defendants continue to facilitate the illegal lending scheme by allowing Spotloan to make and collect on usurious and void loans in multiple jurisdictions, including North Carolina.

148. Upon information and belief, none of the Defendants have applied for a consumer lending license in any state with such laws.

149. Spotloan's website includes the following disclaimer:

> Spotloan is a brand owned by BlueChip Financial ("BlueChip"), a tribally-owned entity organized under and governed by the laws of the Turtle Mountain Band of Chippewa Indians of North Dakota, a federally recognized Indian tribe (the "Tribe"). BlueChip is located on, operates within, and originates and services loans from the Tribe's reservation. Though Spotloans are available to residents of certain states, consumers should know that BlueChip's lending license is issued by the Tribe's Lending Commission, and not by the states in which its consumers may reside. Although the visitation is electronic, consumers are coming on to the Tribe's reservation and subject to the Tribe's jurisdiction to obtain a Spotloan.

37

150.    Despite these representations, Plaintiffs are unable to locate any information regarding Spotloan's operations within the Tribe's reservation, and Mr. Spratt's own declaration concedes that although the "Tribe's headquarters is in Belcourt, North Dakota," Spotloan's offices are in "California, Minnesota, and Georgia." Doc. 26 ¶ 33.

151.    Defendants' attempts to evade state usury protections also extend to the form Spotloan's consumer loan agreements, which prospectively waive the application of all state laws, including those that could challenge the application of the Tribe's laws under the choice-of-law provision, stating, *inter alia*, that "the laws of the Tribe will apply rather than the laws of [the borrower's] state or any other state" and explicitly states that only the law of the Tribe and federal law shall govern the agreement.

152.    As such, the form agreements purport to strip consumers like Plaintiffs of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including North Carolina, which have a long and robust history of precluding usurious lending operations like Spotloan's that burden their citizens with insurmountable debts.

153.    Further, the consumer loan agreement includes an arbitration provision that explicitly states that the arbitrator may award only remedies provided under tribal or federal law, without any right to seek remedies under state law.

154.    Thus, under the terms of their loan agreements, the putative class members prospectively waive any and all rights and remedies available to them under state law, which violates the prospective waiver doctrine and nullifies the arbitration and choice-of-law provisions. This also violates the prospective waiver doctrine by preventing Plaintiffs

38

from pursuing federal claims, such as their unlawful debt claims under RICO, which defines unlawful debt based on state usury laws.

155. The loan contracts issued to all putative class members by Spotloan were substantively identical and all included the same unlawful prospective waiver of the class members' state and federal rights.

**E.     Plaintiffs' Experience.**

156. Taking advantage of the ostensible protections created by the tribal business model, upon information and belief, the interest rates charged on the loans issued to the putative class members were far more than twice the allowable interest rate permitted by state usury and licensing laws in Plaintiffs' and the class members' respective states of residence.

157. For example, from his home in North Carolina, Plaintiff Michael Goetting applied for and obtained two loans from Spotloan for $1,500 and $600 respectively, which had a minimum interest rate of 378%, far exceeding North Carolina's 8-percent interest rate cap.  Mr. Goetting paid over $1,000 on the first loan and $500 on the second from his bank account maintained in North Carolina.

158. From her home in North Carolina, Plaintiff Kimberly Webb applied for and obtained two loans from Spotloan in June 2022 and 2024 for $800 and $400, respectively, which had a minimum interest rate of 490%, far exceeding North Carolina's 8-percent interest rate cap.  Ms. Webb paid back more than she borrowed on these loans from her bank account maintained in North Carolina.

159.    From her home in Indiana, Plaintiff Terri Edgell applied for and obtained eleven loans from Spotloan between 2015 and 2024, which had a minimum interest rate of more than 100%, far exceeding Indiana's 36-percent interest rate cap.  Ms. Edgell paid back more than she borrowed on at least ten of these loans from her bank account maintained in Indiana.

