Exhibit 1

SERVICING AGREEMENT

BETWEEN

RED ROCK TRIBAL LENDING, LLC

AND

BELLICOSE VI, INC.


OCTOBER 25, 2011

# TABLE OF CONTENTS

1.   Recitals...................................................................................................................1

2.   Definitions..............................................................................................................2

3.   Covenants...............................................................................................................5

4.   Business and Affairs in Connection with Enterprise. .......................................8

5.   Liens and Debt. .....................................................................................................16

6.   Servicer Fee Reimbursement, Disbursement, and Capital Contribution. ...........16

7.   General Provisions. ...............................................................................................17

8.   Warranties. ............................................................................................................22

9.   Grounds for Termination. .....................................................................................23

10.  Conclusion Of the Servicing Term .......................................................................25

11.  Consents and Approvals. ......................................................................................25

12.  Disclosures. ...........................................................................................................25

13.  No Present Lien Lease or Joint Venture ...............................................................26

14.  Enterprise's Limited Waiver of Sovereign Immunity .........................................26

15.  Time is of the Essence ..........................................................................................27

16.  Tribal Assets .........................................................................................................28

17.  Governing Law .....................................................................................................28

18.  Dispute Resolution................................................................................................28

19.  Performance During Disputes...............................................................................31

20.  Confidential Information .......................................................................................31

21.  Execution ..............................................................................................................32

22.  Enterprise Name....................................................................................................32

23.  Intent to Negotiate New Agreement .....................................................................32

24.  Entire Agreement ..................................................................................................32

25.  Additional Actions ...............................................................................................32

26.  Representation........................................................................................................33

**Schedule 1.0 – Tribal Laws**

**Schedule 18.2.1 - List of Pre-Approved Arbitrators**

*ii*

# SERVICING AGREEMENT

**THIS SERVICING AGREEMENT** ("Agreement") is made and entered into as of this 25th day of October 2011, by and between RED ROCK TRIBAL LENDING, LLC ("Enterprise"), an economic development arm and instrumentality of, and a limited liability company wholly owned by the LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS ("Tribe"), a federally-recognized Indian Tribe and sole member of the Enterprise, and BELLICOSE VI, INC. ("Servicer"), a U.S. Virgin Islands corporation with offices in the U.S. Virgin Islands. Each of Enterprise and Servicer may be referenced hereinafter individually as a "Party" or together, as the "Parties."

## 1. **Recitals.**

**1.1**    The Tribe is a federally-recognized Indian tribe. The Tribe possesses sovereign governmental authority pursuant to the Tribe's inherent and recognized powers of self-government.

**1.2**    The Tribe has established Enterprise, a limited liability company wholly owned by and formed under the laws of the Tribe, as an economic development arm and instrumentality of the Tribe.

**1.2.1**    The purpose of Enterprise is to promote the self-sufficiency of the Tribe and to address the socio-economic needs of the Tribe, its members, its families, and its community by building capital within the tribal community. This capital will subsequently be dispersed to the Tribe through the Enterprise, and used at the Tribe's discretion for the benefit of its members and the community through tribal initiatives and tribal governmental programs. The increase of such capital, as well as the initiatives and programs funded by it, will guarantee that the Tribe can continue to care for itself, its members, and its community by promoting greater self-determination, political and social autonomy.

**1.2.2**    The Enterprise, pursuant to its Governing Documents, has the exclusive right to develop and operate the Tribe's financial services business that will provide small-denomination short-term financial services and other related goods and services to consumers through its internet call-center and field representative operations and has been directed and authorized to take any and all action as is deemed necessary or desirable in connection with such business and services, including but not limited to the authority to act as the exclusive agent to enter into and to exercise the rights and perform the obligation of Enterprise under this Agreement.

**1.2.3**    The Tribe, through Enterprise, desires to engage in internet-based unsecured lending, as hereinafter defined, and provision of financial services. It is the Tribe's hope that Enterprise's endeavors will improve the economic conditions of its members; enable the Tribe to better serve the social, economic, educational and health needs of the Tribe, its members, and its community; increase Tribal revenues; enhance the Tribe's economic self-sufficiency and self-determination; and provide positive, long-term social, environmental and economic benefits.

*1*

**1.3** Enterprise is seeking managerial, technical and financial experience and expertise for the development and operation of the new Unsecured Lending Business, as defined below. The Servicer is a company located in the U.S. Virgin Islands which provides management and consulting services to companies engaged in the Unsecured Lending Business and is willing and able to provide such assistance, experience, expertise and instruction to the Enterprise.

**1.4** The Enterprise, through a contractual relationship, desires to retain and engage the Servicer as its independent contractor to consult to, develop, manage, and provide operational guidelines regarding the Unsecured Lending Business and any expansion thereof during the term of this Agreement and conforming with the provisions of this Agreement. In addition to providing investment and capital management services, management, operations and marketing consulting, Servicer also provides analytic services to its roster of clients, including risk assessment and management. The parties believe that Servicer possesses the necessary experience and skill to effectively analyze portfolio composition, trends in performance and predictive measures of potential new customers to the Enterprise to increase the profitability and overall risk profile of the Enterprise.

**1.5** Each Party represents and warrants that the individuals executing this Agreement, as set forth in the signature blocks below, are fully and properly authorized under controlling law to enter into this Agreement on behalf of their respective organizations; and that the respective organizations have duly approved and ratified the terms of this Agreement.

**1.6** In addition to the representations and warranties made in Section 12.1 herein, each Party represents and warrants that the individuals executing this Agreement, Enterprise management and Servicer management, do not have criminal records involving any financial crimes or crimes of dishonesty that might trigger any concern from any regulatory body with respect to their involvement in a consumer financial services business.

**1.7** The Servicer further represents and warrants that it, along with all other members of the management as well as employees having any responsibility for the business of the Enterprise, meets the eligibility requirements for licensing pursuant to the Tribe's Consumer Financial Services Regulatory Code. Proper licensing is a requirement for entering into this Agreement and the Transaction Documents.

**2.** **Definitions**. Unless otherwise specified in this Agreement, as they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Section:

**2.1** **Affiliate**. "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii) the power to exercise, directly or indirectly, a controlling influence over management or policies.

*2*

**2.2** <u>**Authorized Debt**</u>. "Authorized Debt" shall have the meaning given to it in Section 5.2.

**2.3** <u>**Commencement Date**</u>. "Commencement Date" shall be the Effective Date.

**2.4** <u>**Commercial Finance Provider**</u>. "Commercial Finance Provider" shall mean any entity that provides credit to Enterprise for the making of Consumer Loan Transactions.

**2.5** <u>**Consumer Loan Transaction**</u>. "Consumer Loan Transaction" means any form of consumer financial services transaction provided by a financial services provider to a consumer or other person that is unsecured or secured by way of ACH agreements.

**2.6** <u>**Effective Date**</u>. The "Effective Date" shall mean the date above written.

**2.7** <u>**Enterprise**</u>. The "Enterprise" is the instrumentality and commercial subdivision of the Tribe formed to engage in (a) the Unsecured Lending Business; and (b) any other lawful commercial activity allowed upon approval of the Tribe as sole member of the Enterprise pursuant to Enterprise's Governing Documents. The Enterprise shall not include any commercial enterprise conducted by the Tribe or any other instrumentality of the Tribe other than as set forth immediately above in this Section 1.2. Enterprise shall have the sole proprietary interest in and responsibility for the conduct of all activities conducted by Enterprise, subject to the rights and responsibilities of the Servicer under this Agreement.

**2.8** <u>**Enterprise Employees**</u>. "Enterprise Employees" shall mean a generic reference to those employees who are employed by Enterprise.

**2.9** <u>**Fiscal Year**</u>. "Fiscal Year" shall mean each twelve (12) month period, or portion thereof, ending on December 31 of each year, or on such other date as may be adopted by Enterprise in the future as the ending date of its fiscal year.

**2.10** <u>**Governing Documents**</u>. "Governing Document" shall mean Enterprise's Articles of Organization and Operating Agreement, if any.

**2.11** <u>**Governmental Action**</u>. "Governmental Action" shall mean any resolution, ordinance, statute, regulation, order or decision regardless of how constituted having the force of law or legal authorization of the Tribe or any instrumentality or agency of the Tribe.

**2.12** <u>**Gross Revenues**</u>. "Gross Revenues" shall mean all revenues of any nature derived directly or indirectly from the operation of Enterprise (including the gross revenues of all Subsidiaries) on a consolidated basis.

**2.13** <u>**Legal Requirements**</u>. "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation all applicable tribal and federal law.

**2.14** <u>**Net Revenues**</u>. "Net Revenues" for the purpose of this Agreement shall mean Gross Revenues of the Enterprise less all Servicing Expenses.

*3*

**2.15**  **New Transaction**. "New Transaction" means a Consumer Loan Transaction with a new customer.

**2.16**  **Operations Manager**. "Operations Manager" shall mean the person employed by Enterprise, if any, to direct the day-to-day operations of Enterprise and to coordinate with the Servicer as defined above as well as any other entities providing services to the Enterprise.

**2.17**  **Primary Bank Account**. "Primary Bank Account" shall have the meaning given to it in Section 4.4.

**2.18**  **Refinancing Transaction**.  "Refinancing Transaction" means a Consumer Loan Transaction that extends or refinances, in whole or in part, an outstanding Consumer Loan.

**2.19**  **Regulatory and Litigation Reserve Fund**. "Regulatory and Litigation Reserve Fund" shall mean that fund established pursuant to Section 4.5 of this Agreement and shall be considered a Servicing Expense of Enterprise.

**2.20**  **Repeat Transaction**. "Repeat Transaction" means a Consumer Loan Transaction with an existing customer that is not a Refinancing Transaction.