160.    From her home in Georgia, Plaintiff Kimberly Childs applied for and obtained a loan from Spotloan in December 2023 for $800, which had an interest rate of 490%, far exceeding Georgia's 8-percent interest rate cap.  Ms. Childs paid back more than $2,000 on this loan from her bank account maintained in Georgia.

161.    Upon information and belief, none of the Defendants, nor the Tribe, the Tribal Council Defendants, or Spotloan has ever obtained a license to issue loans to consumers in any state, including North Carolina, let alone a license to issue the triple-digit interest loans to Plaintiffs and the putative class members.

162.    Plaintiffs and the putative class members applied for their loans on the internet while located in their respective states of residence. Upon information and belief, none of them ever traveled to the Tribe's reservation to obtain their loans.

163.    Plaintiffs and the putative class members all used their home addresses when applying for the loans, and they used bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits used to pay down the loans.

164.    As outlined above, the loans issued to Plaintiff and the putative class members violated the respective usury statutes of each of their home states and entitle Plaintiff and the class to the remedies provided under those states' laws, including

40

avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if

not principal and interest entirely, as well as exemplary damages.[12]

---

[12] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

41

165.    Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiff.

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES)**

166.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

167.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loan.

Plaintiffs Webb, Edgell, and Childs are each a member of this class.

168.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal

business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

169. **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

170. **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

171. **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly

43

and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

172.    Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3) and are being sued in their individual capacities.

173.    The Tribal Council Defendants, along with the Non-Tribal Defendants, Tribe and others, were and continue to be members and associates of an association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

174.    Alternatively, pursuant to Rule 8(d)(2) Federal Rules of Civil Procedure, Plaintiffs allege that Spotloan—the entity itself—is the enterprise; and Defendants have participated in the operation and/or management of Spotloan as described herein.

175.    The Usurious Lending Organization and/or Spotloan itself, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact and/or a legal entity (Spotloan) separate and apart from the persons (Defendants) who operate that entity.

176.    The members and associates of the Usurious Lending Organization and/or Spotloan shared various common purposes, including the evasion of state usury and licensing law, the operation of the "Spotloan" website, the processing of applications from consumers across the United States, the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

177.    The members of the Usurious Lending Organization and/or Spotloan had specific roles and connected relationships. As detailed above, the Defendants' involvement

44

falls into three categories, all of which is instrumental to the ongoing success of the Enterprise. First, the Tribal Council Defendants established Spotloan as a tribal entity and retain high-level oversight and ultimate control over it. Second, Spratt is responsible for the day-to-day operations of Spotloan, including all of its policies created and implemented to ensure the profitability of its usurious loans. And third, RCOF and R&R provide the financing for the scheme so the Enterprise has the capital it needs to make the usurious loans to consumers.

178. The Usurious Lending Organization and/or Spotloan has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

179. The Usurious Lending Organization and/or Spotloan has been engaged in, and its activities affected, interstate commerce. The Tribal Council Defendants perform their roles from the tribal lands in North Dakota but the Non-Tribal Defendants who are operating the Organization do so from locations in other states, including California, Minnesota, and Georgia. The Organization sends loan proceeds into and collects payments from locations throughout the United States.

180. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

181. Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the respective Enterprises' affairs in the collection of unlawful debt.

45

182.    All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

183.    As alleged, each of Defendants associated and participated in the operation and/or management of the affairs of the Usurious Lending Organization and/or Spotloan, which were engaged in the collection of unlawful debt.

184.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Usurious Lending Organization and/or Spotloan, which money transfers would not have been made but for Defendants' conduct.

185.    Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES)

186.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

187.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of the RICO Class defined in Count One.

188.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.

46

The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

189.  **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

190.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

191.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly

47

and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

192. Defendants violated § 1962(d) of RICO by agreeing to participate in the operation and management of Spotloan, which is a company whose sole operations involve the making and collection of usurious debts.

193. Defendants have each agreed to pursue and facilitate in the making and collection of usurious loans through Spotloan, and pursued this endeavor with knowledge that Spotloan only made loans with triple digit interest rates.