**2.21**  **Servicing Budget**. "Servicing Budget" shall have the meaning given to it in Section 4.5.

**2.22**  **Servicing Expenses**. "Servicing Expenses" shall mean the expenses of the operation of Enterprise, incurred pursuant to the Servicing Budget, including but not limited to the following: (1) the payment of salaries, wages, and benefit programs for all employees of Enterprise subject to the approval described in Section 4.3; (2) supplies for Enterprise; (3) utilities; (4) repairs and maintenance of any facility used by Enterprise for the conduct of its business; (5) reserves established for the repayment of any principal or interest on any Authorized Debt of Enterprise; (6) insurance and bonding; (7) advertising and marketing; (8) professional fees; (9) reasonable travel expenses for officers and employees of Enterprise, Servicer or its affiliates to inspect and oversee Enterprise; (10) the Regulatory and Litigation Reserve fund expense; (11) security costs; (12) underwriting expenses; (13) bad debt expenses and (14) legal or professional fees incurred for lobbying or litigation that is not adequately covered by the Regulatory and Litigation fund.. Any expenses not referenced or provided for in this Section that are added as Servicing Expenses after approval of this Agreement and the Servicing Budget in effect at the time must first be approved in writing by the Servicer and the Enterprise as provided for in this Agreement. Each of the above listed expenses is subject to the annual budgetary process and its resolution processes at Section 4.5 of this Agreement.

**2.23**  **Unsecured Lending Business**.  "Unsecured Lending Business" means the activities of a financial services provider in providing Consumer Loan Transactions and other related financial services to consumers or other persons.

**2.24**  **Tribal Council**. "Tribal Council" means the governing body of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

*4*

**2.25 Tribal Net Profits.** "Tribal Net Profits" is calculated by adding the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis all calculated on a cash basis.

**2.26 Tribal Representatives.** "Tribal Representatives" shall mean the person or persons designated by the Enterprise, to serve as its liaisons to the Servicer, and who shall be responsible for assisting in the implementation of tribal policies as such policies relate to Enterprise and the Unsecured Lending Business. The Enterprise may remove and replace the Tribal Representatives in its sole and absolute discretion. The Tribal Representatives shall have the right to attend as an observer all meetings of Enterprise regarding management of Enterprise and shall have access to all documents and records of Enterprise. The salary, wages and benefits of the Tribal Representative(s) are a Servicing Expense of the Enterprise. The Tribal Representatives serve hereunder on behalf and for the benefit of the Enterprise and for purposes of decision-making are no way a substitute for the Tribe itself as sole member of the Enterprise.

**3. Covenants.** In consideration of the mutual covenants contained in this Agreement, the Parties agree and covenant as follows:

**3.1 Engagement of Servicer.** The Enterprise hereby retains and engages Servicer as its independent contractor for the purposes of providing those business management, consulting and professional services to Enterprise pursuant to the terms of this Agreement and advising the Operations Manager of the Enterprise and the Tribal Representatives. Servicer shall have the authority and responsibility over all communication and interaction whatsoever between Enterprise and each service provider, lender and other agents of Enterprise (for purposes of this Agreement, the service provider, lender and other agents of Enterprise or its subsidiaries shall be referred to as "Authorized Agents"). Nothing contained herein grants or is intended to grant Servicer a titled interest to or in Enterprise. The Servicer hereby accepts such retention and engagement as an independent contractor. Enterprise acknowledges that the services contemplated by this Agreement shall be provided by the Servicer from its offices in the U.S. Virgin Islands. Enterprise also acknowledges that the fees to be paid to Servicer as defined in Section 3.5.1 herein, are in fact performance-based fees, and are based solely on the profitability of the Enterprise following commencement of this Agreement. Enterprise also acknowledges that any tax or earnings statements to be issued to Servicer as a result of any payments made pursuant to this Agreement shall be filed with the Virgin Islands Bureau of Internal Revenue and not with the Internal Revenue Service as the Servicer is subject to the administration of tax laws by the Virgin Islands Bureau of Internal Revenue and not the Internal Revenue Service.

**3.2 Term.** The term of this Agreement shall begin on the Effective Date of this Agreement and continue until December 31, 2018 ("Term"). The Term shall automatically renew for an additional period of two (2) years unless either Party hereto provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (1) year, prior to the end of the Term.

## 3.3    Restrictions on Competition.

    **3.3.1**   In consideration for Servicer providing its expertise to the Enterprise, the Enterprise agrees that so long as this Agreement is in effect neither it nor any Affiliate shall, directly or indirectly, either on its own or through any agent, joint venture, subsidiary or independent contractor, engage in the Unsecured Lending Business anywhere in the world except through the Enterprise without engaging the Servicer to provide the management and consulting services contemplated by this Agreement. The exclusivity provisions contained in this Paragraph 3.3.1. shall apply so long as Servicer achieves performance targets described herein. Performance targets are equal to Tribal Net Profits generated by the Enterprise on a monthly basis. The exclusivity provision shall remain in effect to the extent that the Tribal Net Profits as listed in Table 3.3.1 for a particular monthly amount is not achieved but the difference between the required amount and the actual amount are recouped (on a cumulative basis) in any three (3) consecutive month period of time (on a cumulative basis for the two Bellicose V.I.-managed Tribal-lending entities contemplated at this time, including Red Rock Tribal Lending, LLC and North Country Financial, LLC):

### Table 3.3.1 Tribal Net Profit

| Month | Tribe Net Profit |
|-------|------------------|
| 3 | 42,000 |
| 4 | 45,000 |
| 5 | 50,000 |
| 6 | 55,000 |
| 7 | 50,000 |
| 8 | 65,000 |
| 9 | 75,000 |
| 10 | 80,000 |
| 11 | 90,000 |
| 12 | 100,000 |
| 13 | 110,000 |
| 14 | 120,000 |
| 15 | 130,000 |
| 16 | 145,000 |
| 17 | 160,000 |
| 18 | 175,000 |
| 19 | 190,000 |
| 20 | 200,000 |

    The Enterprise acknowledges that the Unsecured Lending Business can be conducted throughout the world (both as to the location of the consumers as well as operations) and that the worldwide restriction is appropriate. Nothing herein shall be taken to restrict the Enterprise, the Tribe, or its Affiliates from engaging in businesses that provide services, which in themselves do not compete with the Unsecured Lending Business. The Enterprise further agrees that it shall not solicit for employment or hire any employees of Servicer. In no event shall failure to meet the

*6*

thresholds contained in this Section be considered a breach of this Agreement. Rather, they are significant only to the application or not of the non-compete provisions of this Section. The Parties agree that having two or more entities in the payday lending space or otherwise engaged in the Unsecured Lending Business, including North Country Financial, LLC and Enterprise, is not a violation of this section restricting competition so long as any such entity is serviced by Servicer and/or its successors or assigns.

      **3.3.2** The Enterprise has carefully read and considered the provisions of this Section and, having done so, agrees that the covenants set forth in this Section are fair and reasonable and are reasonably required to protect the legitimate business interests of the Servicer and the Enterprise including, but not limited to, protection of trade secrets, the Servicer's investment in its Confidential Information (as hereinafter defined), and the Servicer's goodwill and relationships with its clients and vendors. The Enterprise agrees that the covenants set forth in this Section do not unreasonably impair the ability of the Enterprise to conduct any unrelated business. The Parties hereto agree that if a court of competent jurisdiction holds any of the covenants set forth in this Section unenforceable, the court shall substitute an enforceable covenant that preserves, to the maximum lawful extent, the scope, duration and all other aspects of the covenant deemed unenforceable, and that the covenant substituted by the court shall be immediately enforceable against the Enterprise. The foregoing shall not be deemed to affect the right of the parties hereto to appeal any decision by a court concerning this Agreement.

      **3.4** <u>**Servicer's Compliance With Law.; Licenses**</u>. The Servicer covenants that it will at all times comply with all Legal Requirements and any licenses issued under any of the foregoing. If applicable, the Tribe shall not unreasonably withhold, withdraw, qualify or condition such licenses. Enterprise, through the Tribal Representatives will ensure that Servicer is made fully aware of and has acquired all applicable tribal licenses prior to commencement of Enterprise business activities.

      **3.5** <u>**Servicing Fee.**</u>

      **3.5.1** The Parties hereto have agreed that the success of the business is based in large part upon the services provided to the Enterprise by the Servicer. As a result, Enterprise has agreed to a performance-based fee equal to that amount remaining after payment of Tribal Net Profits, Servicer advances, all Servicing Expenses and any principal or interest on borrowed funds in accordance with Section 6.4. The Servicing Fees shall be paid monthly, with the Servicer having the ability to sweep Enterprise bank account amounts into the Servicer's bank accounts, on or before the fifteenth (15th) day of the ensuing month. The Enterprise acknowledges and agrees that the Servicer is not responsible for the performance or activities of any of the lenders or servicing companies that may be doing business with the Enterprise, nor any minimum revenue from the Unsecured Lending Business. However, Servicer has agreed that that the minimum amount per month which shall be paid to the Enterprise shall be twenty thousand dollars ($20,000).

      **3.5.2** Payment of the Servicing Fee shall be subject to and reduced by the obligations of the Servicer to make the payments specified in Sections 3.5.1, 4.6, 7.15 hereof.

7

3.5.3  The Enterprise acknowledges and agrees that Servicer, subject to Legal Requirements and the limitations of Section 4.1.1, shall have the right to enter into agreements with servicing companies or lenders providing goods or services to the Enterprise, and Servicer may be separately compensated under such agreements.

**3.6**  **No Preexisting Contracts**. The Enterprise covenants that there are no valid preexisting contractual impediments to the entry by the Enterprise into this Agreement. Further, the Enterprise agrees to indemnify Servicer and hold harmless its Affiliates for any loss, cost, judgment, settlement or other compromise related to any claim arising out of or related to any alleged pre-existing contractual relationship. Servicer shall be limited to recovery of such indemnification from the assets of Enterprise and shall have no right to indemnification from other assets of the Tribe or any of Tribe's other Affiliates.

**3.7**  **Agreement Scope**. The Enterprise is entering into this Agreement with Servicer in order to avail itself of the expertise of Servicer in developing a profitable Unsecured Lending Business. In recognition of the Servicer's expertise, the scope of this Servicing Agreement covers all aspects of the management of the Unsecured Lending Business, however oversight of the day to day operations of the Enterprise and management of the Enterprise's employees shall be vested in the Operations Manager and/or the Tribal Representatives.

**3.8**  **Certain Activities of Enterprise**. The Enterprise covenants that adequate high speed internet access, and sufficient remote access for the Enterprise to all hardware and software which it is responsible to acquire and install shall be at all times available to Enterprise and Servicer to conduct the Unsecured Lending Business contemplated by this Agreement. Any physical facilities located within the Tribe's jurisdiction shall be maintained in a secure manner to protect sensitive consumer financial information potentially contained therein, including but not limited to protection by the latest security encryption technology for privacy protection which shall also be provided by the Servicer, as approved by the Servicer. Servicer shall have the sole discretion to request upgrades or additions to and to approve the security/encryption technology used in connection with the Unsecured Lending Business which shall be treated as Servicing Expense of the business. If such a request is made following the Tribe's annual approval of a Servicing Budget that does not contain such upgrades or additions, Servicer shall seek approval of the Tribe pursuant to its Governing Documents, approval of which will not be unreasonably withheld, prior to incurring such additional servicing expenses.