194. Through this scheme, Spotloan has made loans in nearly every state in the United States and claims to have made over 1.8 million loans since its inception in 2012. As alleged above, each of Defendants knew of and have agreed to overall objectives of the making and collecting of usurious loans through Spotloan. Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise and/or Spotloan to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

195. Plaintiffs and the RICO Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

196. Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the respective Class Members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

48

**COUNT THREE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST RCOF AND R&R)**

197.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

198.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the RICO Class defined in Count One.

199.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Webb also brings this claim for herself and the following subclass—the "North Carolina Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from North Carolina, and (3) repaid more than the principal balance of the loans.

Plaintiff Webb is a member of this subclass.

200.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Edgell also brings this claim for herself and the following subclass—the "Indiana Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Indiana, and (3) repaid more than the principal balance of the loans.

Plaintiff Edgell is a member of this subclass.

201.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Childs also bring this claim for herself and the following subclass—the "Georgia Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Georgia, and (3) repaid more than the principal balance of the loans.

49

Plaintiff Childs is a member of this subclass.

202. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

203. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

204. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

205. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and

are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

206.    As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

207.    RCOF and R&R *knowingly* provide the capital used by Spotloan to make its illegal loans.

208.    With full knowledge of the impending use of the money in the usurious lending scheme, RCOF and R&R have provided millions of dollars to Spotloan to be used as the capital to make its illegal loans.

209.    In exchange, RCOF and R&R have handsomely profited from their backing of the illegal lending scheme, including payment of "approximately $6 million in interest and finance charges" paid to R&R <u>in 2024 alone</u>. Doc. 30 at ¶ 17.

210.    Plaintiff and the class members conferred a benefit on RCOF and R&R when they repaid the void loans; RCOF and R&R  knew or should have known of the benefits;

51

and Defendants have been unjustly enriched through their upstream receipt of any amounts in connection with the unlawful loans.

211.   Accordingly, on behalf of themselves and the classes defined above, Plaintiffs seek to recover from RCOF and R&R, jointly and severally, all amounts repaid on any loans issued by Spotloan.

## COUNT FOUR
### NORTH CAROLINA CONSUMER FINANCE ACT, N.C. GEN. STAT. § 53-166 (CLASS CLAIM AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)

212.   Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

213.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Goetting and Webb bring this claim for themselves and the following class—the "North Carolina Injunctive Class"—and against the Tribal Council Defendants in their official capacities, initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from North Carolina, and (3) with an outstanding balance on their loan.

Plaintiffs Goetting and Webb are each a member of this class.

214.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

52

215.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether Defendants engaged in the offering, arranging, and making of loans of $25,000 or less to North Carolina consumers; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Defendants had licenses to issue loans to North Carolina consumers; and (4) the propriety of injunctive relief for Plaintiffs and the class members against each of Defendants.

216.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs Goetting's and Webb's claims are typical of the claims of each putative class member. In addition, Plaintiffs Goetting and Webb are each entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

217.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs Goetting and Webb are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs Goetting and Webb and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs Goetting or Webb nor their counsel have any interests which might cause them to not vigorously pursue this action.

218.    As alleged above, the Tribal Council Defendants are the Tribe's "governing body" with the power to, in relevant part to: "engage in any business that will further the economic well-being of the members of the tribe, or to undertake any programs or projects designed for the economic advancement of the people"; and "make and perform contracts and agreements of every description . . . ."  Tribe Const. art. IX.

219.    Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Council Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe, including Spotloan.

220.    The Tribal Council Defendants have engaged in the business of lending or servicing loans in amounts of $25,000 or less, and have contracted for, exacted, and received—both directly and indirectly through their control of Spotloan—in connection with such loans charges in excess of those permitted by Chapter 24 of the General Statutes.

221.    Spotloan—which is controlled by the Tribal Council Defendants—has also issued loans of $25,000 or less to Plaintiffs Goetting and Webb and the North Carolina Injunctive Class members without first having obtained a licensed from the Commissioner of Banks.