**4.**  **Business and Affairs in Connection with Enterprise.**

**4.1**  **Servicer's Authority and Responsibility**. It is the Parties' intentions that Servicer shall provide such management, consulting and analytical services as it deems necessary to assist the Enterprise in undertaking the Unsecured Lending Business contemplated herein.

**4.1.1**  The Servicer is hereby granted the necessary power and authority to act in order to fulfill its responsibilities under this Agreement, including the execution and delivery of any and all agreements necessary or appropriate to effectuate the terms hereof subject to the limitations of the Section 4.1.1 herein. It should be noted, however, that Servicer has no authority

CONFIDENTIAL    Case 1:25-cv-00794-DAB-JGM    Document 52-1    Filed 03/11/26    Page 12 of 41    MARTORELLO_026266

to engage in origination activities, execute loan documentation, or approve the issuance of loans to third parties. Final determination as to whether to lend to a consumer rests with the Enterprise.

      **4.1.2**   Servicer shall, unless otherwise agreed to herein, require express written consent from the Tribe as sole member of the Enterprise to do any of the following: (1) to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of the Enterprise; (2) to sell or otherwise dispose of all or substantially all of the assets of the Enterprise; (3) to waive the sovereign immunity of the Enterprise.

    **4.2**   **Duties of the Servicer**. In providing services to Enterprise, the Servicer's duties may include, without limitation, the following:

      **4.2.1**   **Operations**. Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and to the Operations Manager and Tribal Representatives, reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment, including:

      **(a)**   Screening of and selecting service providers and lenders, and negotiating agreements with such service providers and lenders on behalf of the Enterprise on such terms and conditions as Servicer may reasonably determine to be appropriate, including but not limited to potentially securing a funding agreement between Alpha Credit Resources, LLC and the Enterprise, whereby Alpha Credit Resources, LLC may serve as Commercial Finance Provider for the Unsecured Lending Business;

      **(b)**   Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated service providers and lenders, including, but not limited to, the enforcement or termination of agreements with such service providers and lenders;

      **(c)**   Preparation of suggested practices and recommendations to the Tribal Representative of such suggested practices governing the operations of the Enterprise to provide that such operations are conducted in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

      **(d)**   Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise of such standards and practices to be adopted by the Enterprise provide that such operations are conducted in a manner consistent with the best interests of Enterprise and generally accepted industry standards;

      **(e)**   Preparation of training and education standards and recommendations to the Enterprise of such suggested practices to be adopted by the designated service providers and lenders to provide that such designated service providers and lenders are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

9

(f)     Preparation of standards for financial reporting and accounting and recommendations to the Enterprise of such best practices to be adopted by the designated service providers and lenders of the Enterprise provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted accounting standards presented on a cash basis;

(g)     Preparation of standards and screening and review of and making recommendations to the Enterprise regarding the website contents, marketing and consumer relations practices of designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

(h)     Monitor and supervision of and reporting to the Enterprise regarding the designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise;

(i)     Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise. The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation;

(j)     Servicer may also be responsible for training and monitoring employees of the Enterprise that operate the Enterprise's call center; and

(k)     Sale and transfer of Enterprise's right of collection of collateral on any Loan Transactions that become in default prior to settlement. Servicer shall sell Loan Transactions in default at prevailing market rates, to a third-party debt collector, with the third-party debt collector to effect the collection of the debt. This third-party debt buyer may be Capture Financial LLC or such other third-party debt as may be determined to be appropriate by the Parties.

4.2.2   **Contracts in Enterprise's Name**. Contracts for the operations of Enterprise shall be entered into in the name of Enterprise and shall be executed by the Enterprise. In no event shall Servicer be empowered to waive the sovereign immunity of the Enterprise or the Tribe in any contract, including but not limited to any contract for the operations of the Enterprise or for the supply of goods and services. No contracts for the supply of goods or services to Enterprise shall be entered into with parties affiliated with the Servicer or its officers or directors unless the affiliation is disclosed to and approved by Enterprise, which approval shall not be unreasonably withheld subject to the limitations of Section 4.1.1 herein. Servicer shall deliver all contracts executed by it on behalf of Enterprise to Enterprise on a monthly basis. The Servicer acknowledges that Enterprise and the Tribe retain exclusive sovereign control over the Enterprise's and the Tribe's immunity. If Servicer determines that a limited waiver of Enterprise's Tribal sovereign immunity is necessary and desirable for inclusion in any contract on behalf of the Enterprise, Servicer shall summarize the

CONFIDENTIAL MARTORELLO_026268

need for such waiver and the underlying contract for the Enterprise to seek approval of the Tribal Representative(s) and the Tribe as sole member of the Enterprise. Only after the matter has been forwarded for review to the Tribe's legal counsel, presented to the Tribal Council by the Tribal Representative(s), and authorized by Tribal Council resolution, shall the Servicer be authorized to execute the contract on behalf of the Enterprise.

        **4.2.3** **Consumer Loan Transaction Covenants and Agreements**. The Servicer shall assist the Enterprise with the compilation and provision of information and reports (financial and otherwise) as may be reasonably requested by the Tribe as sole member of the Enterprise in connection with the business of Enterprise or as required under Authorized Debt of Enterprise as defined in Section 5.2 herein, including any reports required to comply with the covenants and agreements contained therein. The Servicer shall promptly advise the Enterprise in the event that the Servicer becomes aware of any matter that may cause a default by Enterprise under any documents evidencing any indebtedness or obligation of Enterprise.

    **4.3** **Employees.**

        **4.3.1** **Servicer's Responsibility**. Subject to the Servicing Budget, Legal Requirements and the terms of this Agreement, Servicer shall have the exclusive responsibility for identifying and recommending third-party service providers needed for the business of the Unsecured Lending Business and shall assist the Operations Manager, at his or her request, in the selection, hiring, training, control and discharge of employees performing regular services for Enterprise in connection with the maintenance, operation, and management of the Unsecured Lending Business. Enterprise shall not engage any third-party service providers needed for the business of the Unsecured Lending Business without the benefit of Servicer's prior advice and approval, for which approval shall not be unreasonably withheld.

        **4.3.2** **Enterprise Employees**. Subject to the Servicing Budget, Servicer shall assist the Operations Manager and/or Tribal Representatives in directing the hiring and management of sufficient employees to effectively staff the Unsecured Lending Business, if any.

        **4.3.3** **Tribal Representative(s)**. Tribal Representative(s) shall have the full access to inspect all aspects of Enterprise, including the daily operations of Enterprise, and to verify daily Gross Revenues and all income of Enterprise. The Servicer or a designee otherwise appointed by the Servicer may accompany the Tribal Representative(s) upon any inspection.

        **4.3.4** **Indian and Other Preference, Wages, and Training**. The Servicer shall, during the term of this Agreement, be required to give preference in recruiting, training and recommending employment to Native Americans in any job category of the Enterprise, in accordance with any employment preference laws or policy now existing or later adopted by the Tribe.

    **4.4** **Enterprise Bank Accounts**. The Servicer shall select a bank or banks for the establishment of (i) a primary bank account by Enterprise into which all funds generated by the Unsecured Lending Business will be transferred and deposited (the "Primary Bank Account") and (ii) any other bank accounts by Enterprise subject to the Deposit Account Control

*11*

Agreement as the Servicer deems necessary or appropriate to conduct the Unsecured Lending Business consistent with this Agreement, e.g., an account to hold the Regulatory and Litigation Reserve Fund (as defined below). Unless otherwise mutually agreed in writing by the Enterprise and Servicer, the Servicer shall have sole signatory and transfer authority over such bank accounts. Servicer shall have sole authority to sweep monies from such bank accounts for distributions made to the Enterprise consistent with Sections 3.5.1 and 6.4. In addition to the foregoing, Servicer shall further have the sole authority to instruct and direct any ACH providers that Enterprise may engage to assist it in operating the Unsecured Lending Business, to the extent provided by this Agreement. The right to consent to change any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers rests mutually with Enterprise and Servicer. The signed authorization of both Servicer and Enterprise shall be required for any change to any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers. This section shall not apply in the event of a default; in the event of a default, the Security Agreement will allow Iron Fence Investments, Inc. to override this section.

**4.5    Servicing Budget and Business Plan**. Servicer shall provide to the Tribal Representatives an initial Servicing Budget and Business Plan ("Servicing Budget") for the review and consent of the Enterprise, which consent shall not be unreasonably withheld or delayed. Servicer shall, not less than ninety (90) days prior to the commencement of each full or partial year, submit to the Tribal Representative(s), for approval by the Enterprise and the Tribe as sole member of the Enterprise, a proposed Servicing Budget for the ensuing full or partial year, as the case may be. The Servicing Budget shall include a Regulatory and Litigation Reserve Fund and such other reserves as are deemed necessary for the conduct of the Unsecured Lending Business.

The Enterprise's and Tribe's approval of the Servicing Budget shall not be unreasonably withheld or delayed. Servicer shall meet with the Tribal Representative(s) to discuss the proposed Servicing Budget, and if requested, with the Tribe as sole member of the Enterprise. The Enterprise's and the Tribe's as sole member of the Enterprise approval shall be deemed given unless a specific written objection thereto is delivered by it to Servicer within sixty (60) days after Servicer and the Tribal Representative and/or the Tribe as sole member of the Enterprise have met to discuss the proposed Servicing Budget. If the Tribal Representative for any reason declines to meet with Servicer to discuss a proposed Servicing Budget, the Servicer shall meet with the Tribe as sole member of the Enterprise. The Enterprise and the Tribe as sole member of the Enterprise shall review the Servicing Budget on a line-by-line basis. To be effective, any notice which disapproves a proposed Servicing Budget must contain specific objections to individual Budget line items.