222.    At all times relevant to this Complaint, neither Spotloan, nor the Tribal Council Defendants have not conducted business under the authority of any law of North Carolina or of the United States related to banks, trust companies, savings and loan associations, cooperative credit unions, agricultural credit corporations or associations organized under the laws of North Carolina, production credit associations organized under

54

the Farm Credit Act of 1933, pawnbrokers, industrial banks, real estate lenders, or installment papers defined in G.S. 105-83.

223. Spotloan and the Tribal Council Defendants' conduct constitutes a violation of N.C. Gen. Stat. § 53-166(a) such that the loans issued to the class members are void under § 53-166(d).

224. Spotloan and the Tribal Council Defendants are further prohibited from "collect[ing], receiv[ing], or retain[ing] any principal or charges whatsoever with respect to the loan[s]."

225. Accordingly, Plaintiffs Goetting and Webb and the North Carolina Injunctive Class are entitled to an injunction against the Tribal Council Defendants in their official capacity prohibiting the further collection and receipt of any amounts on their loans.

## COUNT FIVE
## NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1.1
## (CLASS CLAIM AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES FOR DAMAGES AND AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)

226. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

227. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Goetting and Webb bring this claim for themselves and the same class alleged in Count Four against the Tribal Council Defendants in their official capacities for injunctive relief.

228. Pursuant to Rule 23, Plaintiffs Goetting and Webb also bring this claim on behalf of themselves and the following subclass—the "North Carolina Damages

55

Subclass"—as defined below, against all Defendants in their individual capacities for damages:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from North Carolina, and (3) paid more than the principal balance of their loan.

Plaintiffs Goetting and Webb are each a member of this class.

229. North Carolina's Unfair and Deceptive Trade Practices Act prohibits "unfair and deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. 75-1.1(a).

230. Defendants committed multiple unfair and/or deceptive acts within the State of North Carolina by facilitating the collection of usurious loans that the State of North Carolina has declared immoral, unethical, oppressive, unscrupulous, and unconscionable, including but not limited to:

    a. Facilitating the making of payday loans to residents of North Carolina after the law authorizing such payday lending expired and in knowing violation of North Carolina law and public policy;

    b. Collecting amounts from bank accounts in North Carolina and held by citizens of North Carolina on the ACH Network for loans that Defendants knew were originated without a license required by North Carolina law;

    c. Representing to consumers that the loan contracts were not subject to state law, including state usury protections, when they knew that was not the case in North Carolina, including under the express terms of North Carolina law and multiple rulings by the Fourth Circuit; and,

56

d. Collecting amounts from bank accounts in North Carolina and held by citizens of this State for loans that Defendants knew were usurious when issued and violated the public policy of North Carolina and nearly every other U.S. state.

231. With the sunset of N.C. Gen. Stat. § 523-281, payday lending is no longer authorized under North Carolina law, and the issuance of payday loans are contrary to North Carolina public policy. Nonetheless, Defendants, through their control of Spotloan, have continued to issue and collect on loans that are both payday loans and far exceed North Carolina's usury rate.

232. Defendants' conduct affects commerce within North Carolina and nationwide, including through the interstate transfer of funds from bank accounts maintained by citizens of North Carolina to accounts maintained and controlled by the Defendants.

233. Defendants' conduct has caused and continues to cause ongoing harm to Plaintiffs Goetting and Webb and the members of the putative class, including the loss of funds to Defendants on loans that Defendants knew violated North Carolina law at the time of inception.

234. Accordingly, Plaintiffs Goetting and Webb and the putative class members in the North Carolina Damages Subclass are entitled to damages from Defendants in their individual capacities for treble the amounts paid above the principal balance of their respective loans, and their attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1.

235. Plaintiffs Goetting and Webb and the putative class members in the North Carolina Injunctive Class are further entitled to an injunction against the Tribal Council Defendants in their official capacities barring the further collection of their loans.