If the proposed Servicing Budget contains disputed budget item(s), the Enterprise and Servicer agree to cooperate with each other in good faith to resolve the disputed or objectionable proposed item(s). In the event the Enterprise and Servicer are not able to reach mutual agreement concerning any disputed or objectionable item(s) within a period of sixty (60) days after the date the Enterprise provides written notice of its objection to Servicer, either Party shall be entitled to submit the dispute to arbitration in accordance with Section 18. If the Enterprise and Servicer are unable to resolve the disputed or objectionable item(s) prior to the commencement of the applicable year, the undisputed portions of the proposed Servicing Budget

12

shall be deemed to be adopted and approved and the corresponding line item(s) contained in the Servicing Budget for the preceding year shall be adjusted as set forth herein and shall be substituted in lieu of the disputed item(s) in the proposed Servicing Budget. Those line items which are in dispute shall be determined as follows:

Pending resolution of any disputes over the Servicing Budget, each line item shall be determined by increasing the preceding year's actual expense for the corresponding line item by an amount determined by Servicer which does not exceed the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average, all items (1982-1984=100) for the year prior to the year with respect to which the adjustment to the line item(s) is being calculated or any successor or replacement index thereto. The resulting Servicing Budget obtained in accordance with the preceding sentence shall be deemed to be the Servicing Budget in effect until such time as the Enterprise and Servicer have resolved the disputed items.

Servicer may, subject to approval by the Enterprise if such a change requires reallocation of more than fifteen percent (15%) of the particular line items being affected, revise the Servicing Budget from time to time, as necessary, to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of expense. Servicer may, after notice to the Tribal Representatives, reallocate part or all of the amounts budgeted with respect to any line item to another line item and to make such other modifications to the Servicing Budget as Servicer deems necessary when such reallocation is fifteen percent (15%) or less than for the line items being affected. The Enterprise acknowledges that the Servicing Budget is intended only to be a reasonable estimate of Enterprise revenue and expenses for the ensuing year. Servicer shall not be deemed to have made any guaranty, warranty or representation whatsoever in connection with the Servicing Budget, however Servicer shall act in good faith when projecting, proposing and presenting an Servicing Budget to the Enterprise for its approval.

    4.6    **Regulatory and Litigation Matters**. If any claim or legal action, except an action to impose taxes as contained in 7.5.1 of the Agreement, is brought against the Enterprise, the Tribe, the Servicer, Enterprise or any employee of the Servicer having responsibilities related to the Enterprise or of Enterprise, or official or employee of the Tribe by any person arising out of the operation of Enterprise or against the Servicer, its parent or Affiliates, employees, directors, managers or members arising out of Servicer's provision of services to the Unsecured Lending Business of Enterprise or performance hereunder or the execution of this Agreement or any other related agreement by Enterprise and Servicer, Enterprise, or the Servicer, as appropriate, shall defend such action. Any cost of such litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by the Enterprise or Servicer against any third party, shall constitute a Servicing Expense. The only exception to the foregoing shall be that each Party will be responsible for its own acts if same are proven to constitute fraud or willful or wanton misconduct. Nothing in this Section shall be construed to waive, in whole or in part, the Tribe's or Enterprise's sovereign immunity, except as contemplated in the limited waiver of sovereign immunity contained in Section 14 herein.

*13*

The Enterprise and Servicer shall establish and maintain a separate and segregated joint signature bank account ("Regulatory and Litigation Reserve Fund") that shall contain a balance of not less than, but no more than, Fifty Thousand Dollars ($50,000). The Regulatory and Litigation Reserve Fund shall be funded with one dollar ($1.00) for every New Transaction and ($.50) for every Repeat Transaction and Refinancing Transaction, as those terms are defined herein. The exclusive purpose of the Regulatory and Litigation Reserve Fund is to provide funding for Enterprise of the costs of any litigation, defense, responses to regulatory inquiries, litigation and other similar expenses arising out of the business of Enterprise. If any claim or legal action is brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, Enterprise, in collaboration and coordination with the Servicer, shall defend such action with monies in the joint signature account described herein as Servicer and Enterprise may agree. Any cost of such regulatory action or litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by Servicer or Enterprise against any third party, shall be paid by the Regulatory and Litigation Reserve Fund to the extent funds are at the time of payment available therein or if funds are not at the time of such payment then available the amount paid in excess of available funds shall constitute an Servicing Expense. In the event Servicer expends any monies from the Regulatory and Litigation Reserve Fund, the Regulatory and Litigation Reserve Fund shall be replenished in the same manner of initial funding described in the first sentence of this paragraph beginning the first day of the first month following such an expenditure and continue until the Regulatory and Litigation Reserve Fund is again fully funded at $50,000.

To the extent Enterprise maintains or acquires any insurance policy that might cover the cost of defense of any action or any liability resulting from an action against the Enterprise or operation of the Unsecured Lending Business, Enterprise shall name Servicer as an additional insured under any such insurance policy. To the extent there is any such insurance coverage available, Servicer shall seek to use such insurance monies before use of Regulatory and Litigation Reserve Fund monies in defense of any claim or legal action brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, in collaboration and coordination with the Servicer. If, in Servicer's sole discretion, it is not practicable to expend insurance monies before Regulatory and Litigation Reserve Fund monies, Servicer shall seek to replenish any spent Regulatory and Litigation Reserve Fund monies with reimbursement under any applicable insurance policy. To the extent the Regulatory and Litigation Reserve Fund is insufficient to cover the costs of defense of any action or liability, Servicer shall advance monies that it deems necessary and appropriate to defend against such action or liability. Servicer shall be able to be reimbursed with distributions from the Regulatory and Litigation Reserve Fund as it might later be replenished in the manner described in this Paragraph 4.6.

**4.7** **No Servicer Wages or Salaries**. Neither the Servicer nor any of Servicer's employees, officers, directors or principals shall be compensated by wages from or contract payments by Enterprise for their efforts or for any work which they perform under this Agreement other than the Servicing Fee paid to Servicer under Section 6.2.

CONFIDENTIAL Case 1:25-cv-00794-DAB-JGM    Document 52-1    Filed 03/11/26    Page 18 of 41    MARTORELLO_026272

**4.8** **Internal Control Systems**. The Servicer shall recommend and assist the Operations Manager and Tribal Representatives in implementing accounting standards applicable to the unsecured consumer lending industry.

**4.9** **Daily Deposits to Bank Account**. The Servicer shall collect all gross revenues and other proceeds connected with or arising from the operation of Enterprise and all other activities of Enterprise and deposit proceeds daily into a bank account established under Section 4.4 consistent with Paragraph 3.5.1 herein, except as to any restrictions on cash deposits imposed by the local bank.

**4.10** **No Cash Disbursements**. The Servicer shall not make any cash disbursements from the bank accounts or on hand cash except for the disbursements from any petty cash fund of Enterprise maintained in accordance with the Servicing Budget. Any and all other payments or disbursements by the Servicer shall be made by check or wire transfer drawn against a bank account.

**4.11** **Transfers Between Accounts**. The Servicer has the authority to transfer funds among the bank accounts of Enterprise unless otherwise provided by the Servicing Budget, in order to pay Servicing Expenses, pay the Servicing Fee, or to pay a debt service and any other payments provided for in Section 6 or elsewhere in this Agreement.

**4.12** **Accounting and Books of Account.**

     **4.12.1 Statements**. The Servicer shall prepare and provide to Enterprise servicing statements on a monthly, quarterly, and annual basis, which shall include: comparative statements of all revenues after the first full year of operation, statements of all other amounts collected and received, and all deductions and disbursements made there from in connection with Enterprise. The monthly and quarterly servicing reports shall be delivered by the twenty-first (21st) day of the following month, with the annual servicing report delivered within ninety (90) days of the year-end and shall be in form satisfactory to meet all requirements under any Authorized Debt as defined in Section 5.2. The Enterprise shall include as an Servicing Expense the annual compilation of the books and records of Enterprise and any Subsidiaries as Enterprise deems necessary by a certified public accounting firm selected by the Enterprise subject to the reasonable consent of Servicer, which consent shall not be unreasonably withheld. Such reviews may be used by the Servicer for reporting purposes under applicable laws, if required. The reviewers shall have access to all books and records, all cash management procedure manuals, all internal control manuals, and all other records, documents, papers and persons of Enterprise or employed by Enterprise or Servicer as the reviewers shall deem necessary. For each review performed, the reviewers shall provide Servicer with a letter noting any control weaknesses or other items which it believes should be brought to the attention of the Servicer, and shall permit Servicer to respond to the letter with changes to the operations of Enterprise deemed appropriate by the Servicer which address any concerns expressed in the draft letter within thirty (30) days. The Enterprise warrants that it shall retain in the strictest confidence the information provided by Enterprise, and shall include in any reports concerning Servicer's financial affairs only such portions of information supplied by Enterprise as is required by statute to be provided.

CONFIDENTIAL Case 1:25-cv-00794-DAB-JGM    Document 52-1    Filed 03/11/26    Page 19 of 41  MARTORELLO_026273

**4.12.2 Accounting Standards.** Servicer shall maintain the books and records reflecting the operations of Enterprise in accordance with the accounting practices of Servicer on a cash basis consistently applied and shall adopt and follow a fiscal year end of December 31. The accounting records reflecting detailed day-to-day transactions of Enterprise's operations shall be kept by Servicer and made available to the Tribal Representative(s) upon request. The accounting systems and procedures shall, at a minimum (i) include an adequate system of internal accounting controls; (ii) permit the preparation of financial statements on a cash basis; (iii) permit the calculation and payment of the Servicing Fee; (iv) provide for the allocation of servicing expenses or overhead expenses among Enterprise and any other user of shared facilities and services; and (vi) provide for disbursements to Enterprise

**4.13    Enterprise Servicing Standards.** Servicer shall operate Enterprise in accordance with servicing standards mutually agreed upon by the Servicer and the Enterprise, which standards shall be consistent with the servicing standards of the industry generally.

**5.    Liens and Debt.**

**5.1    Liens.** The Enterprise specifically represents and warrants to the Servicer that during the term of this Agreement Enterprise shall not act in any way whatsoever, either directly or indirectly, to cause any Party to become an encumbrance or lienholder of any facility utilized by Enterprise or any tangible or intangible personal property assets of Enterprise, other than, as to the tangible or intangible personal property assets of Enterprise only, a creditor of Enterprise, or the Servicer, provided the Servicer is a creditor or is guaranteeing the amounts due under Authorized Debt, or to allow any Party to obtain any interest in this Agreement without the prior written consent of the Servicer.