**COUNT SIX**
**GEORGIA PAYDAY LENDING ACT, O.C.G.A. §§ 16-17-2, 16-17-3**
**(CLASS CLAIM AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)**

236. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

237. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Childs also brings this claim for herself and the following class—the "Georgia Injunctive Relief Class"—and against the Tribal Council Defendants in their official capacities for injunctive relief, initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Georgia, and (3) with an outstanding balance of their loan.

Plaintiff Childs is a member of this class.

238. **Numerosity. Fed. R. Civ P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

239. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members.

58

These questions include: (1) whether Defendants engaged in the offering, arranging, and making of loans of $3,000 or less to Georgia consumers; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Defendants are chartered banks, trusts, thrifts, or credit unions exempt from the Georgia Payday Lending Act; (4) the nature of the loans issued to Plaintiff Childs and the class members; (5) whether Defendants had licenses to issue loans to Georgia consumers; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

240. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiff Childs's claims are typical of the claims of each putative class member. In addition, Plaintiff Childs is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

241. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiff Childs is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff Childs and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Childs nor her counsel have any interests which might cause them to not vigorously pursue this action.

242. The Tribal Council Defendants have each engaged in a business transacted through at least mail, electronic, and internet means which consists in whole or in part of

making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less.

243.    Neither the Tribal Council Defendants nor Spotloan are chartered banks, trusts, thrifts, or credit unions subject to Chapter 1 of Title 7 of the Georgia Code, nor laws regulating state and federally chartered credit unions.  Defendants are not insured by the Federal Deposit Insurance Corporation.

244.    The subject loans issued to Ms. Childs and the class were not residential mortgages, open-credit plans, retail installment loans, motor vehicle finance loans, pawnbroker loans, or loans issued in anticipation of a tax refund.  Moreover, the simple interest of the loans exceeded 16 percent per annum.

245.    Neither the Tribal Council Defendants nor Spotloan, nor any other coconspirators in the Usurious Lending Organization, obtained a license under the Georgia Industrial Loans Act or any other relevant provision of Georgia law.

246.    Despite their lack of a license, the Tribal Council Defendants, through their control of Spotloan, issued loans to Plaintiff Childs and the relevant class members of less than $3,000 each.

247.    The Tribal Council Defendants' conduct constitutes a violation of O.C.G.A. § 16-17-2(a) that entitles Plaintiff Childs and the Georgia Injunctive Class to injunctive relief barring the Tribal Council Defendants in their official capacities from collecting any indebtedness created by the relevant loan transactions under § 16-7-3.  *See Western Sky Financial, LLC v. State ex rel. Olens*, 300 Ga. 340, 367-68 (2016).

## COUNT SEVEN
## INDIANA UNIFORM CONSUMER CREDIT CODE, IND. CODE § 24-4.5-5-202
## (CLASS CLAIM AGAINST THE TRIBAL DEFENDANTS IN THEIR OFFICIAL
## CAPACITIES FOR INJUNCTIVE RELIEF)

248.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

249.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Edgell brings this claim for herself and the following class—the "Indiana Injunctive Relief Class"—and against the Tribal Council Defendants in their official capacities, initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Indiana, and (3) with an outstanding balance on their loan.

Plaintiff Edgell is a member of this class.

250.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

251.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether Defendants engaged in the offering, arranging, and making of loans to Indiana consumers without a license; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) the

61

nature of the loans issued to Plaintiff Edgell and the class members; and (4) what is the proper recovery for Plaintiff Edgell and the class members against each of Defendants.

252.    **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiff Edgell's claims are typical of the claims of each putative class member.  In addition, Plaintiff Edgell is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

253.    **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiff Edgell is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff Edgell and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Edgell nor her counsel have any interests which might cause them to not vigorously pursue this action.

254.    The Tribal Council Defendants, through their control over Spotloan, regularly engaged in the business of issuing consumer credit to Plaintiff Edgell and the class members for personal, family, or household purposes.