**5.2    Authorized Debt.** "Authorized Debt" shall mean debt incurred by Enterprise to operate the Unsecured Lending Business, including from one or more Commercial Finance Providers, and any extensions or renewals of such debt.

**6.    Servicer Fee Reimbursement, Disbursement, and Capital Contribution.**

**6.1    Disbursements at the Commencement of the Term.**  On the Effective Date, Servicer shall pay from its own account, and not the account of Enterprise, to Enterprise as directed by Enterprise the sum of five thousand and No/100 Dollars ($5,000.00) to reimburse the Enterprise for due diligence-related costs.

**6.2    Servicing Fee.** Servicer is authorized by Enterprise to pay itself its Servicing Fee in accordance with the terms of Section 3.5.1 hereof.

**6.3    Disbursements.** All revenues received by Enterprise in connection with the Unsecured Lending Business shall be deposited into the Primary Bank Account. These revenues shall, in turn, be disbursed by Servicer, for and on behalf of Enterprise, from the Primary Bank Account to pay, to the extent available, Servicing Expenses.

**6.4    Payment of Fees and Tribal Disbursement.** No later than fifteen (15) days or such other time period as provided in this Agreement after the end of each calendar month of operations, the Servicer shall calculate and report to the Enterprise the Gross Revenuesfor the

CONFIDENTIAL MARTORELLO_026274

preceding month and shall disburse the funds in the Primary Bank Account (or otherwise set aside reserves out of such funds as permitted by this Agreement) to the extent due and payable in the following order of priority:

6.4.1   To the Enterprise, 50% of Tribal Net Profits and to Tribal Loan Management, LLC, 50% of Tribal Net Profits in accordance with Section 7.15;

6.4.2   To Servicer, an amount sufficient to reimburse Servicer for any amounts advanced to the Enterprise by Servicer;

6.4.3   To all service providers, including Servicer, all Servicing Expenses, including allocations to reserves as provided in the Servicing Budget, including any additional monies owed to Servicer, to the extent the same have not been paid during the course of the preceding calendar month;

6.4.4   To any creditor of the Enterprise, an amount sufficient to repay any principal or interest outstanding under any Authorized Debt extended by such creditor but only to the extent then required to be repaid (and which amount(s) shall first be paid out of any reserves established for the repayment of any such debt); and

6.4.5   To the Servicer, the Servicing Fee in the manner directed by the Servicer (which shall be paid monthly pursuant to Section 3.5.1 hereof).

7.   **General Provisions.**

7.1   **Notice**. All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each Party at the following addresses:

**If to Enterprise:**      Red Rock Tribal Lending, LLC
P.O. Box 249
Watersmeet, MI  49969

Lac Vieux Desert Band of Lake Superior Chippewa Indians,
As sole member of Red Rock Tribal Lending, LLC
Attn: General Counsel
P.O. Box 249
Watersmeet, Michigan 49969

**If to Servicer:**      Bellicose VI, Inc.
2106 Company Street, Suite 4
Christiansted, VI   000820

*17*

**7.2** **Authorization**. The Enterprise and Servicer represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof. The Enterprise further warrants that it has complied with all applicable tribal laws and procedures necessary to effectuate its obligations herein, including but not limited to any requisite Tribal approvals. Upon request, each Party shall furnish the other evidence of the authority represented in this Paragraph 7.2.

**7.3** **Relationship**. Servicer and Enterprise or the Tribe as sole member of the Enterprise shall not be construed as joint-venturers or partners of each other by reason of this Agreement and none shall have the power to bind or obligate the other except as set forth in this Agreement.

**7.4** **Servicer's Contractual Authority in the Performance of this Agreement**. Subject to the provisions of Section 4.2.2, and applicable law, Servicer is authorized to negotiate, and perform for the account of Enterprise any contracts deemed necessary or appropriate by Servicer and executed by the Enterprise to perform Enterprise's obligations under this Agreement and any other agreement or other instrument reasonable necessary or appropriate in the conduct of the Unsecured Lending Business or authorized herein.

**7.5** **Further Actions**. Enterprise and Servicer agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

**7.5.1** **Taxes**. If any state or any local government attempts to impose any possessory interest tax upon any Party to this Agreement or upon any facility utilized by Enterprise, in the name of the appropriate Party or parties in interest, will, upon the request of either Party, resist such attempt through legal action. The costs of such action and the compensation of legal counsel shall be an Servicing Expense of Enterprise. Any such tax shall constitute an Servicing Expense of Enterprise. This Section shall in no manner be construed to imply that any Party to this Agreement or Enterprise, or Authorized Agents are liable for any such tax, or that any state or federal tax on the Servicer's income is to be considered an expense of Enterprise or Authorized Agents.

**7.5.2** **Tribal Taxes**. The Enterprise agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments, or other charges of any nature whatsoever on payments of any debt service to Servicer, or to any Authorized Agents, or to any lender furnishing financing for any facility utilized by or for Enterprise, or on Enterprise or the revenues therefrom, or on any Servicing Fee as described in Section 3.5 of this Agreement; provided, however, Enterprise may assess a tax upon Servicer or an Authorized Agent in the nature of a business license and occupation tax or other tax assessed against Servicer or an Authorized Agent by any state, but only to the extent that same is a dollar for dollar set off against the state tax. The Enterprise further agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments or other charges of any nature whatsoever on the salaries or benefits, or dividends paid to, any of the Servicer's stockholders, officers, directors, or employees or any of the stockholders, officers, directors, or employees of Enterprise, or any of the Subsidiaries of Enterprise or Servicer, or any of the Authorized Agents. The Enterprise further agrees that the amount of any

CONFIDENTIAL MARTORELLO_026276

tax, fee, assessment or other charge of any nature whatsoever that may subsequently be imposed contrary to this Section 7.5.2 shall be added to the Servicing Fee to which the Servicer is entitled under this Agreement. Servicer retains the right, in its sole discretion, to terminate this Agreement and all accompanying agreements if it reasonably determines that any statute or regulation of the Tribe renders operation of Enterprise uncompetitive. Should the Servicer terminate this Agreement pursuant to this Section, the Servicer shall retain the right to repayment of money lent to Enterprise on a limited recourse basis, limited exclusive to the assets of the Enterprise and to no other assets of the Tribe or any other arm or affiliate of the Tribe. Except as otherwise provided herein, if any taxes, fees or assessments are levied by the Tribe on Enterprise, Servicer, or any Authorized Agent, such taxes and assessments shall be abated for the term of this Agreement. Nothing herein shall limit the Tribe's ability to tax its members or businesses operating within the regulatory jurisdiction of the Tribe.

**7.5.3** **Situs of the Contracts**. This Agreement, as well as all contracts entered into between Enterprise and any person or any entity providing services to Enterprise or to the Servicer on behalf of Enterprise, shall be deemed entered into at the Tribal Administration Office of the Tribe in Watersmeet, Michigan, and shall be subject to all Legal Requirements of the Tribe and federal law, except as otherwise expressly provided herein.

**7.5.4** **Enforcement**. Authorized Agents are agreed to be intended third party beneficiaries of this Section 7.5 and shall have the right to enforce same to the extent of any breach thereof as same applies to such Authorized Agent.

**7.6** **Defense**. Except for disputes between Enterprise and Servicer, Servicer shall bring and/or defend and/or settle any claim or legal action brought against Servicer or Enterprise and/or the Tribe, individually, jointly or severally in connection with the operation of Enterprise. Servicer and Enterprise shall consult and agree on who Enterprise shall retain as legal counsel, accountants and such other professionals, consultants and specialists to defend and/or settle any such claim or cause of action, and such professionals shall be under the supervision of Servicer, subject to the approval of the Enterprise. In all claims or legal actions bringing claims against Enterprise and/or the Tribe involving questions of jurisdiction, tribal sovereignty or sovereign immunity issues, the Servicer shall consult with Enterprise and the Tribe concerning the presentation and defense of such actions and the Tribe and Enterprise shall provide any information necessary to assist in the Servicer's and Enterprise's defense of any such claims or legal actions. All liabilities, reasonable costs, and expenses, including attorneys' fees and disbursements, incurred in defending and/or settling any such claim or legal action which are not covered by insurance shall be paid from the Regulatory and Litigation Reserve Fund to be established by Enterprise and the Servicer pursuant to Section 6.3, or otherwise as an Servicing Expense. Nothing contained herein is a grant to the Servicer of the right to waive tribal sovereign immunity of the Tribe or of Enterprise.

**7.7** **Tribal Laws**. The Enterprise represents that attached hereto as Schedule 1.0 is a complete copy of each and every law of the Tribe or otherwise that may pertain to the transactions and activities contemplated to be conducted pursuant to this Agreement and the agreements between Enterprise and each designated service provider and lender of the Subsidiaries and between Enterprise and such Subsidiaries; and furthermore, that except as provided in such laws set forth in Schedule 1.0, there are no laws, requirements or restrictions

*19*

that are reasonably known to the Parties as of the effective date of this Agreement that could apply to such transactions and activities, including but limited to laws, requirements or restrictions related to civil or criminal usury. Any passage by the Tribe of any law or requirement that, in Servicer's discretion, is determined to have a material negative impact on the financial benefits of this Agreement may be regarded as a breach of this Agreement by Enterprise, and actionable by Servicer under the dispute resolution provisions herein.

7.8 **Waivers**. No failure or delay by Servicer or Enterprise to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

7.9 **Captions**. The captions for each Section are intended for convenience only.

7.10 **Severability**. If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof. If, however, any material part of a Party's rights under this Agreement shall be declared invalid or unenforceable (specifically including Servicer's right to receive its Servicing Fees) the Party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other Party, without liability on the part of the terminating Party.

7.11 **Interest**. Any amount payable to Servicer or Enterprise by the other which has not been paid as provided herein shall accrue interest as may be agreed upon by the parties.