255.    The subject loans issued to Ms. Edgell and the class were not exempt from the IUCCC under Ind. Code § 24-4.5-1-202.  Moreover, the simple interest of the loans exceeded 25 percent per annum.

256.    Neither the Tribal Council Defendants nor Spotloan, nor any other coconspirators in the Usurious Lending Organization, obtained a license under the IUCCC or any other relevant provision of Indiana law.

62

257.    Despite their lack of a license, the Tribal Council Defendants, through their control of Spotloan, issued loans to Plaintiff Edgell and the relevant class members without a license and with interest rates far exceeding 25% per annum.

258.    The Tribal Council Defendants' conduct constitutes a violation of the IUCCC that renders the loans issued to Plaintiff Edgell and the class members void under § 24-4.5-5-202(2) and entitles Plaintiff Edgell and the class members to an injunction against the Tribal Council Defendants in their official capacities enjoining future collection of the loans in violation of the IUCCC, pursuant to Ind. Code §§ 24-4.5-5-108 and 24-4.5-5-202, and the Court's equitable powers. *See* Ind. Code § 24-4.5-1-103 (stating that "the principles of law and equity" shall supplement the "provisions" of the IUCCC), § 24-4.5-6-115 (stating "[t]he grant of powers to the department in this Article does not affect remedies available to debtors under this Article or under other principles of law or equity"); *see also id.* § 24-4.5-5-202 at cmt. 4 (stating that "[i]n addition to the individual debtor's remedies and remedies of the Administrator described above, the debtor may have other remedies based on general principles of law or equity, or based on the provisions of other applicable law. See Sections 1.103 and 6.115").

## COUNT EIGHT
### DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
### (CLASS CLAIM AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

259.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

260.   Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

261.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Goetting, Webb, and Childs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Indiana, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

Plaintiffs Goetting, Webb, and Childs are each a member of this class.

262.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Goetting and Webb also bring this claim for themselves and the following subclass—the "North Carolina Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from North Carolina, and (3) have an outstanding balance on their loan.

Plaintiffs Goetting and Webb are each a member of this subclass.

263.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Childs also brings this claim for herself and the following subclass—the "Georgia Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Georgia, and (3) have an outstanding balance on their loan.

Plaintiff Childs is a member of this subclass.

264.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Edgell also brings this claim for herself and the following subclass—the "Indiana Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Spotloan; (2) from Indiana, and (3) have an outstanding balance on their loan.

Plaintiff Edgell is a member of this subclass.

265.     **Numerosity**. **Fed. R. Civ P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Spotloan and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

266.     **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious and/or made without a license under the respective state laws governing the loans; (4) whether the loans are void under respective state laws governing the loans; and (5) whether Plaintiffs are entitled to declaratory relief.

267.     **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the

same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

268.    **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

269.    Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Indiana, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

270.    None of the Defendants, nor Spotloan, were licensed to make loans in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Indiana, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

271.    Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

272.    Plaintiffs and members of the classes are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

66

273. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

274. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

275. Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are void and invalid and the loans of the Void Debt Class and subclass members are uncollectable. Plaintiffs also seek to enjoin the Tribal Council Defendants, in their official capacity, from allowing collection on the loans.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged herein;

D. An Order declaring the loans issued to the Void Debt Class and Void Debt Subclasses to be void and unenforceable;

67

E.      An Order providing for any and all injunctive relief the Court deems appropriate;

F.      An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

G.      An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

H.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

J.      Such further relief as this Court may deem just and proper.

## <u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS**, *individually and on behalf of all others similarly situated*

*/s/ Andrew J. Guzzo*
Andrew J. Guzzo*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: aguzzo@kellyguzzo.com

*Notice of Special Appearance Attorney for Plaintiffs*

By: /s/ Rashad Blossom
Rashad Blossom (State Bar No. 45621)
Blossom Law, PLLC
301 S. McDowell Street
Suite 1103
Charlotte, NC 28204
rblossom@blossomlaw.com
*Local Rule 83.1(d) counsel for Plaintiffs*