7.12 **Reimbursement**. The performance by Servicer of its responsibilities under this Agreement are conditioned upon Enterprise generating sufficient funds from borrowings and operations to enable Servicer on a timely basis to perform its obligations hereunder. Notwithstanding the foregoing, Servicer shall, according to the terms of this Agreement may, at its option if not so required, advance funds or contribute property, on behalf of Enterprise, subject to the prior approval of the Enterprise, to satisfy obligations of Enterprise in connection with Enterprise and this Agreement. Servicer shall keep appropriate records to document all reimbursable expenses paid by Servicer, which records shall be made available for inspection by Enterprise through the Tribal Representative(s) or its agents upon request and supplied to the Tribe as sole member of the Enterprise on a monthly basis. Enterprise agrees to reimburse Servicer with interest from future Net Revenues of Enterprise for money paid or property contributed by Servicer to satisfy obligations of Enterprise in connection with this Agreement. Interest shall be calculated at the rate set forth in Section 7.11, or if no rate was agreed upon at six percent (6%) per annum, from the date the Servicer advances monies to the date reimbursement is made. The Servicer's sole source of such reimbursement shall be from the assets of Enterprise.

CONFIDENTIAL Case 1:25-cv-00794-DAB-JGM    Document 52-1    Filed 03/11/26    Page 24 of 41 MARTORELLO_026278

**7.13** <u>Travel and Out-of-Pocket Expenses</u>. Subject to the Servicing Budget, all travel and out-of-pocket expenses of Enterprise or Servicer or employees of Enterprise reasonably incurred in the performance of their duties shall be an Servicing Expense.

**7.14** <u>Third-Party Beneficiary</u>. This Agreement is exclusively for the benefit of the parties hereto and it may not be enforced by any Party other than the parties to this Agreement and shall not give rise to liability to any third party other than the authorized successors and assigns of the parties hereto.

**7.15** <u>Brokerage or Other Fees</u>. Servicer and Enterprise acknowledge that Tribal Loan Management, LLC has brokered the transaction between the Tribe, as sole member of the Enterprise, and Servicer. Further, the Enterprise has authorized that fifty percent (50%) of the Tribal Net Profits due to the Tribe pursuant to Section 3.5.1 with the minimum set forth therein be paid directly to Tribal Loan Management, LLC by the Servicer on behalf of the Enterprise concurrent with the payment to the Enterprise on a monthly basis along with a copy of the monthly financial statements of the Enterprise. Servicer and Enterprise hereby agree to indemnify and hold the other harmless from and against any and all claims, loss, liability, damage or expenses (including reasonable attorneys' fees) suffered or incurred by the other Party as a result of a claim brought by a person or entity engaged or claiming to be engaged as a finder, broker or agent by the indemnifying Party except for those listed in this Paragraph 7.15.

**7.16** <u>Survival of Covenants</u>. Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination or expiration of this Agreement, shall survive any such termination or expiration for a period of one (1) year following the termination or expiration of this Agreement.

**7.17** <u>Survival of Remedy</u>. Subsequent to any termination of this Agreement, the dispute resolution provisions of this Agreement, including but not limited to the waiver of the Enterprise's sovereign immunity, shall remain available to the Parties with respect to disputes arising out of or relating to this Agreement prior or subsequent for a period of one (1) year after the termination date.

**7.18** <u>Periods of Time</u>. Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or any holiday observed by the Tribe, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or Tribal holiday.

**7.19** <u>Preparation of Agreement</u>. This Agreement shall not be construed more strongly against either Party regardless of who is responsible for its preparation.

**7.20** <u>Exhibits</u>. All exhibits and schedules attached hereto are incorporated herein by reference and made a part hereof as if fully rewritten or reproduced herein.

**7.21** <u>Successors, Assigns, and Subcontracting</u>. The benefits and obligations of this Agreement shall inure to and be binding upon the parties hereto and their respective successors and assigns. Enterprise's (subject to the limitations of its Governing Documents) prior written consent shall be required for Servicer to assign or subcontract any of its rights, interests or obligations as Servicer hereunder to any successor or assign, except to any parent, subsidiary or

21

affiliate of Servicer. The Enterprise shall, with the prior written consent of the Servicer, which consent shall not be unreasonably withheld, have the right to assign this Agreement and the assets of Enterprise to an instrumentality of the Tribe, including an entity wholly owned by the Tribe organized to conduct the business of Enterprise for the Tribe that assumes all obligations herein. Any assignment by the Enterprise shall not prejudice the rights of the Servicer under this Agreement. No assignment authorized hereunder shall be effective until all necessary government approvals, if any, have been obtained.

    **7.22**   **Modification**. Any change to or modification of this Agreement must be in writing signed by all parties hereto.

## 8.    Warranties.

    **8.1**   **Warranties**. The Servicer and Enterprise each warrant and represent that they shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated, except pursuant to Section 7.22. The Servicer and Enterprise warrant and represent that they shall take all actions necessary to ensure that this Agreement shall remain in full force and effect at all times.

    **8.2**   **Interference in Tribal Affairs**. The Servicer agrees not to interfere in or attempt to influence the internal affairs or government decisions of Tribal government by offering cash incentives, by making written or oral threats to the personal or financial status of any person, or by any other action, specifically including actions in the normal course of business of the Servicer that only affect the activities of Enterprise, except for contact with Enterprise, authorized Enterprise employees, or the Tribe as contemplated in this Agreement. For the purposes of this Section 8.2, if any such undue interference in Tribal affairs is alleged by the Enterprise in writing and through arbitration it is found that the Servicer has unduly interfered with the internal affairs of the Tribal government and has not taken sufficient action to cure and prevent such interference, that finding of interference shall be grounds for termination of the Agreement.

    **8.3**   **No Political Interference with Operations**. The Enterprise agrees that it shall not, through the Tribe's elected government officials or tribal employees, interfere with the day-to-day operations of Servicer or of the Subsidiaries.

    **8.4**   **Prohibition of Payments to Members of Tribal Government**. The Servicer represents and warrants that no payments have been or will be made to any member of the Tribal government, any Tribal official, any relative of a member of Tribal government or Tribal official, or any Tribal government employee for the purpose of obtaining any special privilege, gain, advantage or consideration. Any payment received by a Tribal Representative in the performance of his or her duties as Tribal Representative shall not constitute a prohibited payment.

    **8.5**   **Prohibition of Hiring Members of Tribal Government**. No member of the Tribe may be employed at Enterprise without a written waiver of this Section 8.5 by the Tribe adopted by motion or Resolution of the Tribal Council, and as otherwise required by applicable law. This provision shall not apply to the hiring or selection of the Tribal Representative.

22

**8.6    Prohibition of Financial Interest in Enterprise.** No member of the Tribal government or relative of a member of the Tribal government shall have a direct or indirect financial interest in Enterprise greater than the interest of any other member of the Tribe, nor shall any such person have any direct or indirect financial interest in the Servicer, its parents, subsidiaries or affiliates.

**8.7    Definitions.** As used in this Section 8, the term "member of the Tribal government" means the Tribal Representatives or any member of the Tribal Council, or other tribal elected official, or any independent board or body created to oversee any aspect of Enterprise or its business and any Tribal Court official; the term "relative" means an individual residing in the same household who is related as a spouse, father, mother, son or daughter.

## 9.    Grounds for Termination.

**9.1    Voluntary Termination and Termination for Cause.** This Agreement may be terminated as set forth in this Agreement.

**9.2    Voluntary Termination.** This Agreement may be terminated upon the mutual written consent and approval of the Parties. This Agreement may also be terminated voluntarily solely by Servicer upon one hundred and eighty (180) days written notice to the other Party pursuant to the notice provisions of Section 7.1 herein. The Enterprise may terminate this agreement upon one hundred and eighty (180) days written notice following the period in which any Authorized Debt is outstanding in which any Bellicose VI guaranty remains outstanding.

**9.3    Termination for Cause.** Any of the parties may terminate this Agreement if any of the Parties commits or allows to be committed any material breach of this Agreement. A material breach of this Agreement shall include, but not be limited to, a failure of either Party to perform any monetary obligation within five (5) days of when due, or any nonmonetary material duty or obligation on its part for any twenty (20) consecutive days after notice. A Party may not terminate this Agreement on grounds of material breach unless it has provided written notice to the other parties of its intention to declare a default and to terminate this Agreement and the defaulting Party thereafter fails to cure or take steps to substantially cure the default within ninety (90) days following receipt of such notice. The discontinuance or correction of a material breach shall constitute a cure thereof.

In the event of any termination for cause, regardless of fault, the Parties shall retain all money previously paid to them pursuant to Section 6 of this Agreement and shall receive all amounts currently owed to them under this Agreement.

An election to pursue damages or other equitable remedies while this Agreement remains in effect pursuant to the provisions of Section 9.6 or 9.7 shall not preclude the injured Party from providing notice of termination pursuant to this Section 9.3. Neither shall termination preclude a suit for damages.

**9.4    Involuntary Termination Due to Changes in Legal Requirements.** It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited

23

by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

**9.5**     **Consequences of Servicer's Breach**. In the event of the termination of this Agreement by Enterprise for cause under Section 9.3, the Servicer shall not, prospectively from the date of termination, except as provided in Section 9.3, have the right to its Servicing Fee from Enterprise, but such termination shall not affect the Servicer's rights relating to reimbursement for any amounts it has loaned Enterprise under this Agreement through the date of termination or other agreements entered pursuant hereto. Any Net Revenues accruing through the date of termination shall be distributed in accordance with Section 6 of this Agreement.

**9.6**     **Consequences of Enterprise's Breach**. In the event of termination of this Agreement by the Servicer for cause under Section 9.3, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise, but only insofar as these liabilities result from acts within the control of Enterprise or its agents or created by the termination of this Agreement, and also with the source for such indemnification limited to the assets or future earnings of Enterprise and without recourse to other assets of the Tribe. The parties acknowledge and agree that termination of this Agreement may not be a sufficient or appropriate remedy for breach by Enterprise, and further agree that pursuant to the other provisions of this Agreement, the Servicer shall, upon breach of this Agreement by Enterprise, have the right to pursue such remedies (in addition to termination) at law or equity as it determines are best able to compensate it for such breach, including, without limitation monetary compensation, except that the source for such compensation shall be limited to the assets or future earnings of Enterprise without recourse to other assets of the Tribe, specifically the Servicing Fee pursuant to Section 6 for a term equal to the then remaining term of this Agreement at the amount specified in Section 6 provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt.  Enterprise specifically acknowledges and agrees that there will be irreparable harm to the Servicer and that damages will be difficult to determine if Enterprise commits any breach, and Enterprise therefore further acknowledges that an injunction and/or other equitable relief is an appropriate remedy for any such breach.  In such event, the Servicer shall have the right to its Servicing Fee accruing through the date of termination as provided in Section 6 of this Agreement, the repayment of

24

unpaid principal and interest and other amounts due under any loans from it to Enterprise, provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt as defined in Section 5.2.

**10.    Conclusion Of the Servicing Term**. Upon the conclusion of the Term of this Agreement, or the termination of this Agreement under other of its provisions, in addition to other rights under this Agreement, the Servicer shall have the following rights:

**10.1    Transition**. If termination occurs at any time other than upon the conclusion of its Term, Servicer shall be entitled to a reasonable period of not less than thirty (30) days to transition services for which it has been retained to provide to Enterprise to the Tribe or its designee. Any property or equipment of Servicer that may be located at any location of the Tribe or Enterprise shall be returned to Servicer. Any property or equipment of Enterprise that may be located at any location of the Tribe or Enterprise shall be returned to Enterprise.

**10.2    Undistributed Net Revenues and Remaining Regulatory and Litigation Reserve Fund Monies**. If Enterprise has accrued Net Revenues which have not been distributed under Section 6 of this Agreement, the Servicer shall receive that Servicing Fee equal to that Fee it would have received had the distribution occurred during the Term of the Servicing Agreement. Any monies remaining in the Regulatory and Litigation Reserve Fund twelve (12) months after the conclusion of the management term shall be distributed fifty-fifty to the Servicer and Enterprise in accord with the proportion the Parties contributed those monies to the Regulatory and Litigation Reserve Fund.

**11.    Consents and Approvals.**

**11.1    Enterprise**. Where approval or consent or other action of Enterprise is required, such approval shall mean the written approval of the Enterprise subject to its Governing Documents. Should the Governing Documents require the Tribe as sole member of the Enterprise to act, such action should be evidenced by a duly enacted resolution or properly recorded motion at a meeting of the Tribal Council thereof. Any such approval, consent or action shall not be unreasonably withheld or delayed.

**11.2    Servicer**. Where approval or consent or other action of the Servicer is required, such approval shall mean the written approval of the Operations Manager. Any such approval, consent or other action shall not be unreasonably withheld or delayed.

**12.    Disclosures.**

**12.1    Warranties. The Servicer warrants and represents as follows**: (i) no person or entity has any beneficial ownership interest in the Servicer other than as set forth herein; (ii) no officer, director or owner of 5% or more of the stock of the Servicer has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense related to business of payday loans or the payday loan industry in general, or had any association with individuals or entities known to be connected with organized crime; and (iii) no offices or director of the Servicer, has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense described in subsection (ii) above, or had any association with individuals or entities known to be connected with organized crime.

25

**12.2    Disclosure Amendments**. The Servicer agrees that whenever there is any material change in the information disclosed pursuant to this Section 12 it shall notify the Enterprise in writing pursuant to Section 7.1. All of the warranties and agreements contained in this Section 12 shall apply to any person or entity that would be listed in this Section 12 as a result of such changes.

**12.3    Breach of Servicer Warranties and Agreements**. The material breach of any warranty or agreement of the Servicer contained in this Section 12 shall be grounds for immediate termination of this Agreement; provided that if a breach of the warranty contained in clause (ii) of Section 12.2 is discovered, and such breach was not disclosed but all officers and directors of the Servicer sign sworn affidavits that they had no knowledge of such breach, then the Servicer shall have thirty (30) days after notice from Enterprise to terminate the interest of the offending person or entity and, if such termination takes place, this Agreement shall remain in full force and effect.

**13.    No Present Lien Lease or Joint Venture**. The parties agree and expressly warrant that neither the Servicing Agreement nor any exhibit thereto is a mortgage or lease and, consequently, does not convey any present interest whatsoever in Enterprise or its assets, nor any proprietary interest in Enterprise itself. The parties further agree and acknowledge that it is not their intent, and that this Agreement shall not be construed, to create a joint venture between Enterprise and the Servicer; rather, the Servicer shall be deemed to be an independent contractor for all purposes hereunder.

**14.    Enterprise's Limited Waiver of Sovereign Immunity**. Subject to the provisions hereof, Enterprise, to the extent that Enterprise can avail itself to the sovereign immunity of the Tribe, the Enterprise hereby clearly, expressly and irrevocably grants to Servicer and its respective successors and assigns hereunder a clear, express and unequivocal waiver of tribal sovereign immunity, to the extent limited herein, from suits, actions or arbitration or mediation proceedings and consents to suits, actions or arbitration or mediation proceedings arising under this Agreement, all in accordance with the terms and limitations herein. Enterprise hereby makes this limited waiver of sovereign immunity as follows:

**14.1**    For the purpose of allowing the Servicer to take any and all actions necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth in Section 18, including mediation, arbitration, and judicial enforcement proceedings which seek injunctive or declaratory relief and/or damages (as limited in Paragraph 16), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted herein. This waiver of sovereign immunity also applies to any attempt by a later tribal government to revoke the Enterprise's waiver of sovereign immunity or consents herein. The Enterprise waives its sovereign immunity, if applicable, from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions hereof, which is final because either the time for appeal thereof has expired or the judgment or an order issued by a court having final appellate jurisdiction over the matter.

**14.2**    Subject to this Section 14, pursuant to its limited waiver, Enterprise expressly waives its immunity from suit and consents to be hailed into mediation or arbitration as provided

*26*

in Section 18 and/or to be sued in any of the following: the Lac Vieux Desert Band of Lake Superior Chippewa Tribal Court, Michigan state courts, and the United States District Court for the Western District of Michigan and appellate courts therefrom for all three (3) jurisdictions for any claims by the Servicer arising out of this Agreement. As to any claims by the Servicer or its successors or assigns arising under this Agreement, Enterprise waives its rights to claim it is a tribal entity and/or is operating as a subordinate part of the tribal government entitling as a defense to legal action by the Servicer or its successors or assigns in accord with this Paragraph 14.2.

     **14.3**    Enterprise agrees that it shall not plead or raise as a defense to any action brought by the Servicer or its successors or assigns any right or claim of right to the requirement of exhaustion of tribal court remedies, as the parties have expressly agreed, subject to 14.2 above. The Enterprise waives its rights to have any dispute, controversy, suit, action or proceeding, if any, heard in any tribal court or other tribunal or forum, council or adjudicative body of the whether or not such forum now exists or is hereafter created. The Enterprise hereby expressly waives any requirement which may exist for exhaustion of any remedies available in any tribal forum prior to the commencement of any dispute, controversy, suit, action proceeding in any state or federal court even if any such tribal forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver, and any application of the abstention doctrine and any other law or interpretation thereof that might otherwise require, as a matter of law or comity, that resolution of any claim, controversy or dispute be heard first in a tribal forum.

     **14.4**    The limited waiver of sovereign immunity granted here does not include any waiver, either express or implied, to any third party.

     **14.5**    The Enterprise covenants and agrees that the clear, express and unequivocal limited waiver of sovereign immunity and other waivers contained herein are irrevocable and agrees not to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers contained herein or in any way attempt to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers, as the case may be. In the event that the Enterprise (i) revokes, limits, or attempts to revoke or limit the waivers granted herein, (ii) takes any action that is inconsistent with the waivers granted herein, or (iii) fails to submit to the jurisdiction of the tribal, state or federal courts or arbitration tribunals as provided herein, the parties expressly recognize and agree that there remains no adequate remedy at law available to the Parties and that they will be injured. In any such event, Enterprise hereby agrees that the Servicer may seek immediate judicial injunctive relief as provided herein.

     **14.6**    The limited waiver of sovereign immunity of Enterprise as provided for in this Section shall expire at the conclusion of the longer of (i) one (1) year after the termination or expiration of this Agreement, or (ii) at the conclusion of any mediation, arbitration or litigation matter with respect to this Agreement pending at the termination or expiration of this Agreement, including the conclusion of any potential appeals available from such proceedings.

**15.**    **<u>Time is of the Essence</u>**. Time is of the essence in the performance of this Agreement.

CONFIDENTIAL

MARTORELLO_026285

16.     **Tribal Assets**. The Servicer understands and agrees that notwithstanding anything to the contrary herein, the obligations of the Enterprise hereunder are unsecured obligations and no recourse may be made against any assets of the Tribe, and recourse may only be made against the revenues and personal property of Enterprise after entry of a judgment in a court of competent jurisdiction as provided by the applicable law and the provisions of this Agreement related to an arbitration and provided that obligations due under any Authorized Debt have been paid in full or payment of the judgment is approved by the Lender under any Authorized Debt.

17.     **Governing Law**. The interpretation, validity and performance of this Agreement shall be governed by the laws of the Tribe and of the State of Michigan, without regard to the conflicts of law rules of such Tribe or State. If any of the terms and provisions of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

18.     **Dispute Resolution**. All disputes, controversies or claims between the Parties arising out of or relating to this Agreement, including without limitation any dispute, controversy or claim between the Parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a Party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per the limited waiver of tribal sovereign immunity contained in Section 14 above. If a Party ("Complaining Party") concludes that the other Party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the Parties informal efforts to resolve the Dispute as set forth in Paragraph 18.1 below have been unsuccessful, the Complaining Party may give written notice to the Responding Party ("Notice of Dispute"), which specifies: (a) the nature of the Dispute; (b) the corrective action which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (c) a reasonable time limit within which the Corrective Action must be taken ("Time Limit"); and (d) the amount of damages or losses asserted to have arisen from the Dispute. Except in the case of emergencies, no Arbitration Proceedings on a Dispute may be commenced by a Party unless prior Notice of Dispute and opportunity to take Corrective Action have been given as provided in this Subsection. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take substantial steps to make the Corrective Action provided for in the Notice of Dispute then, with respect to the Dispute, either Party may initiate Arbitration Proceedings under Paragraph 18.2 with respect to the asserted Dispute. Each of the Parties hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary.

18.1    **Negotiations/Mediation**. Before Arbitration Proceedings are commenced, the Parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both Parties. Should the Parties' good faith efforts to resolve a Dispute be unsuccessful, the Parties agree that prior to resorting to judicial or arbitral avenues of relief, they may engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the Parties do not reach a solution within a period of thirty (30) days from the date on which the Dispute was first asserted in writing, then the provisions in Paragraph 18.2 below shall apply.

CONFIDENTIAL

**18.2** **Binding Arbitration**. Subject to the requirements and limitations of Paragraph 18.1, either Party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this Paragraph 18.2.

**18.2.1** **Notice of Intent**. A Party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other Party and shall promptly thereafter file the Notice of Intent to Arbitrate with any arbitration organization of its choosing in accordance with the that arbitration organization's rules and pay the required fees. A Notice of Intent to Arbitrate shall specify: (a) the matters to be submitted to arbitration; (b) the nature of the relief to be sought in the arbitration; and (c) the name of the "Pre-Approved Arbitrator" desired to be selected by the Party. The Parties have established a list of pre-approved, mutually acceptable arbitrators, "Pre-Approved Arbitrators," whom either Party may identify as the decider for any Dispute under any arbitration organization's rules. The list of Pre-Approved Arbitrators is contained at Schedule 18.2.1 hereto..

**18.2.2** **Response**. Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other Party shall serve a written response ("Response") specifying (a) any additional matters it intends to submit to arbitration relating to the Dispute, and (b) the nature of any relief it intends to seek in the arbitration. The responding Party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees. In the event that the Pre-Approved Arbitrator identified by the Party initiating a Notice of Intent to Arbitrate is unavailable to serve for whatever reason, the responding Party shall in its Response identify an alternate Pre-Approved Arbitrator from Schedule 18.2.1 to hear the Dispute. The Parties shall alternate identification of Pre-Approved Arbitrators no longer than each ten (10) days until a Pre-Approved Arbitrator who is able to serve in the timeframes provided in this Agreement is identified.

**18.2.3** **Arbitrators**. The Pre-Approved Arbitrators identified from Schedule 18.2.1 shall be the "Decider Arbitrator." Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator. Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated. The Parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any Party or its affiliates, and nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe. If no Pre-Approved Arbitrator can serve then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators. All decisions, awards, orders and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

**18.2.4** **Conduct of Arbitration**. After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the Parties agree otherwise. The Decider Arbitrator shall apply the governing law specified in Section 17, and shall follow such rules of discovery and evidence as the United States District Court for the State of Michigan would apply. Within sixty (60)

CONFIDENTIAL Case 1:25-cv-00794-DAB-JGM    Document 52-1    Filed 03/11/26    Page 33 of 41 MARTORELLO_026687

days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the decision.

18.2.5 **Standard of Review**. All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable Laws, and the rights and interests of the Parties, so as to do substantial justice to the Parties. No order in Arbitration Proceedings may terminate this Agreement except upon (a) a determination that the Dispute on which the order is based constitutes a major and material default under this Agreement, or (b) upon a determination of repeated defaults sufficient to indicate callous indifference to a Party's obligations under this Agreement; provided that in no event shall this Agreement be subject to termination for breach of a term or conditions the breach of which the Parties have agreed shall not be the basis for termination of this Agreement.

18.2.6 **Place of Arbitration**. All hearings and other proceedings in the arbitration shall be held at Marquette, Michigan, unless otherwise designated by the Parties.

18.2.7 **Relief Available**. With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

    **(a)** issue appropriate Interlocutory Orders to mitigate damage or prevent irreparable injury to a Party; and

    **(b)** render a final decision which:

        **(i)** determines or declares the rights, duties, adequacy of performance, breach or liabilities of a Party under the Agreement;

        **(ii)** orders a Party to specifically perform its obligations under the Agreement;

        **(iii)** awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a Party; and/or

        **(iv)** contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either Party. Except as inconsistent with the provisions of this Section 18, the arbitration shall be conducted in accord with the Commercial Rules of the American Arbitration Association then in effect.

18.2.8 **Decision Binding; Enforcement**. The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered. All Final Decisions shall be conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. A Party may enter a Final Decision and institute Judicial Proceedings for the sole purpose of enforcing a Final Decision in any tribunal specific in Section 14 above. In

CONFIDENTIAL Case 1:25-cv-00794-DAB-JGM   Document 52-1   Filed 03/11/26   Page 34 of 41 MARTORELLO_026288

such Judicial Proceedings, neither Party, without consent of the other Party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in the Judicial Proceeding.

        **18.2.9** <u>**Costs of Arbitration**</u>. All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the Parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her decision and/or award according to the extent to which each Party prevailed on the issues subject to the arbitration. Each Party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

        **18.2.10** <u>**Survival of Remedy**</u>. Subsequent to any expiration or termination of this Agreement, this Section shall remain available to the Parties with respect to Disputes arising out of or relating to this Agreement, whether such Dispute arose prior or subsequent to the expiration or termination of the Agreement, for the longer of (i) one (1) year, or (ii) the conclusion of any proceedings timely initiated pursuant to this Section 18, including the conclusion of any appeals allowed by proceedings hereunder.

**19.**     <u>**Performance During Disputes**</u>. It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Servicer shall remain in Enterprise as Servicer; and Enterprise and Servicer shall continue their performance of the provisions of this Agreement and its exhibits, subject to the maintenance of any licenses required to perform such duties. Servicer shall be entitled to seek injunctive relief from such court or other competent authority as contemplated by Section 14 of this Agreement to maintain the status quo in the event of a threatened eviction during any dispute, controversy, claim or disagreement arising out of this Agreement.

**20.**     <u>**Confidential Information**</u>. Each of the Parties agree that any information received concerning any other Party during the performance of this Agreement, regarding a Party's organization, financial matters, marketing plans, or other information of a proprietary nature (the "Confidential Information"), will be treated by all Parties in full confidence and except as required to allow Servicer or Enterprise to perform their respective covenants and obligations hereunder, or in response to legal process or appropriate and necessary inquiry, and will not be revealed to any other persons, firms or organizations; provided, however, that a Party may disclose such information to such of its officers, employees or agents who need to know the information for purposes of performing services to such Party for purposes related to this Agreement and who agree to keep such information confidential and to be bound by this Section to the same extent as if they were signatories to and bound by this Agreement. The provisions of Sections 3.3.2 and 3.3.3 shall apply to the enforcement of this Section. The provisions of this Section shall survive the termination of this Agreement. Confidential Information shall include all information, data, knowledge, and know-how (in whatever form and however communicated) relating to the Enterprise, or to its businesses, operations, properties, products, strategies, plans, markets, or financial positions, that is delivered or disclosed by Servicer, or any Servicer representative, or any of its officers, directors, partners, employees, agents, affiliates, or shareholders, to Enterprise in writing, electronically, verbally, or through visual means, or which

*31*

Enterprise learns or obtains aurally, through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how regardless of whether or not any such information is marked or designated "confidential."

The obligations not to use or disclose the Confidential Information shall not apply to Confidential Information which (a) has been made previously available to the public by Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates or becomes generally available to the public, unless the Confidential Information being made available to the public results in a breach of this Agreement; (b) prior to disclosure to Enterprise or Servicer or Servicer's affiliates, was already rightfully in any such person's possession; or (c) is obtained by Enterprise or Servicer or Servicer's affiliates from a third party who is lawfully in possession of such Information, and not in violation of any contractual, legal or fiduciary obligation to Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates, with respect to such Confidential Information and who does not require Enterprise or Servicer or Servicer's affiliates to refrain from disclosing such Confidential Information to others.

21. **Execution**. This Agreement is being executed in three (3) counterparts. Each of the three originals is equally valid and binding upon the parties.

22. **Enterprise Name**. Enterprise shall be operated under the business name of Red Rock Tribal Lending, LLC, and such trade names as both the Servicer and Enterprise and the Tribe as sole member of Enterprise shall agree.

23. **Intent to Negotiate New Agreement**. On or before one hundred twenty (120) days before the end of the Term of this Agreement, Enterprise shall give Servicer notice of its intent regarding their willingness to enter into negotiations for a new Servicing Agreement to be effective upon the conclusion of this Agreement. If Enterprise and Servicer are unable to agree to the terms of a new agreement or if Enterprise decide not to enter into negotiations for a new agreement, then Enterprise and Servicer shall agree upon a transition plan within thirty (30) days' notice from Enterprise of its intention not to negotiate a new Servicing Agreement which plan shall be sufficient to allow Enterprise to operate Enterprise and provide for the orderly transition of the management of Enterprise.

24. **Entire Agreement**. This Agreement, including the Exhibits referred to herein and any document executed by the Parties simultaneously herewith, constitutes the entire understanding and agreement of the Parties hereto and supersedes all other prior agreements and understandings, written or oral, between the Parties.

25. **Additional Actions**. Each of the Parties agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be reasonably required by another Party in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the parties hereto to the fullest extent permitted by law; provided, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of Enterprise or the Servicer under this Agreement or any other agreement or document related hereto. Each of the parties further agrees to review and

32

consider the tax benefits that arise from the operation of Enterprise pursuant to the terms of this Agreement and to allocate such tax benefits among the parties in order to promote the respective interests of the parties hereto to the fullest extent permitted by law.

26.    **Representation**. The Tribe and Enterprise have been represented by Rosette, LLP in connection with the negotiation of this Agreement, and Servicer has been represented by Greenberg Traurig LLP. Each Party has had its attorneys fully explain and counsel it in connection with the rights and obligations imposed upon such Party under this Agreement and the agreements and other documents contemplated to be executed in connection with the Unsecured Lending Business. Each Party has a complete understanding of such rights and obligations and is entering into the Agreement notwithstanding any covenants or restrictions set forth herein that may impose obligations on the parties.

**[remainder of page intentionally left blank]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

**RED ROCK TRIBAL LENDING, LLC**

By: _Craig Mansfield_

Name: Craig Mansfield

Title: Co-Manager

By: _Michelle Allen_

Name: Michelle Allen

Title: Co-Manager

**BELLICOSE VI, INC.**

By _[signature]_

Name: Matt Martorello

Title: President

1

CONFIDENTIAL

MARTORELLO_026292

**Schedule 1.0**

CONFIDENTIAL
Case 1:25-cv-00794-DAB-JGM    Document 52-1    Filed 03/11/26    Page 39 of 41    MARTORELLO_026293

PLEASE REFER TO TAB A4 OF THIS BINDER

## Schedule 18.2.1 - List of Pre-Approved Arbitrators

List of Pre-Approved Arbitrators from Indian Country

Robert Anderson

John Bickerman

Robert Clinton

Matthew L.M. Fletcher

JoAnn Cook-Gasco

B.J. Jones

Stacey Leeds

Carrie Newton Lyons

John Petoskey

Michael Petoskey

Frank Pommersheim

Wenona Singel

Jill Tompkins

Kevin Washburn

Robert A. Williams

*3*