# Exhibit 5

# SERVICING AGREEMENT

This Servicing Agreement (this "Agreement") is entered into this ⟨25⟩ day of May, 2011 ("Effective Date") by and between TC Decision Sciences, LLC, a Delaware limited liability company ("AGENCY") and Great Plains Lending, LLC, a business entity duly organized under and recognized by the laws of the Otoe-Missouria Tribe of Indians ("CLIENT").

*Recitals*

      A.     WHEREAS, AGENCY has agreed to provide or arrange for the provision of outsourced customer support and collections services to CLIENT.

      B.     WHEREAS, CLIENT owns consumer loan accounts (the "Accounts") and desires to engage the services of AGENCY for providing customer support and collections services to those Accounts.

NOW THEREFORE, in consideration of the foregoing, the parties agree as follows:

*Agreement*

1. <u>Services Performed</u>. CLIENT shall utilize the outsourcing services (the "Services") of AGENCY or its designees in connection with CLIENT's servicing of the Accounts. CLIENT will from time to time provide AGENCY with information identifying and concerning such Accounts and specific services to be provided. AGENCY will provide customer support to those Accounts specified by CLIENT. AGENCY will adhere to customer support procedures provided by CLIENT and from time to time revised in writing. In addition, AGENCY will provide collections services to past due Accounts specified by CLIENT. AGENCY will adhere to collections procedures provided by CLIENT and from time to time revised in writing. AGENCY will provide Services according to the Service Levels defined in Exhibit 1.

2. <u>Servicing Fees</u>. In exchange for providing the Services, CLIENT shall pay AGENCY five dollars ($5) per month per active Account (the "Servicing Fees"). Servicing Fees shall be billed on a monthly basis on or about the last day of each month. CLIENT shall pay AGENCY all Servicing Fees within thirty (30) days of date of invoice.

3. <u>Waiver of Warranties</u>. NEITHER PARTY PROVIDES ANY WARRANTIES, REPRESENTATIONS OR CONDITIONS, WHETHER EXPRESS OR IMPLIED, IN FACT OR IN LAW INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OR CONDITIONS OF MERCHANTABLE, NON-INFRINGEMENT, QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.

4. <u>Limitation of Liability</u>. EXCEPT FOR ANY ACTION RESULTING FROM NEGLIGENCE OR INTENTIONAL ACTS OR OMISSIONS, NEITHER PARTY SHALL BE RESPONSIBLE OR HELD LIABLE TO THE OTHER FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR SPECIAL DAMAGES, LOST PROFITS OR REVENUES.

5.     It is AGENCY's sole responsibility to comply with all laws, rules and regulations related to AGENCY's program for the collection of any debt associated with the services contemplated in this Agreement. AGENCY shall defend, hold harmless and indemnify CLIENT, it affiliates and officers, for a violation by AGENCY of any collection law, including but not limited to the Fair Debt Collection Practices Act and any other applicable state or federal law. <u>Effective Date,</u>

Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 2 of 48   TF-VA000610

Term, and Termination. This Agreement shall be effective as of the Effective Date and shall continue in effect until the first date upon which there is no remaining Accounts, unless it is terminated in accordance with this Section 5. Either party may terminate this Agreement, with or without cause, by providing ninety (90) days written notice to the other party. Termination will become effective on the ninety first (91st) day after such notice is given. CLIENT will be responsible for invoices for all Services up to and including the last day of Service.

6. Legal Relationship. It is understood that AGENCY and CLIENT shall be independent contractors. Notwithstanding the foregoing, the parties agree that Services contemplated to be undertaken shall be in CLIENT's name and that AGENCY's employees shall represent themselves as representatives of CLIENT in furtherance of this Agreement.

7. Notices. Any such notice made under this Agreement shall be deemed to have been sufficiently given if either served personally or sent by recognized overnight courier addressed to the party at its address set forth below:

    CLIENT:            Great Plains Lending, LLC
                       8151 Highway 177
                       Red Rock, Oklahoma 74651

                       With a copy for information purposes to:

                       OMDA
                       Attn: Rebecca Bartlett
                       923 N. Robinson, Suite 500
                       Oklahoma City, OK 73102

    AGENCY:            TC Decision Sciences, LLC
                       Attention: Ken Rees, CEO
                       4150 International Plaza, Ste. 400
                       Fort Worth, Texas 76109

8. Other Agreements. This Agreement constitutes the entire agreement of the parties with respect to the specific subject matter hereof and supersedes all prior agreements and understandings, whether written or oral, between the parties with respect to the specific subject matter hereof.

9. Waiver. Waiver by AGENCY or CLIENT of a breach of any provision hereto shall not be deemed a waiver of any future compliance with this Agreement, and such provisions shall remain in full force and effect.

10. Force Majeure. AGENCY shall be relieved from its responsibility to perform hereunder due to acts of God, acts of nature, acts of terrorism or war but only to the extent that such events prevent AGENCY from performing the Services. AGENCY will allocate its available production capacity to its clients on such terms as it may deem advisable and this Agreement may, at CLIENT's option, be terminated immediately upon notice to AGENCY. For purposes hereof, AGENCY's clients shall be deemed to include subsidiaries and affiliates of AGENCY.

11. Survival. All provisions of this Agreement relating to limitation of liability, confidentiality and non-disclosure, governing law and waiver of sovereign immunity shall survive the termination of this Agreement.

12. <u>Headings Have No Legal Effect</u>. The headings and captions of this Agreement are for convenience of reference only, and have no legal effect, and are not to be construed as defining or limiting, in any way, the scope or provisions of this Agreement.

13. <u>Dispute Resolution</u>. If either party believes that the other party has breached this Agreement, or in the event of any dispute hereunder including, but not limited to, any dispute over the proper interpretation of the terms and conditions hereof, the following procedures may shall be invoked:

    a. The goal of the parties shall be to resolve all disputes amicably and voluntarily whenever possible. The party asserting breach or seeking an interpretation of this Agreement first shall serve written notice on the other party. The notice shall identify the specific Agreement provision alleged to have been violated or in dispute and shall specify in detail the asserting party's contention and any factual basis for the claim. Representatives of the parties shall meet within thirty (30) days of receipt of notice in an effort to resolve the dispute;

    b. Either party may refer a dispute arising under this Agreement to arbitration under the rules of the American Arbitration Association ("AAA"), subject to enforcement or pursuant to review as provided in this Section 13 by a federal district court. The remedies available through arbitration are limited to enforcement of the provisions of this Agreement. The parties consent to the jurisdiction of such arbitration forum and court for such limited purposes and no other, and each waives immunity with respect thereto. One (1) arbitrator shall be chosen by the parties from a list of qualified arbitrators to be provided by the AAA. If the parties cannot agree on an arbitrator within ten (10) business days, then the arbitrator shall be named by the AAA. The expenses of arbitration shall be borne equally by the parties. The arbitrator shall apply Otoe-Missouria substantive law or, if not applicable, the substantive laws of the State of Oklahoma as well as the Federal Rules of Civil Procedure;

    c. The party asserting breach or seeking an interpretation of this Agreement under this Section 11(a) shall be deemed to have certified that to the best of such party's knowledge, information, and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 13, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating party an appropriate sanction, which may include an award to the other party of its reasonable expenses incurred in having to participate in the arbitration; and

    d. Either party may bring an action in a federal district court for the de novo review of any arbitration award under Section 13(b). The decision of the court shall be subject to appeal. Each party hereby waives any claim of immunity and consents to suit therein for such limited purposes. The parties hereby acknowledge that this express waiver extends only to actions brought by AGENCY, its successors and assigns (and not any other party) against CLIENT for claims of any kind arising under this Agreement. Nothing herein shall be construed to authorize a money judgment other than for damages for failure to comply with an arbitration decision requiring the payment of monies.

e. EACH PARTY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANYWAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

f. Limited Waiver of Tribal Sovereign Immunity. GP Lending irrevocably (i) waives any sovereign immunity and any other privilege that may be asserted from its status as an instrumentality or entity of the Otoe-Missouria Tribe of Indians and any defenses associated with such immunity or privilege from unconsented suit, and (ii) consents to any legal proceedings or alternative dispute resolution pursuant to this Agreement and the enforcement and collection of judgment or award, injunction, specific performance or declaratory relief, conditioned only upon following limitations: (a) this waiver is limited to the tribal entity, GP Lending, and does not extend to an action against the tribal government of the Otoe-Missouria Tribe of Indians, and shall not be deemed a waiver of the rights, privileges and immunities of the tribal government of the Otoe-Missouria Tribe of Indians, and (b) the waiver is limited to actions to (i) interpret or enforce the provisions of this Agreement, and (ii) enforce any agreement, order, judgment or ruling resulting from such an action including, but not limited to, any execution and collection of monetary damages.

14. Confidential and Proprietary Information.

A) AGENCY and CLIENT acknowledge that they may disclose ("Furnishing Party") to the other party ("Receiving Party"), information relating to Furnishing Party's business and operations that is confidential ("Confidential Information"). Receiving Party shall disclose such Confidential Information only to Receiving Party's officers, directors, employees, agents, affiliates and representatives who reasonably need to know such Confidential Information in the course and scope of Receiving Party's performance of the Services. Furthermore, Receiving Party shall give notice to its officers, directors, employees, agents, affiliates and representatives that such Confidential Information is to be regarded as confidential and therefore not to be shared with anyone not directly employed by Receiving Party without prior permission. Each party shall (i) keep the Confidential Information secure and confidential and (ii) treat all Confidential Information of Furnishing Party with the same degree of care as it accords its own Confidential Information, but in no event less than a reasonable degree of care.

B) The obligations set forth in Section 16(A) shall not apply to any (i) information that becomes generally available to the public other than as a result of unauthorized disclosure by Receiving Party; (ii) information that has been released without restriction by Furnishing Party; or (iii) information that was received by Receiving Party on a non-confidential basis, prior to receipt from Furnishing Party, from a third party lawfully possessing and lawfully entitled to disclose such information without the burden of confidentiality.

Case 1:25-cv-00794-DAB-JGM   Document 52-5   Filed 03/11/26   Page 5 of 48   TF-VA000613

C)    Compelled Disclosure. If Receiving Party is legally compelled (including, without limitation, by law, rule, regulation, stock exchange or governmental regulating or administrative or similar agency, as part of a judicial or administrative proceeding or otherwise, by deposition, interrogatory, request for information or documents, subpoena, civil or criminal investigative demand or otherwise) to disclose any Confidential Information, Receiving Party shall, to the extent permitted by law, promptly notify Furnishing Party to permit the Furnishing Party to seek a protective order or take other appropriate action.  Receiving Party shall also cooperate in Furnishing Party's efforts to obtain a protective order or other reasonable assurance that the Confidential Information shall be treated confidentially.  If, in the absence of a protective order, Receiving Party or its representatives are compelled as a matter of law to disclose the Confidential Information, Receiving Party may disclose to the party compelling disclosure only the part of the Confidential Information as is required by law to be disclosed.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**GREAT PLAINS LENDING, LLC**

By: _____
          John R. Shotton

Name: _Chairman_____

Title: _Chairman_____

**TC DECISION SCIENCES, LLC**

By: _____

Name: _Kenneth E Rees_____

Title: _CEO_____

## EXHIBIT 1 – SERVICE LEVELS

**1  OVERVIEW**

AGENCY shall be responsible for providing (i) project management, (ii) support personnel, (iii) training support, (iv) the technology infrastructure, and (v) facilities during the Hours of Operation as further defined herein to place outbound calls and receive inbound calls to provide customer support and collections services to a portfolio of accounts owned by CLIENT ("Accounts") and associated with the Great Plains Lending brand name.

**2  SCOPE OF SERVICES**

A) **AGENCY shall:**

    i) Provide voice call recording and the ability to transfer recorded calls electronically to CLIENT upon request;

    ii) Provide real time, dial-in capabilities to give CLIENT the ability to listen to live calls at any time dialing is occurring facilitated by an AGENCY employee; and

    iii) Provide an electronic solution for CLIENT to be able to securely retrieve electronic documents such as disposition files, recorded calls and reports and/or utilizing a secure communications channel which would be provided by CLIENT.

B) **CLIENT shall:**

    i) Designate key point(s) of contact to clarify and resolve questions;

    ii) Provide CLIENT applications, access to those applications and customer data retention at its data center.

**3  BUSINESS REQUIREMENTS**

**Hours of Operation**

Outbound calling shall be conducted during the following "Hours of Operation" are stated in local time at the called parties location:

    i) 8:00 a.m. - 9:00 p.m., Monday through Saturday; and

    ii) 8:00 a.m. - 8:00 p.m. Sunday.

Inbound calls for Customer Support shall be received and handled under current hours Monday through Friday 8:00 am ET to 10:00 pm ET and Saturday 9:00 am ET to 5:00 pm ET with intention to be handled 24x7 in the near future when volume dictates the need and justification for such coverage.

Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 8 of 48 TF-VA000616

## PARTICIPATION AGREEMENT (GREAT PLAINS LENDING)

THIS PARTICIPATION AGREEMENT (GREAT PLAINS LENDING) (this "Agreement"), is made effective as of the 1st day of December, 2015 ("Effective Date"), by and among (a) GPL Servicing Ltd., a Cayman Islands exempted company incorporated with limited liability ("GPLS") and (b) Great Plains Lending, LLC, a business entity duly organized under and recognized by the laws of the Otoe-Missouria Tribe of Indians ("GP Lending") and for all purposes shall replace and supersede that Participation Agreement dated May 25, 2011 between the Parties. Each party to this Agreement may be referred to herein as a "Party" or, collectively, as the "Parties".

*Recitals*

**WHEREAS**, the Otoe-Missouria Tribe of Indians (the "Tribe") is a federally recognized Indian tribe endowed with sovereignty that predates the United States Constitution and whose sovereignty is recognized in the Indian Commerce Clause of the United States Constitution, subsequent United States Supreme Court cases and by the United States Congress.

**WHEREAS**, the United States Congress has recognized and enacted legislation including the Native American Business Development, Trade Promotion and Tourism Act (25 U.S.C. §§ 4301 et seq.) and other legislation which recognizes the federal policy and Congressional intent "to promote economic self-sufficiency and political self-determination for Indian tribes" through offering services from the Tribe's Indian Country.

**WHEREAS**, in furtherance of its objectives of economic self-sufficiency and political self-determination, the government of the Tribe operates certain businesses (including GP Lending) as arms of the Tribe and as incorporated entities formed and operating pursuant to the Tribe's inherent sovereign authority expressed in the Tribe's constitution and other applicable Tribal Law which offer goods and services from within the Indian Country of the Tribe in an effort to increase the standard of living for its tribal members.

**WHEREAS**, GP Lending is a business entity operating completely within the Indian Country of the Tribe under Tribal Law which is wholly-owned by the Tribe, operates as an arm of the Tribe, and explicitly possesses all the privileges and immunities of the Tribe, including the sovereign immunity of the Tribe.

**WHEREAS**, GP Lending has all requisite authority under the laws of the Tribe to make Loans (as defined below) to Borrowers (as defined below). As transactions originated and transacted completely within the Indian Country of the Tribe, these Loans are governed by the laws of the Tribe, are within the jurisdiction of the Tribe and the Tribe's tribal courts and are consensual agreements agreed to by Borrowers acknowledging that the Loan is made under the jurisdiction and law of the Tribe and acknowledging that the contract was entered into in the Indian Country of the Tribe.

**WHEREAS**, GP Lending, operating completely within the Indian Country of the Tribe, has made and will make Loans to Borrowers.

**WHEREAS**, on May 25, 2011 GP Lending and GPLS entered into that certain Participation Agreement (Great Plains Lending) (the "Prior Participation Agreement).

**WHEREAS**, the Parties now wish to amend, restate, replace and supersede the Prior Participation Agreement as set forth herein.

1

**TF App. 0574**

Confidential   Case 1:25-cv-00794-DAB-JGM      Document 52-5      Filed 03/11/26      Page 9 of 48 TF-PA-565139

**WHEREAS**, GP Lending desires to sell and transfer certain undivided participation interests in some of the Loans (collectively, the "Participated Loans") to GPLS in accordance with the terms and conditions of this Agreement.

**WHEREAS**, GPLS may from time to time desire to acquire such undivided participation interests offered by GP Lending in such Participated Loans without recourse in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE,** in consideration of the promises and the covenants hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

*Agreement*

1. **Definitions.** For the purposes of this Agreement, the following terms shall have the meanings indicated:

(a) "Affiliate" shall mean with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such other Person.

(b) "Agreement" has the meaning set forth in the introductory paragraph.

(c) "Annual Remittance Report" has the meaning set forth in Section 5(c).

(d) "Applicant" shall mean any person who is not a Borrower that submits an application to become a Borrower either before or after the Effective Date.

(e) "Book Value" shall mean the outstanding unpaid principal indebtedness plus any accrued interest on the Participated Loans.

(f) "Borrower" shall mean any person who GP Lending has extended credit to either before or after the Effective Date.

(g) "Business Day" shall mean a day other than a Saturday, Sunday or day on which the tribal government offices of the Tribe are closed.

(h) "Cash Revenue" shall mean all cash received for a given month from Borrowers on account of Participated Loans, except for any cash received during such month as repayment of the principal amount of any Participated Loans.

(i) "Charge-Off" shall mean the principal amount of a Loan in addition to any interest on such Loan that is delinquent more than sixty (60) days.

(j) "Collection Account" shall mean a restricted FDIC-insured bank account owned by GP Lending at a banking institution acceptable to GPLS into which all collections received from Borrowers are deposited and from which GP Lending shall be entitled to transfer funds each day sufficient to fund the Funding Account for new Loans in accordance with Section 5(a).

(k) "Confidential Customer Information" shall mean Customer Information or other information about Borrowers or Applicants that is required to be kept confidential by the respective Parties under the Laws.

2

(l)     "Contingent Obligations" shall mean, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(m)     "Customer Information" shall mean nonpublic information relating to Borrowers or Applicants, including without limitation, names, addresses, telephone numbers, e-mail addresses, credit information, account numbers, social security numbers, loan balances or other loan information, and lists derived therefrom and any other information required to be kept confidential by the respective Parties under the Laws.

(n)     "Effective Date" has the meaning set forth in the introductory paragraph.

(o)     "Federal Consumer Laws" includes, without limitation, the following, as applicable: 12 U.S.C. § 1031 Prohibiting Unfair, Deceptive or Abusive Acts or Practices; Truth in Lending Act, 15 U.S.C. § 1601 et seq., and related regulations at 12 C.F.R. Part 1026; Consumer Leasing Act, 15 U.S.C. §§ 1667 et seq., and related regulations at 12 C.F.R. Part 1013; Fair Credit Billing Act, 15 U.S.C. § 1666a; Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and related regulations at 15 C.F.R. Part 1002; Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., and related regulations at 12 C.F.R. Part 1005; Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. and related regulations at 12 C.F.R. Part 1022); privacy provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 et seq., and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314; Fair Debt Collection Practices Act , 15 U.S.C. § 1692 et seq., and related regulations at 16 C.F.R. Part 901; Talent Amendment, 10 U.S.C. § 987, and related regulations of the Department of Defense at 32 C.F.R. part 232; and Servicemembers' Civil Relief Act, 50 U.S.C. App. §§ 501-596, each as amended from time to time.

(p)     "Filing Offices" shall mean (i) the Washington, D.C. Recorder of Deeds, (ii) the Office of the Tax Commission of the Tribe and (iii) the Secretary of State of the State of Oklahoma.

(q)     "Funding Account" shall mean a restricted FDIC-insured bank account owned by GP Lending into which funds may be deposited from time to time, including from the Collection Account, which shall be used exclusively to fund new Loans in accordance with Section 5(a).

(r)     "GAAP" shall mean United States of America generally accepted accounting principles, consistently applied.

(s)     "Governmental Authority" shall mean the Tribe, federal or state government (or any political subdivision of any of the foregoing), and any agency, authority, commission, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, whether or not any such Governmental Authority has jurisdiction over GP Lending.

(t)     "GP Indemnified Parties" has the meaning set forth in Section 21(a)(ii).

(u)     "GP Indemnifying Party" has the meaning set forth in Section 21(a)(i).

(v)     "GP Lending" has the meaning set forth in the introductory paragraph.

3

Confidential   Case 1:25-cv-00794-DAB-JGM     Document 52-5     Filed 03/11/26     Page 11 of 48   TF-PA-565141

(w)    "GP Lending Participation Percentage" shall mean three and one quarter percent (3.25%) or such greater amount as agreed between the Parties in writing from time to time.

(x)    "GPLS" has the meaning set forth in the introductory paragraph.

(y)    "GPLS Collateral" the meaning set forth in Section 19(c).

(z)    "GPLS Indemnified Parties" has the meaning set forth in Section 21(a)(i).

(aa)    "GPLS Indemnifying Party" has the meaning set forth in Section 21(a)(ii).

(bb)    "GPLS Participation Percentage" shall mean ninety six and three quarters percent (96.75%) or such lesser amount as agreed between the Parties in writing from time to time.

(cc)    "Hedging Obligations" shall mean, with respect to any specified Person, the obligations of such Person under: (i) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements; (ii) other agreements or arrangements designed to manage interest rates or interest rate risk; and (iii) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

(dd)    "Indebtedness" of a Person shall mean, without duplication (i) all indebtedness for borrowed money; (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (including, without limitation, "capital leases" in accordance with GAAP) (other than trade payables and accrued expenses incurred in the ordinary course of business); (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments; (iv) all obligations evidenced by notes, bonds or similar instruments whether convertible or not, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses; (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property); (vi) all indebtedness referred to in clauses (i) through (v) above secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness; (vii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vi) above; (viii) banker's acceptances; (ix) the balance deferred and unpaid of the purchase price of any property or services due more than three months after such property is acquired or such services are completed; (x) Hedging Obligations; and (xi) obligations under convertible securities of such Person.

(ee)    "Indemnified Parties" has the meaning set forth in Section 21(a)(ii).

(ff)    "Initial Term" has the meaning set forth in Section 17(a).

(gg)    "Insolvency Event" has the meaning set forth in Section 17(b)(v).

(hh)    "Laws" shall mean all applicable codes, statutes, laws, permits, rules, regulations, governmental requirements, ordinances, orders, policies, determinations, judgments, writs, injunctions, decrees and common law and equitable rules, causes of action, remedies, regulatory guidance and

4

Confidential

TF App. 0577

TF-PA-565142

principles as the same may be amended, modified, supplemented or superseded from time to time.

(ii) "License Agreement" shall mean that certain License and Support Agreement, dated on or about the Effective Date, by and between GP Lending and TC Decision Sciences, LLC.

(jj) "Lien" shall mean any mortgage, lien, pledge, security interest, conditional sale or other title retention agreement, charge or other security interest or encumbrance of any kind, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement or any lease or license in the nature thereof, any option or other agreement to sell or give a security interest in.

(kk) "Loan Documents" shall mean the loan agreements, notes and other documentation executed by the Borrowers to obtain Loans from time to time.

(ll) "Loan Schedule" shall mean with respect to each Loan: at a minimum (i) a loan identification number; (ii) the name of the Borrower, (iii) the amount financed; (iv) the finance charge; (v) the origination date; and (vi) the final maturity date.

(mm) "Loans" shall mean fully amortizing consumer loans in a principal amount not exceeding $3,000.00 with an initial term not exceeding 24 months and not less than 6 months made by GP Lending from time to time.

(nn) "Marketing Agreement" shall mean that certain Marketing Agreement, dated on the Effective Date, by and between GP Lending and Tailwind Marketing, LLC.

(oo) "Master Participation Certificate" shall mean the certificate furnished by GP Lending to GPLS from time to time substantially in the form of Exhibit A attached hereto, which is deemed to be part of this Agreement.

(pp) "Material Adverse Effect" shall mean a material adverse effect on: (i) the business operations, properties, assets, condition (financial or otherwise) of GP Lending, taken as a whole; (ii) the ability of GP Lending to fully and timely perform its obligations under this Agreement; (iii) the legality, validity, binding effect, or enforceability of this Agreement against GP Lending; or (iv) the rights, remedies and benefits available to GPLS or any of its Affiliates hereunder.

(qq) "Material Contract" shall mean any contract or other arrangement to which GP Lending is a party (other than this Agreement) for which breach, nonperformance, cancellation, termination or failure to renew could reasonably be expected to have a Material Adverse Effect.

(rr) "Monthly Remittance Report" has the meaning set forth in Section 5(c).

(ss) "Net Cash Revenue" shall mean Cash Revenue less any Charge-Offs.

(tt) "New Loan" shall mean Participated Loans made to Borrowers who are not and have not previously been Borrowers under any Participated Loans.

(uu) "Participated Loans" has the meaning set forth in the recitals and

includes Repeat Loans.

(vv) "Participation Fee" shall mean, for each calendar month, the applicable amounts as set forth on Exhibit B multiplied by the GPLS Participation Percentage.

5

Confidential Case 1:25-cv-00794-DAB-JGM Document 52-5 Filed 03/11/26 Page 13 of 48 TF-PA-565143

(yy)     "Participation Interest" has the meaning set forth in Section 2(a).

(xx)     "Party" has the meaning set forth in the introductory paragraph.

(yy)     "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, U.S. tribal sovereign nation, unincorporated organization or government or agency or political subdivision thereof.

(zz)     "Proceeding" shall mean any action, suit, proceeding, inquiry or investigation before or by any court, public board or government agency.

(aaa)     "Program" shall mean a lending program for the solicitation, marketing, and origination of Loans pursuant to Program Guidelines.

(bbb)     "Program Guidelines" shall mean those guidelines established by GP Lending for the administration of the Program as set forth in Exhibit C, as amended, modified or supplemented from time to time by GP Lending effective with prior notice to GPLS.

(ccc)     "Purchases" has the meaning set forth in Section 2(a).

(ddd)     "Received Payments" has the meaning set forth in Section 5(a).

(eee)     "Records" has the meaning set forth in Section 20(i).

(fff)     "Register" has the meaning set forth in Section 16(c).

(ggg)     "Registrar" has the meaning set forth in Section 16(c).

(hhh)     "Related Parties" of any Person means such Person's Affiliates or any of its respective partners, directors, agents, employees and controlling persons.

(iii)     "Renewal Term" has the meaning set forth in Section 17(a).

(jjj)     "Repeat Loan" shall mean any Participated Loan made to a Borrower who was a Borrower under another Participated Loan.

(kkk)     "Requirements" shall mean all Laws of the Tribe and any federal laws, rules and regulations applicable to GP Lending and the Program, and all other laws, regulations and guidelines that GP Lending irrevocably consents to adhere to as set forth in this Agreement, including the Federal Consumer Laws, it being understood that GP Lending does not acknowledge or consent to the applicability of the Federal Consumer Laws to the Program but is agreeing to comply with them solely for purposes of this Agreement.

(lll)     "Reserve Amount" has the meaning set forth in Section 2(e).

(mmm)     "Retained Interest" shall mean, with respect to a Loan for which a participation interest has been sold by GP Lending to GPLS hereunder, the GP Lending Participation Percentage of such Loan.

(nnn)     "Securities" shall mean any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

6

Confidential     Case 1:25-cv-00794-DAB-JGM     Document 52-5     Filed 03/11/26     Page 14 of 48     TF-PA-565144

(ooo) "Servicing Agreement" shall mean that certain Servicing Agreement dated on the Effective Date by and between GP Lending and GPLS

(ppp) "Taxes" shall mean any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

(qqq) "Terrorism Laws" shall mean (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States of America Treasury Department and any other enabling legislation or executive order relating thereto, and (ii) the USA PATRIOT Act.

(rrr) "Tribal Agency" shall mean any Otoe-Missouria Tribe of Indians tribal agency that has jurisdiction over GP Lending.

(sss) " Tribal Law" shall mean any law or regulation duly enacted by the Tribe.

(ttt) "Tribal Regulator" shall mean any agency or department of the Tribe that has jurisdiction over GP Lending.

(uuu) "USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act, and the regulations adopted thereunder.

For purposes of this Agreement, unless the context otherwise requires: (a) accounting terms not otherwise defined in this Agreement, and accounting terms partly defined in this Agreement to the extent not defined, shall have the respective meanings given to them under GAAP; (b) terms defined in Article 9 of the UCC as in effect in the relevant jurisdiction and not otherwise defined in this Agreement are used as defined in that Article; (c) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement; (d) references to any Article, Section, Schedule, Appendix or Exhibit are references to Articles, Sections, Schedules, Appendices and Exhibits in or to this Agreement and references to any paragraph, subsection, clause or other subdivision within any Section or definition refer to such paragraph, subsection, clause or other subdivision of such Section or definition; (e) the words "include", "includes" and "including" means "including without limitation"; (f) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (g) except as otherwise expressly provided herein, references to any Law refers to that Law as amended from time to time and include any successor Law; and (h) references to any Person include that Person's successors and assigns.

2.    **Participation Interests.**

(a)    Right to Purchase Participation Interests. During the term of this Agreement, GPLS or one or more of its Affiliates, shall have the right, but not the obligation, to purchase (each, a "Purchase") undivided participation interests equal to the GPLS Participation Percentage in each Loan and the applicable Loan Documents (each a "Participation Interest" and, collectively, the "Participation Interests") from GP Lending. GP Lending must obtain the express written permission of GPLS prior to selling any loans or participation interests other than to GPLS, such permission not to be unreasonably withheld. Any agreement with any other party to which GP Lending sells other participation interests in the Loans shall be in a substantially similar format to this Agreement.

(b)    Purchases and Sales of Participation Interests. On each Business Day, GP Lending shall provide a report of the Loans that were approved and funded by GP Lending which are eligible to be Participated Loans. In no event shall GP Lending sell any Participation Interests to GPLS for which

7

TF App. 0580

TF-PA-565145

the Loans shall have been outstanding for less than two (2) Business Days. If GPLS elects to make a Purchase, then GP Lending shall sell to GPLS, and GPLS shall purchase from GP Lending, such amount of Participation Interests as shall be specified by GP Lending at a purchase price (each, a "Purchase Price") equal to (i) the GPLS Participation Percentage of the applicable aggregate Book Value of the Participated Loans and (ii) the agreement by GPLS to pay the Participation Fee with respect to such Participated Loans. On each Business Day on which GPLS purchases a Participation Interest, GP Lending shall automatically be deemed to have sold, transferred, assigned, set over and conveyed to GPLS, without recourse, except as set forth herein and subject to the terms of this Agreement, such Participation Interest, and the rights, benefits and proceeds arising therefrom or in connection therewith, for the Purchase Price. The Purchase of the Participation Interests shall, to the extent permitted to be transferred under applicable law, include, to the extent of such Participation Interests, the proceeds of or arising out of all claims, suits, causes of action and any other right of GP Lending (in its capacity as a lender), whether known or unknown, or any of its Affiliates, agents, representatives or any other Person arising under or in connection with the applicable Loan Documents or that is in any way based on or related to any of the foregoing or the loan transactions governed thereby including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and purchased pursuant to this Agreement. In no event shall GP Lending sell any Participation Interests to GPLS for which the Participated Loans shall have been outstanding for less than two (2) Business Days. At the closing of each Purchase of Participation Interests hereunder, GP Lending shall (x) provide access or otherwise make available to GPLS or one of its designees all of the Loan Documents relating to the Participated Loans and (y) deliver to GPLS a Loan Schedule of such Participated Loans. Thereafter, for so long as any of such Participated Loans shall remain outstanding, GP Lending shall deliver to GPLS (A) on each Business Day, an updated Loan Schedule of such Participated Loans, and (B) not later than the fifth (5th) Business Day of each calendar quarter during the term of this Agreement, commencing with the calendar quarter beginning on January 1, 2016, a certification by an authorized officer of GP Lending as to the accuracy of each such Loan Schedule delivered to GPLS during the immediately preceding calendar quarter and that each of the Participated Loans described on each such Loan Schedule was made under the authority of a duly-authorized officer of GP Lending. For purposes of clarification, GP Lending shall at all times maintain the Retained Interest in all Loans made by GP Lending in which GPLS owns a Participation Interest.

(c) <u>Ownership of Participation Interest</u>. GPLS is, and shall be considered for all purposes as, the legal and equitable owner of a Participation Interest in each Participated Loan and the associated Loan Documents (to the extent of such Participation Interest) together with all of the rights, privileges, and remedies applicable thereto (subject to the terms of this Agreement).

(d) <u>Effect of Sale</u>. THIS AGREEMENT INVOLVES A SALE OF A PARTICIPATION INTEREST IN THE PARTICIPATED LOANS AND THE APPLICABLE LOAN DOCUMENTS AND SHALL IN NO WAY BE CONSTRUED AS A LOAN OR AN EXTENSION OF CREDIT BY GPLS TO GP LENDING OR THE CREATION OF ANY OTHER RELATIONSHIP BETWEEN THE PARTIES.

(e) <u>Reserve Amount</u>. As of the Effective Date, the Reserve Amount refers to and means an amount equal to $6,023,917.00 which GP Lending shall pay to GPLS as follows: (i) $265,420 as of the Effective Date, (ii) thirty-six (36) equal monthly installments of $33,466 beginning on the first day of each month after the Effective Date, and (iii) $4,553,720 on the earlier of the expiration date or the termination date of this Agreement. If upon the termination or expiration of this Agreement GP Lending holds any amounts owned by GPLS in a reserve or other account of any kind, then GP Lending shall promptly return any such remaining amounts to GPLS.

(f) <u>No Recourse.</u> Each sale of Participation Interests by GP Lending to GPLS (i) is without recourse, representation or warranty of any kind, either expressed or implied, except as may

8

otherwise be expressly contained herein, including, without limitation, the representations and warranties set forth in Section 12(a), and (ii) to the extent permitted to be transferred under applicable Law, includes all claims, suits, causes of action and any other right of GP Lending whether known or unknown, against, applicable Borrowers or any of their respective affiliates, agents, representatives, contractors, advisors or any other Person arising under or in connection with the underlying Loan Documents or that is in any way based on or related to any of the foregoing or the loan transactions governed thereby, including, without limitation, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold pursuant to this Agreement.

(g)  Securities Laws. GPLS acknowledges and agrees that (i) the proposed sale of Participation Interests hereunder is a contractual relationship and does not involve, nor is it intended in any way to constitute, the sale of a "security" within the meaning of any applicable securities laws and (ii) it is not contemplated that any filing will be made with any regulatory agency or pursuant to the securities laws of any other jurisdiction in connection with the sale of Participation Interests hereunder.

(h)  Termination of Origination of Loans. GPLS acknowledges and agrees that GP Lending may elect to reduce or suspend the origination of new Loans at any time.

(i)  Rights and Remedies. In the event of an indemnifiable event as contemplated under Section 21(a) or in the event of any failure by GPLS to perform any of its obligations under this Agreement, GP Lending shall have all rights and remedies available under this Agreement at law and in equity.

(j)  Investigation of Loans. GPLS has conducted such independent investigations and due diligence as it deems to be warranted into the nature, validity, enforceability, collectability and value of the Participation Interests and the Participated Loans, and all other facts it deems material to the purchase of the Participation Interests and is entering into this transaction solely on the basis of that investigation and GPLS' own judgment, and is not acting in reliance on any representation made or information furnished by GP Lending, its employees, agents, representatives, or independent contractors (other than the representations and warranties of GP Lending contained in this Agreement). GPLS agrees and represents that the Loan Documents made available to it were an adequate and sufficient basis on which to determine whether and at what price to purchase the Participation Interests. GPLS has been urged, invited and directed to conduct and has conducted such due diligence review and analysis of the Participation Interests, the Participated Loans and the Loan Documents, and related information, together with such records as are generally available to the public from local, county, state and federal authorities, record-keeping offices and courts as GPLS deems necessary, proper or appropriate in order to make a complete informed decision with respect to the purchase and acquisition of Participation Interests. GPLS ACKNOWLEDGES AND AGREES THAT GPLS IS PURCHASING PARTICIPATION INTERESTS BASED UPON GPLS' INDEPENDENT EXAMINATION, STUDY, INSPECTION AND KNOWLEDGE OF THE PARTICIPATION INTERESTS AND THE PARTICIPATED LOANS AND THAT GPLS IS RELYING UPON ITS OWN DETERMINATION OF THE QUALITY, VALUE, AND CONDITION OF THE PARTICIPATION INTERESTS AND THE PARTICIPATED LOANS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GP LENDING.

(k)  Information Sharing. With respect to the sharing of any Customer Information or Confidential Customer Information relating to any Borrower or Applicant with any affiliated or non-affiliated company, GPLS, its Affiliates and agents shall comply with the requirements of all Laws of the United States of America even if such laws may not be applicable. Additionally, GPLS and its Affiliates and agents shall not sell, transfer or otherwise convey Customer Information to any other Person other than in connection with a subsequent sale of the Participation Interests to a third party subject to Section 16.

9

Confidential  Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 17 of 48  TF-PA-565147

(l)     Repurchase of Participation Interests. GP Lending shall use its best efforts to sell Charge-Offs at a competitive market rate in an arm's length transaction to a Person that is not related to or affiliated with GP Lending, and upon an agreement to sell any such sellable Charge-Offs, GP Lending shall, simultaneously with the sale and receipt of the related cash proceeds, promptly (i) repurchase GPLS' Participation Interest in such sellable Charge-Offs for a cash repurchase price equal to (I) the GPLS Participation Percentage, multiplied by (II) the amount of such cash proceeds, and (ii) pay GPLS the amount referred to in the preceding subsection (i) hereof.

(m)     Participation Fee. The Participation Fee shall be paid by GPLS to GP Lending as set forth in Section 4(a)(i). For purposes of clarification, the Parties agree that the Participation Fee shall constitute compensation for services rendered by GP Lending in connection with this Agreement.

## 3.     Servicing and Administration.

(a)     GP Lending's Charge-off Policy. GP Lending's policies regarding underwriting, risk, loan loss reserves and Charge-Offs shall be communicated in writing to GPLS from time to time and prior to any material change to such policies.

(b)     Servicing of Loans. GP Lending or its designees will service the Participated Loans in accordance with the Servicing Agreement. In performing its duties as servicer of the Participated Loans, GP Lending or such designees shall or shall cause a third party to service and administer the Participated Loans in accordance with the Program Guidelines, and in connection therewith, shall follow customary servicing procedures; provided, that notwithstanding the foregoing, except in the event that GP Lending is negotiating a payment plan or other workout of a Participated Loan with a Borrower, GP Lending shall not otherwise reduce the interest rate on a Participated Loan or the principal balance due on a Participated Loan. To the extent GP Lending is using a designee or third party to service the Participated Loans, GP Lending shall agree to provide a collateral assignment of any servicing agreement it enters into with respect to the Participated Loans which would allow GPLS to assign to itself or its designees any servicing agreement in the event of an Event of Default that is continuing that would result in a Material Adverse Effect on GPLS.

(c)     Compliance Reviews and Audits. During the term of this Agreement and at all times thereafter, GP Lending shall have reasonable access to GPLS' offices, to the books and records of GPLS (to the extent that such books and records pertain to the Participated Loans), to the officers, employees and accountants of GPLS, and to the computer files containing copies of the Loan Documents, all for the same purposes of ensuring that GPLS is complying fully with its obligations under this Agreement; provided, that the exercise of such audit and review rights by GPLS shall be conducted during normal business hours in a manner which does not unreasonably interfere with GP Lending's normal business operations and customer and employee relations. In addition, and not as a limitation of the foregoing, GP Lending shall have the right, from time to time during the term of this Agreement, to conduct audits and/or compliance reviews of GPLS and the records generated hereunder at GPLS' expense; provided, that the exercise of such audit and review rights by GP Lending shall be conducted during normal business hours in a manner which does not unreasonably interfere with GPLS' normal business operations and customer and employee relations. For purposes of clarification, the obligations of GPLS and rights of GP Lending under this Section 3(c) shall apply solely with respect to GPLS and not, for purposes of clarification, with respect to any of its Affiliates.

## 4.     Pricing and Fees.

TF App. 0583

Confidential   Case 1:25-cv-00794-DAB-JGM      Document 52-5      Filed 03/11/26      Page 18 of 48   TF-PA-565148

(a)     Within ten (10) days from the end of each calendar month, GPLS shall remit the following amounts to GP Lending:

   (i)     The Participation Fee pursuant to Section 2(m) and Exhibit B; plus

   (ii)     Three hundred and five dollars ($305.00) for each New Loan made during such previous month multiplied by the GPLS Participation Percentage; plus

   (iii)     One hundred and twenty dollars ($120.00) for each Repeat Loan made during such previous month multiplied by the GPLS Participation Percentage.

(b)     All charges and fees provided for in this Agreement are in U.S. dollars and are inclusive of any and all Taxes, duties, or similar charges. GP Lending will be solely responsible and shall timely pay any and all Taxes imposed on or with respect to, or arising as a result of or in connection with, any fees, charges or other amounts payable to or for the benefit of GP Lending hereunder or the transfer or sale of Participation Interests to GPLS hereunder, it being expressly understood that GP Lending shall not be responsible for any U.S. income tax on the income of GPLS. GP Lending shall indemnify GPLS and hold GPLS harmless from any and all claims and liabilities for such Taxes or arising from GP Lending's failure to report or pay any such Taxes.

5.     **Distributions.**

(a)     <u>Distribution of Payments.</u>  By the close of business on each Business Day, with respect to any payments received with respect to a Participated Loan, such payments shall be automatically deposited into the Collection Account with funds necessary to fund new Loans being made the following day being transferred from the Collection Account to the Funding Account.  Those payments referred to in the preceding sentence that are automatically deposited into the Collection Account shall be referred to hereafter as the "<u>Received Payments</u>."  Except with respect to not more than three and one quarter percent (3.25%) of the Received Payments, GP Lending shall not transfer any Received Payments from the Collection Account to any other account other than to transfer sufficient funds into the Funding Account to fund new Loans approved for funding on that Business Day and as permitted by this Section 5(a). GPLS shall have a perfected security interest in the Collection Account and the Funding Account and it shall be subject to a deposit control agreement acceptable to the financial institution, GP Lending and GPLS. To secure GP Lending's obligation to cause any payments received with respect to a Participated Loan to be deposited into the Collection Account and to transfer the appropriate monies received to GPLS (or its designee(s)) with respect to monies due to it pursuant to its Participation Interest, and to secure GPLS's interest in the Collection Account funds transferred to the Funding Account, GP Lending hereby grants to GPLS a first priority, continuing security interest in, and assignment of, GP Lending's right, title and interest in, to and under the Funding Account and the Collection Account, that portion of the funds in the Funding Account and the Collection Account that belong to GPLS, and all proceeds of any thereof, whether now or hereafter existing or arising. GPLS may indicate some or all of the collateral on the financing statement, whether generally or specifically.  On each Business Day, GP Lending shall transfer to an account designated by GPLS an amount equal to the GPLS Participation Percentage of any payments received by GP Lending on such Business Day and

11

Confidential  Case 1:25-cv-00794-DAB-JGM     Document 52-5     Filed 03/11/26     Page 19 of 48  TF-PA-565149

deposited into the Collection Account and GP Lending shall retain an amount equal to the GP Lending Participation Percentage of any payments received by GP Lending on such Business Day.  To the extent that any portion of such amount transferred to GPLS is determined to represent a returned payment by a Borrower (a "bounced payment") or a refund to a Borrower, GPLS shall be required to remit such amount immediately back to the Collection Account by no later than the next Business Day or GP Lending shall deduct such amount from the amount otherwise due to GPLS on the next Business Day.

(b)    Periodic Reports. Not later than the fifth (5th) Business Day of each month during the term of this Agreement, GP Lending will furnish to GPLS a monthly remittance report (a "Monthly Remittance Report") in a format agreed to by the Parties, as to the last day of the preceding month. In addition, not more than sixty (60) days after the end of each calendar year during the term of this Agreement, GP Lending will furnish to GPLS an annual remittance report (an "Annual Remittance Report") with the format agreed to by the Parties, as to the prior calendar year. In addition, GP Lending shall provide GPLS with such information concerning the Loans as is necessary for GPLS to prepare its federal or other applicable income tax return as GPLS may reasonably request from time to time. Reports provided to GPLS pursuant to this Section 5(b) shall be accompanied by a certification by an authorized officer of GP Lending as to the accuracy of the report.

6.    **Interests of the Parties.**

(a)    Collections of Payments. Subject to any other right set forth in this Agreement, GP Lending shall have the exclusive right to collect all sums due from a Borrower or any guarantors, third parties, or otherwise on account of each Participated Loan in accordance with the Servicing Agreement, including but not limited to, any principal, interest, late charges, origination fees and other fees or penalties, whether received directly from a Borrower, any guarantors, or any other Persons, or as amounts payable by exercise of any right held by GP Lending against any Persons.

(b)    Duties of GP Lending as Custodian.

(i)    GP Lending shall (i) hold the Loan Documents for Participated Loans as custodian for the benefit of GPLS and GP Lending, and (ii) maintain such accurate and complete accounts, records and computer systems pertaining to the Loan Documents indicating GPLS' Participation Interest in the Participated Loans. GP Lending shall act with reasonable care in performing its duties as custodian and shall comply with respect to the safeguards of such Customer Information in accordance with the Requirements.

(ii)    GP Lending shall maintain the Loan Documents and all related physical and electronic records and loan files at its principal office or at such other office as shall be specified to GPLS by written notice not later than ten (10) Business Days prior to any change in location. GP Lending shall make available to GPLS or its duly authorized representatives, attorneys or auditors a list of locations of the Loan Documents and the related accounts, records and computer systems maintained by GP Lending at such times during GP Lending's normal business hours as GPLS shall reasonably instruct, which does not unreasonably interfere with GP Lending's normal operations or customer or employee relations.

7.    **Bookkeeping Entries.** The sale of a Participation Interest in each Participated Loan shall be reflected on GP Lending's balance sheet and other financial statements as a sale of a participation interest by GP Lending to GPLS and not as a sale of a whole loan. GP Lending shall be responsible for maintaining a complete set of books and records for the Participated Loans which shall be clearly marked to reflect the sale of each Participation Interest in each Participated Loan to GPLS and the ownership of each Participation Interest by GPLS.

12

**TF App. 0585**

Confidential    Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 20 of 48    TF-PA-565150

**8. Information.** Subject to any Laws restricting disclosure and confidentiality provisions of this Agreement, GP Lending shall from time to time make available to GPLS or its duly authorized representatives, attorneys or auditors, upon written request and within a reasonable time, the following with respect to each Participated Loan: (i) the Loan Documents and such other information as is then available to GP Lending regarding the status of payments of principal, interest, finance charges and any other applicable charges collected from the Borrower; and (ii) such other information regarding each Participated Loan as G P L S o r a n y Governmental Authority may require. GP Lending hereby authorizes GPLS or any of its designees to verify or discuss with GP Lending any matter relating to any Participated Loan in person, by mail, by telephone or otherwise. GP Lending shall cooperate fully with GPLS and its designees in an effort to facilitate and promptly conclude any such verification or discussion process.

**9. Privacy.** GPLS shall not distribute any Customer Information received from GP Lending (or copies thereof) to any Person, except (A) as required by applicable Requirements or any applicable Governmental Authority, (B) as permitted by applicable Requirements to its Affiliates or (C) to its attorneys, accountants, and other parties to whom disclosure is required pursuant to litigation to enforce this Agreement or to defend the same, or in connection with tax filings. GPLS shall treat as confidential and shall not disclose or otherwise make available any Customer Information received from GP Lending with respect to any Borrower, customer or consumer, except in accordance with GP Lending's privacy policy.

**10. Security of Customer Information.** GP Lending and GPLS shall implement and maintain administrative, technical and physical safeguards designed to ensure the security of Customer Information pursuant to the Requirements including, but not limited to, the following: (i) access controls on information systems, including controls to authenticate and permit access only to authorized individuals and controls to prevent its representatives from providing Customer Information to unauthorized individuals who may seek to obtain this information through fraudulent means; (ii) access restrictions at physical locations containing Customer Information, such as buildings, computer facilities, and records storage facilities to permit access only to authorized individuals; (iii) encryption of electronic Customer Information, including while in transit or in storage on networks or systems to which unauthorized individuals may have access; (iv) procedures designed to ensure that information system modifications are consistent with the information security measures; (v) dual control procedures, segregation of duties, and employee background checks for representatives with responsibilities for or access to Customer Information; (vi) monitoring systems and procedures to detect actual and attempted attacks on or intrusions into information systems; (vii) response programs that specify actions to be taken when GP Lending or GPLS detects unauthorized access to information systems, including immediate reports to the other parties; (viii) measures to protect against destruction, loss or damage of Customer Information due to potential environmental hazards, such as fire and water damage or technological failures; (ix) training staff to implement the information security measures; (x) regular testing of key controls, systems and procedures of the information security measures by independent third parties or staff independent of those that develop or maintain the security measures; (xi) appropriate measures to completely and permanently destroy consumer information by shredding, permanently erasing, or otherwise permanently rendering consumer information inaccessible and illegible and (xii) appropriate measures to safeguard consumer information in accordance with those Laws that are applicable to the respective Party. Each of GP Lending and GPLS shall respond promptly and thoroughly to any requests for information concerning the respective information security measures implemented by such party.

**11. Costs and Expenses.** Neither Party shall be responsible for any other Party's costs, expenses, liabilities and disbursements incurred or paid in connection with this Agreement, or any matters relating to or arising therefrom; provided, however, that any Tax or fee imposed pursuant to any tribal authority on either GP Lending or GPLS in connection with the Participation Interests or the transactions contained

13

Confidential Case 1:25-cv-00794-DAB-JGM Document 52-5 Filed 03/11/26 Page 21 of 48 TF-PA-565151

in and contemplated by this Agreement, will be paid by GP Lending. GP Lending shall promptly reimburse GPLS if any such Tax or fee is paid by GPLS. In the event that GP Lending fails to promptly reimburse GPLS, GPLS shall have the right to set off against any payments then due or to become due from GPLS to GP Lending (including, without limitation, the Participation Fee).

**12.  Representations and Warranties.**

    (a)  The representations and warranties made by GP Lending in this Agreement shall not merge into any document associated herewith and shall survive and continue until the termination of this Agreement; provided, that the representations and warranties contained in Sections 12(a)(i), (ii), (iii), (iv), (v), (vi), (viii) and (ix) hereof shall survive such termination indefinitely, and all of such representations and warranties made by GP Lending shall be enforceable at law or in equity against GP Lending, its successors and assigns, by GPLS and its Affiliates, successors and assigns. GP Lending hereby makes the following representations and warranties to GPLS as of the date hereof and as of the date of each Purchase:

    (i)  <u>Organization and Good Standing</u>.  GP Lending is a business entity duly formed under the laws of and operating within the Indian Country of the Tribe as an arm of the Tribe possessing all sovereign immunity of the Tribe, validly existing and in good standing under the laws of the Tribe and has full power, authority and the legal right to own its properties and conduct its business as now conducted, and to execute, deliver and perform its obligations under this Agreement;

    (ii)  <u>Due Qualification</u>.  GP Lending (A) has obtained all licenses and approvals as required under Tribal Law or any applicable federal or state laws that are necessary to perform its duties hereunder and (B) is in compliance with its organizational documents and (C) will maintain all previous requirements in good standing under Tribal Law;

    (iii)  <u>Due Authorization: Enforceability</u>.  GP Lending has the full power and authority to execute and deliver this Agreement and to perform all its obligations hereunder, including, without limitation, selling and transferring the Participation Interests hereunder. GP Lending has secured all necessary tribal government approvals for the irrevocable limited waiver of sovereign immunity contained in this document. The execution, delivery and performance of this Agreement by GP Lending including, without limitation, the sale and transfer of the Participation Interests hereunder, have been duly authorized by all necessary action on its part and do not and will not contravene any provision of its organizational documents. This Agreement has been duly executed and delivered by GP Lending and constitutes the legal, valid and binding obligation of GP Lending, enforceable against GP Lending in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles;

    (iv)  <u>Arm of the Tribe</u>.  GP Lending is a wholly-owned entity of the Tribe that is validly recognized as an arm of the Tribe. GP Lending was created pursuant to the constitution and laws of the Tribe, is directly owned and operated by the Tribe, and the activities of GP Lending inure to the benefit of the Tribe in its sovereign capacity by furthering the Tribe' exercise of its right to self-government, its administration of all tribal affairs to the best advantage of the individual members of the Tribe, and preserving and increasing tribal resources. GP Lending operates completely within the Indian Country of the Tribe. Each Loan has been underwritten, approved and made within the Indian Country of the Tribe, is subject to the laws of the Tribe and each Borrower has and will specifically acknowledge and consent to the application and jurisdiction of the Tribal Laws and that the Loan is being made on tribal lands when entering into a Loan. GP Lending shall comply with the Requirements;

14

(v) <u>Limited Waiver of Sovereign Immunity</u>. Except as provided in Section 20(d), and then limited only to the extent specified therein, GP Lending has not, either by express agreement or by its actions, waived its sovereign immunity with regard to the Loans, and it has acted at all times in a manner consistent with preserving the application of Tribal Law, Tribal jurisdiction and Tribal Sovereign Immunity and jurisdiction to and over the Loans;

(vi) <u>No Conflict</u>. The execution, delivery and performance by GP Lending of this Agreement and the transactions contemplated hereby do not violate, conflict with or result in a breach or default under the organizational documents of GP Lending or any Requirements applicable to GP Lending or any agreement or other document to which GP Lending is a party or by which it or any of its property is bound;

(vii) <u>No Proceeding</u>. There is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or threatened against GP Lending which would have a Material Adverse Effect on the transactions contemplated by, or GP Lending's ability to perform its obligations under this Agreement;

(viii) <u>Criminal Matters; Tax Liens; Proceedings and Judgments</u>. Except as set forth on <u>Schedule 12(a)(viii)</u>, neither GP Lending nor any of its officers, directors, members or managers has been subject to any of the following:

(A) Criminal conviction (except minor traffic offenses and other petty offenses);

(B) Tax liens for amounts which are past due and which are not being contested in good faith by appropriate proceedings for which adequate reserves made in accordance with GAAP are being maintained;

(C) Administrative or enforcement proceedings commenced by the Tribal Regulator or any governmental entity (whether or not such entity has jurisdiction over GP Lending, including but not limited to the Securities and Exchange Commission, any state securities or consumer protection regulatory authority, the Consumer Financial Protection Bureau or the Federal Trade Commission); or

(D) Restraining order, decree injunction, or judgment entered in any proceeding or lawsuit alleging fraud on the part of GP Lending or any principal thereof;

(ix) <u>Participation Interests</u>. Each of the Participation Interests to be transferred by GP Lending hereunder has been duly authorized and, upon such transfer in accordance with the terms hereof, shall be validly transferred free from all Taxes, Liens and charges with respect to the transfer thereof. Upon receipt of the Participation Interests hereunder, GPLS will be vested with good and marketable title thereto, free and clear of all Taxes, Liens and charges with respect to the transfer thereof;

(x) <u>No Consents</u>. GP Lending is not required to obtain any consent, authorization, approval, order, license, franchise, permit, certificate or accreditation of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or authority or any other Person in order for it to execute, deliver or perform any of its obligations under or contemplated by this Agreement;

(xi) <u>Equity Capitalization of GP Lending</u>. All of the outstanding equity interests of GP Lending have been duly authorized, validly issued and are owned by the Tribe;

TF App. 0588

Confidential Case 1:25-cv-00794-DAB-JGM Document 52-5 Filed 03/11/26 Page 23 of 48 TF-PA-565153

(xii) <u>Indebtedness and Other Contracts</u>. GP Lending (A) has no outstanding Indebtedness, (B) is not a party to any contract, agreement or instrument, the violation of which, or default under which, by the other party(ies) to such contract, agreement or instrument could reasonably be expected to result in a Material Adverse Effect or (C) is not in violation of any term of or in default under any Material Contract that could reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect;

(xiii) <u>Creation, Perfection, and Priority of Liens</u>. If, notwithstanding the Parties' intent and belief, based on the advice of counsel and their independent analysis, the sale to GPLS of Participation Interests pursuant to this Agreement is held or deemed not to be an absolute sale or is held or deemed to be a pledge of security for a loan, Section 19(c) of this Agreement is effective to create in favor of GPLS a legal, valid, binding, and upon the filing of the appropriate financing statements with the Filing Offices, enforceable perfected first priority security interest and Lien in the entire right, title and interest of GP Lending in and to the GPLS Collateral;

(xiv) <u>Absence of Litigation</u>. There is no Proceeding pending or, to the knowledge of GP Lending, threatened in writing against or affecting GP Lending which (A) could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, (B) if adversely determined, could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect or (C) questions the validity of this Agreement or any of the transactions contemplated hereby or thereby or any action taken or to be taken pursuant hereto or thereto;

(xv) <u>No Undisclosed Events, Liabilities, Developments or Circumstances</u>. No event, liability, development or circumstance has occurred or exists, or is contemplated to occur with respect to GP Lending or its business, properties, prospects, operations or financial condition, that would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect;

(xvi) <u>Tax Status</u>. GP Lending (A) has made or filed all foreign, federal, state and tribal income and all other material tax returns, reports and declarations required by any jurisdiction to which it is subject, except prior to the date hereof where any failure to do so did not result in any material penalties to GP Lending, (B) has paid all taxes and other governmental assessments and charges shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and for which an adequate reserve has been established on its books in accordance with GAAP, and (C) has set aside on its books adequate reserves in accordance with GAAP for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be delinquent by the taxing authority of any jurisdiction (other than those being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and subject to adequate reserves taken by GP Lending as shall be required in conformity with GAAP), and the officers of GP Lending know of no basis for any such claim. Each of the Participated Loans is issued and shall be at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the U.S. Internal Revenue Code of 1986 (as amended) and any related Treasury regulations promulgated thereunder. GP Lending is authorized to receive, and shall receive, on behalf of each Borrower (as its agent) the applicable IRS Form W-8 delivered to it by GPLS;

(xvii) <u>Conduct of Business; Regulatory Permits</u>. GP Lending is not in violation of any term of or in default under its certificate of formation or operating agreement or other governing documents. GP Lending is not in violation of any judgment, decree or order or any statute, ordinance, rule or regulation applicable to GP Lending (A) purporting to enjoin or restrain the execution, delivery or performance of this Agreement, or directing that the transactions provided for herein not be consummated as herein provided, or (B) to the extent any such violation would reasonably be expected

16

TF App. 0589

Confidential   Case 1:25-cv-00794-DAB-JGM   Document 52-5   Filed 03/11/26   Page 24 of 48   TF-PA-565154

to have, either individually or in the aggregate, a Material Adverse Effect. GP Lending possesses all material consents, authorizations, approvals, orders, licenses, franchises, permits, certificates and accreditations and all other appropriate regulatory authorizations necessary to conduct its business as required by the Tribe, and GP Lending has not received any notice of proceedings relating to the revocation or modification of any such consents, authorizations, approvals, orders, licenses, franchises, permits, certificates, accreditations or permits. GP Lending is in compliance with all applicable laws, rules, regulations and ordinances of all applicable Governmental Authorities, including, without limitation, all applicable state regulatory and similar laws, rules, regulations and orders, except to the extent any such non-compliance would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and GP Lending will offer the Loans in accordance with the Program Guidelines;

(xviii) Foreign Corrupt Practices. Notwithstanding the fact that the following may not be applicable to GP Lending, neither GP Lending nor any director, officer, agent, employee or other Person acting on behalf of GP Lending has, in the course of its actions for, or on behalf of: GP Lending (A) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (B) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (C) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (D) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee;

(xix) Disclosure. Notwithstanding any other provision of this Agreement, all disclosures provided to GPLS regarding GP Lending, its business and properties, and the transactions contemplated hereby and thereby furnished by or on behalf of GP Lending, are true and correct in all material respects and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, taken as a whole and in light of the circumstances under which they were made, not materially misleading, and to the knowledge of GP Lending, no event or circumstance has occurred or information exists with respect to GP Lending or any of its business, properties, prospects, operations or condition (financial or otherwise), which, under applicable law, rule or regulation, requires public disclosure or announcement by GP Lending but which has not been so publicly announced or disclosed to GPLS;

(xx) Terrorism Laws. To the extent applicable, GP Lending is in compliance, in all material respects, with all Terrorism Laws; and

(xxi) Taxes. Currently no Taxes or fees are imposed pursuant to any tribal authority on either GP Lending or GPLS in connection with the Participation Interests or the transactions contained in and contemplated by this Agreement. In the event any tribal authority imposes any Taxes or fees upon either GP Lending or GPLS, GP Lending will bear the entire burden of such Taxes or fees and shall reimburse GPLS for such.

(b) The representations and warranties made by GPLS shall not merge into any document associated herewith and shall survive and continue until the termination of this Agreement and shall be enforceable at law or in equity against GPLS, its successors and assigns, by GP Lending and its successors and assigns. GPLS hereby makes the following representations and warranties to GP Lending as of the date hereof and as of the date of each Purchase;

(i) Organization and Good Standing. GPLS is an exempted company duly formed with limited liability under the laws of the Cayman Islands, validly existing and in good standing under the laws of the Cayman Islands and has full power, authority and the legal right to own its properties and conduct its business as now conducted, and to execute, deliver and perform its obligations

17

TF App. 0590

TF-PA-565155

under this Agreement;

    (ii) <u>Due Qualification</u>. GPLS is in compliance with its organizational documents;

    (iii) <u>Due Authorization: Enforceability</u>. GPLS has the full power and authority to execute and deliver this Agreement and to perform all its obligations hereunder. The execution, delivery and performance of this Agreement by GPLS have been duly authorized by all necessary corporate action on its part and do not and will not contravene any provision of its organizational documents. This Agreement has been duly executed and delivered by GPLS and constitutes the legal, valid and binding obligation of GPLS, enforceable against GPLS in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency moratorium and/or other similar laws and general equitable principles;

    (iv) <u>No Conflict.</u> The execution, delivery and performance by GPLS of this Agreement and the transactions contemplated hereby do not violate, conflict with or result in a breach or default under the organizational documents of GPLS or any other regulation applicable to GPLS or any agreement or other document to which GPLS is a party or by which it or any of its property is bound;

    (v) <u>No Proceeding</u>. There is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or threatened against GPLS which would have a material adverse effect on the transactions contemplated by, or GPLS's ability to perform its obligations under this Agreement;

    (vi) <u>GPLS Accepts "As-Is" Condition</u>. EXECUTION OF THIS AGREEMENT SHALL CONSTITUTE AN ACKNOWLEDGEMENT BY GPLS THAT THE PURCHASE OF EACH PARTICIPATION INTEREST SHALL BE MADE WITHOUT RELIANCE ON ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR OTHERWISE (OTHER THAN THE REPRESENTATIONS AND WARRANTIES OF GP LENDING CONTAINED IN THIS AGREEMENT) IN AN "AS-IS", "WITH ALL FAULTS" CONDITION BASED SOLELY ON GPLS' OWN INSPECTION AND LEGAL AND BUSINESS DUE DILIGENCE INVESTIGATION. GPLS acknowledges and agrees that GP Lending neither has nor does represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the Participation Interests, the Participated Loans or applicable Loan Documents and does not guaranty or make any representation or warranty regarding the performance or collection of any Participated Loan. All documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to GPLS with respect to any and all Participation Interests, Loans or the Loan Documents are done so on an "as is" basis, with all faults;

    (vii) <u>Independent Investigation</u>. GPLS represents and warrants to GP Lending that GPLS based its decision to purchase each Participation Interest solely upon GPLS' investigation and evaluation of the Participation Interests, the Participated Loans (including the compliance thereof with the Laws) and each Borrower's creditworthiness, to the extent deemed necessary or advisable by GPLS, and not in reliance on any information, representation or advice provided by GP Lending. GPLS further warrants that it will, without reliance on any advice or analysis that may be provided by GP Lending and based on such documents, information, analysis and other factors as GPLS deems appropriate at the time, continue to make its own investment decisions in connection with the Participation Interests and the Participated Loans; and

    (viii) <u>Investment Representation</u>. GPLS hereby represents and warrants to GP Lending that (A) the purchase of Participation Interests is a legal investment for GPLS under applicable laws, (B) GPLS has acquired and is acquiring the Participation Interests for its own account and not with a view to the sale, transfer or other distribution thereof other than in accordance with the exercise of any contractual

TF App. 0591

Confidential Case 1:25-cv-00794-DAB-JGM Document 52-5 Filed 03/11/26 Page 26 of 48 TF-PA-565156

rights of redemption it may have, (C) GPLS acknowledges that the Participation Interests are not Securities and are not registered under or subject to any securities laws, (D) GPLS understands that its purchase of Participation Interests involves a high degree of risk, including the risk of nonpayment and Charge-Off, (E) GPLS has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of the purchase of Participation Interests hereunder, (F) GPLS can afford a complete loss of the sums advanced and to be advanced hereunder, (G) GPLS acknowledges that it has been offered an opportunity to ask questions of and receive answers from officers of GP Lending concerning all material aspects of this Agreement, the Participation Interests and the Participated Loans, and that any request for such information has been fully complied with to the extent GP Lending possesses such information or can acquire it without unreasonable effort or expense, (H) GPLS recognizes that no governmental agency has passed upon the Participation Interests, the Participated Loans or this Agreement or made any finding or determination as to their fairness and (I) GPLS is an "accredited investor" as defined in Rule 501 under the Securities Act of 1933, as amended.

**13. Covenants of GP Lending.** Until this Agreement shall have terminated:

    (a) <u>Notices from Governmental Authority or Threat or Initiation of Litigation or Arbitration</u>. GP Lending will deliver to GPLS, within ten (10) Business Days of the date of receipt, (i) any notice of actual or threatened adverse action issued by any Tribal Agency or Governmental Authority, whether or not such Governmental Authority has jurisdiction over GP Lending, the Participation Interests or the Participated Loans, (ii) notice of any actual or threatened third party litigation or arbitration in connection with the Program, and (iii) any customer complaints; provided, however, GP Lending may provide aggregate customer complaint information on a monthly basis.

    (b) <u>Mergers; Acquisitions and Asset Sales.</u> GP Lending shall not (i) enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), (ii) convey, sell, lease or sub lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, the Loans or any income or profits therefrom (other than sales or other transfers of the Retained Interests) or any of its other assets, property or equity Securities of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired (other than sales or other transfers of other assets of GP Lending in the ordinary course of its business consistent with past practice with the prior written consent of GPLS (which consent shall not be unreasonably withheld or delayed)), or (iii) acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person.

    (c) <u>Other Information</u>. GP Lending will deliver to GPLS:

        (i) subject to limitations imposed by applicable law, promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of GP Lending (other than any routine inquiry) and, upon request and at GPLS' reasonable cost and expense, copies of all such documents and information furnished to such Governmental Authority; and

        (ii) such other information, documents and data with respect to GP Lending as from time to time may be reasonably requested by GPLS.

    (d) <u>Prohibition Against Liens</u>. GP Lending shall not, directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to the Participated Loans or any income or profits therefrom (other than Liens on or with respect to the Retained Interests), or file or permit

19

Confidential TF-PA-565157

the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to the P a r t i c i p a t e d   L o a n s , or any income or profits therefrom, under the UCC of any State or under any similar recording or notice statute.

(e)    Prohibition Against Indebtedness.  GP Lending shall not, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness secured by a Lien on any Participated Loans or any income or profits therefrom (other than Liens on or with respect to the Retained Interests and any Loans other than Participated Loans).

(f)    Books and Records; Inspections.

(i)    GP Lending shall (A) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (B) permit any representatives designated by GPLS (including any consultants, accountants, lawyers and appraisers retained by GPLS) at GPLS's sole expense, to visit and inspect any of the properties of GP Lending, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants, all upon reasonable prior written notice and at such reasonable times during normal business hours and as often as may reasonably be requested and by this provision GP Lending authorizes such accountants to discuss with GPLS and such representatives the affairs, finances and accounts of GP Lending. GP Lending acknowledges that GPLS, after exercising its rights of inspection, may prepare certain reports pertaining to GP Lending's assets solely for internal use by GPLS.

(ii)    Without limiting the foregoing, GPLS may, at GPLS' sole cost and expense, make test verifications of the Loans in any manner and through any medium that GPLS considers advisable, and GP Lending shall furnish all such assistance and information as GPLS may reasonably require in connection therewith.

(g)    Compliance with Laws.  GP Lending shall comply with all applicable Requirements.

(h)    No Further Negative Pledges.  GP Lending shall not enter into, assume or become subject to any agreement (other than this Agreement) prohibiting or otherwise restricting the existence of any Lien upon the Participated Loans or any income or profits therefrom (other than Liens on or with respect to the Retained Interests), or requiring the grant of any security with regard to the Participated Loans, or any income or profits therefrom for any obligation.

(i)    Existence and Maintenance of Properties.  GP Lending shall maintain and preserve (i) its existence and good standing in the jurisdiction of its organization and (ii) its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary (other than such jurisdictions in which the failure to be so qualified or in good standing could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect).

(j)    Duties to GPLS.  GP Lending shall have the duty to GPLS to maintain operating costs and staffing at a level customary within the industry.

(k)    Modification of Organizational Documents, Loan Documents and License Agreement.  GP Lending shall not, without the prior written consent of GPLS (which consent shall not be unreasonably withheld or delayed), permit any of (i) its charter or other organizational documents or (ii) the Loan Documents to be amended or modified in any respect adverse to GPLS. GP Lending shall not, without the prior written consent of GPLS, permit the License Agreement to be amended, modified

20

TF App. 0593

Confidential    Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 28 of 48    TF-PA-565158

or terminated. GP Lending shall promptly give written notice to GPLS of any change in the Constitution of the Tribe or any tribal ordinances, law or regulations that will affect this transaction or the Loans, and such notice shall include copies of all changes thereto.

(l)     Employment Requirements. GP Lending shall have experienced management to run all aspects of the Program, to insure proper financial information and controls and that are dedicated solely and exclusively to managing the Program.

(m)     Limitation on Businesses. GP Lending shall not offer consumer financial products other than those provided in conjunction with services provided by Think Finance, Inc. or its Affiliates.

(n)     Affiliate Transaction. GP Lending shall not obtain any services or incur expenses from any Affiliate other than on an arm's length basis at current market rates.

**14.   Covenants of GPLS. Until this Agreement shall have terminated:**

(a)     Notices from Governmental Authority or Threat or Initiation of Litigation or Arbitration. GPLS will deliver to GP Lending, within ten (10) Business Days of the date of receipt, (i) any notice of actual or threatened adverse action issued by any Tribal Agency or Governmental Authority, whether or not such Tribal Agency or Governmental Authority has jurisdiction over GPLS, the Participation Interests or the Participated Loans, (ii) notice of any actual or threatened third party litigation or arbitration with respect to this Agreement or the Participation Interests, and (iii) any customer complaints, provided, however, GPLS may provide aggregate customer complaint information on a monthly basis.

(b)     Other Information. GPLS will deliver to GP Lending:

(i)     subject to limitations imposed by applicable law, GPLS will deliver to GP Lending promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of GPLS (other than any routine inquiry); and

(ii)     such other information, documents and data with respect to GPLS as from time to time may be reasonably requested by GP Lending.

(c)     Books and Records; Inspections.

(i)     GPLS shall (A) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (B) permit any representatives designated by GP Lending (including  any consultants, accountants, lawyers and appraisers retained by GP Lending) to visit and inspect any of the properties of GPLS, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants, all upon reasonable prior written notice and at such reasonable times during normal business hours and as often as may reasonably be requested and by this provision GPLS authorizes such accountants to discuss with GP Lending and such representatives the affairs, finances and accounts of GPLS. GPLS acknowledges that GP Lending, after exercising its rights of inspection, may prepare certain reports pertaining to GPLS' assets for internal use by GP Lending.

(ii)     Without limiting the foregoing, GP Lending may, at GP Lending's sole cost and expense, make test verifications of the Loans in any manner and through any medium that GP Lending considers advisable, and GPLS shall furnish all such assistance and information as GP Lending may

21

require in connection therewith.

(d)   Compliance with Relevant Laws and Rules. GPLS will comply with all L a w s , including all privacy laws, which apply to GPLS' performance obligations under this Agreement.

**15.   The Master Participation Certificate; Quarterly Attestations.** The Master Participation Certificate for the Participation Interests shall be substantially in the form annexed hereto as Exhibit A and shall, on original issue, be executed and delivered by GP Lending, to GPLS upon the payment by GPLS of the purchase price for the initial Purchase made by GPLS hereunder, and shall be executed by GP Lending; thereafter, GP Lending shall deliver to GPLS by no later than the fifth (5th) Business Day of each calendar quarter during the term of this Agreement, commencing with the calendar quarter beginning on January 1, 2016, an updated Master Participation Certificate evidencing all subsequent Purchases made in the preceding calendar quarter.

**16.   Right of Transfer.**

(a)   Upon written consent of GP Lending (which consent shall not be unreasonably withheld or delayed), GPLS and any of its Affiliates which make Purchases hereunder may assign the Participation Interests and/or their respective rights under this Agreement to any other entity subject to such assignee agreeing to be bound by the terms set forth in this Agreement, subject to Sections 16(b) and 16(c).

(b)   Upon the transfer by GPLS or any of their respective Affiliates of any of the Participation Interests and/or their respective rights under this Agreement pursuant to Section 16(a), GPLS or any of their respective Affiliates which transfer such Participation Interests and/or rights under this Agreement shall have no further obligations hereunder with respect to such Participation Interests or rights. Similarly, after any such assignment, GP Lending will have no right to enforce any provision of this Agreement against GPLS or its Affiliates, as assignors, in regard to the transferred Participation Interests and or rights shall look to the assignee as the counterparty to this Agreement.

(c)   GP Lending (the "Registrar") shall maintain at an office located in the United States a copy of the issuance and each assignment of the Participation Interests delivered to the Registrar and a register (the "Register") for the recordation of the names and addresses of the original owners and assignees, and the principal amount of Participation Interests held by the original owner and each assignee thereof from time to time. The Register may be in electronic form. The entries of the Register shall be conclusive, and the Registrar, GPLS and all of its assignees shall treat each Person whose name is recorded in the Register pursuant to these terms as the owners of such principal amount of Participation Interests for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be kept confidential. Any fees and expenses of the Registrar for its services shall be charged to the registered owner of the Participation Interests and not to GP Lending.

**17.   Termination.**

(a)   The term of this Agreement shall commence as of the Effective Date and shall continue for a period of one (1) year (the "Initial Term"). This Agreement will automatically renew for subsequent one (1) year periods (each a "Renewal Term") unless either Party provides written notice of termination to the other at least ninety (90) calendar days prior to the expiration of the Initial Term or any Renewal Term.

(b)   Subject to the provisions of Section 20 (c), this Agreement may also be terminated upon the occurrence of one or more of the following events, within the time periods set forth below:

TF App. 0595

Confidential   Case 1:25-cv-00794-DAB-JGM      Document 52-5      Filed 03/11/26      Page 30 of 48   TF-PA-565160

(i) If either Party breaches this Agreement including, without limitation, any breach of any representation, warranty or covenant contained herein, the non-breaching Party may immediately terminate this Agreement by providing written notice thereof to the breaching Party if such breaching Party does not cure such breach within thirty (30) calendar days after receipt of the written notice of the breach. Upon such breach by GP Lending and a termination of this Agreement by GPLS, to the extent GPLS is not receiving the funds it is due under Section 5(a) or pursuant to the Monthly Remittance Report, GPLS may pursue self-help remedies, and in such event GP Lending hereby appoints GPLS (its officers, employees or agents) as its true and lawful attorney (and agent in fact) for the sole purpose of enabling GPLS or its agent to assert such rights and collect such monies from Borrowers in the manner set forth herein, such appointment being coupled with an interest is irrevocable so long as any monies are owed to GPLS pursuant to the terms of the Agreement.

(ii) GPLS may terminate this Agreement by giving written notice at least ninety (90) calendar days in advance of termination if GP Lending ceases to fund Loans and GP Lending does not resume funding within such ninety (90) calendar day period. Further, if GP Lending changes the Program in a way that causes a material adverse effect on GPLS then GPLS may terminate this Agreement upon ninety (90) calendar days prior written notice to GP Lending if GP Lending fails to take steps reasonably requested by GPLS to minimize the material adverse effect on GPLS within such ninety (90) calendar day period.

(iii) This Agreement shall automatically terminate simultaneously with the termination of the (A) Servicing Agreement, (B) Marketing Agreement, or (C) License Agreement.

(iv) Either Party may terminate this Agreement at any time upon at least 90 days prior written notice to the other Party. In the event this Agreement terminates pursuant to Paragraph 17(b)(iii), the obligations of GPLS shall continue to remain in place until proper notice under this sub-paragraph is given and the time period set forth above expires.

(v) This Agreement shall terminate upon the occurrence of an Insolvency Event (as defined below) by either Party. It shall constitute an insolvency event ("Insolvency Event") by GP Lending if GP Lending shall file for protection under the laws of the Tribe, or GP Lending fails to pay its obligations as they become due. It shall constitute an Insolvency Event by GPLS hereunder if GPLS shall file for protection under Part V of the Cayman Islands Company Law or similar law, an involuntary petition is filed against GPLS under any such laws and is not dismissed within thirty (30) calendar days of such filing, or a receiver or any Governmental Authority takes control of GPLS.

(vi) In the event of an act of God or other natural disaster which makes the carrying out of this Agreement impossible, or if a Party's performance hereunder is rendered illegal or materially adversely affected by reason of changes in Law (either federal, state or tribal) applicable to the Participation Interests, the Participated Loans or to either Party, or if a Party is advised in writing by any Governmental Authority having or asserting jurisdiction over such Party, the Participation Interests or the Loans that the performance of its obligations under this Agreement is or may be unlawful, then the Party unable to perform, or whose performance has been rendered illegal or who has been so advised by a Governmental Authority, may terminate this Agreement by giving written notice at least ninety (90) calendar days in advance of termination to the other Party, unless such changes in applicable Law or communication from such Governmental Authority require earlier termination, in which case termination shall be effective upon such earlier required date.

(c) Notwithstanding any other provision of this Agreement, upon any change in Law that has a Material Adverse Effect on the Program, either Party, upon prior written notice, may terminate this Agreement.

23

Confidential Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 31 of 48 TF-PA-565161

     (d)     In the event of a termination of this Agreement, GP Lending shall continue to service the Loans according to the terms of the Servicing Agreement until all outstanding Loans have been repaid or are charged off in accordance with the GP Lending charge off policy.

**18.  Effect of Agreement and Relationship of Parties; Integration.**  This Agreement is not intended to constitute, and shall not be construed to establish, a partnership or joint venture between the Parties.  The Parties will have no obligations or responsibilities to each other except as specifically stated herein.

**19.  Intention of the Parties.**

     (a)   The relationship between the Parties hereunder is not intended to be that of debtor and creditor.  This Agreement will not create a joint venture, partnership or other formal business relationship or entity of any kind, or an obligation to form any such relationship or entity.

     (b)   It is the intention of the Parties that the sale of the Participation Interests pursuant to this Agreement shall be an absolute sale, without recourse, of the Participation Interests (and the Parties agree to treat the transfer of the Participation Interests as an absolute sale rather than a secured financing), which includes interests in the Participated Loans to the extent of the Participation Interests and the GPLS Participation Percentage.

     (c)   If, notwithstanding the Parties' intent and belief, based on the advice of counsel and their independent analyses, the sale to GPLS of Participation Interests pursuant to this Agreement is held or deemed not to be an absolute sale or is held or deemed to be a pledge of security for a loan, GP Lending and GPLS intend that the rights and obligations of the Parties shall be established pursuant to the terms of this Agreement and that, in such event, GP Lending shall be deemed to have assigned and granted to GPLS a security interest in and, as of the date of this Agreement, does hereby assign and grant to GPLS a security interest in the Participation Interests, which includes the GPLS Participation Percentage in the Participated Loans and all proceeds thereof (collectively, the "GPLS Collateral"), which assignment and security interest shall be, upon the filing of the appropriate financing statement in the Filing Officers, perfected and of first priority. In such event, with respect to the GPLS Collateral, this Agreement shall constitute, and hereby is, a security agreement under applicable law.

     (d)   GP Lending hereby authorizes GPLS to file financing statements in form and content reasonably acceptable to GP Lending with the Filing Offices to evidence the sale of the Participation Interests to GPLS hereunder and to perfect the assignments of the Participation Interests to GPLS as a first priority security interest.

     (e)   GP Lending and GPLS each acknowledge and agree that it is the intention of the Parties that GP Lending is the sole lender of the Participated Loans, and GPLS shall not assert in any forum or for any purpose that it is the lender of the Participated Loans including, without limitation, any litigation, regulatory inquiry or other proceedings of any kind.

     (f)   In connection herewith the Parties acknowledge, state and affirm that:

          (i)   GP Lending retains sole and exclusive authority to establish and implement underwriting criteria with respect to the Loans in accordance with the Program Guidelines;

          (ii)   GP Lending is exclusively identified in all Loan Documents as the sole lender and that no other Person is identified as a lender;

24

(iii) an officer of GP Lending or his or her designee acting within the boundaries of the Indian Country of the Tribe shall make the final determination as to whether to issue a Loan or refinance any Loan; and

(iv) GPLS shall not directly or indirectly engage in any of the conduct described in Sections 19(f)(i),(ii) or (iii) of this Agreement.

**20. Miscellaneous.**

(a) Notices. Except as otherwise expressly provided herein, all notices required or agreed to be given pursuant hereto shall be in writing and shall be deemed to have been properly given, served and received (i) if delivered by messenger, when delivered, (ii) if mailed, on the third (3rd) Business Day after deposit in the United States of America mail certified, postage prepaid, return receipt requested, (iii) if by facsimile or e-mail, upon sender's transmission, or (iv) if delivered by reputable overnight express courier, freight prepaid, the next Business Day after delivery to such courier. Notices shall be addressed to the Parties as set forth below:

If to GPLS:
GPL Servicing Ltd.
c/o Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone:     (312) 902-5297 and (312) 902-5495
Facsimile:      (312) 902-1061
Attention:      Mark R. Grossmann, Esq. and Scott E. Lyons, Esq.
E-Mail:         mg@kattenlaw.com
                scott.lyons@kattenlaw.com

If to GP Lending:
Great Plains Lending, LLC
8151 Highway 177
Red Rock, Oklahoma 74651

with a copy (for informational purposes only) to:

OMDA
423 North Robinson Ave., Suite 500
Oklahoma City, Oklahoma 73102
Facsimile:      (405) 235-4702
Attention:      Rebecca Bartlett
E-Mail:         rbartlett@omdevelopment.org

The Parties may change their addresses for notice by serving written notice upon all other Parties.

(b) Execution in Counterparts. This Agreement may be executed in any number of counterparts and by the Parties on separate counterparts including via facsimile or other electronic means, each of which counterparts, when so executed and delivered, shall be deemed an original and all of which counterparts, taken together, shall constitute but one and the same agreement. A copy of an executed signature page to this Agreement delivered by any Party hereto via facsimile or by other electronic means (including delivery as a PDF) shall be deemed effective on the date of such delivery.

TF App. 0598

Confidential   Case 1:25-cv-00794-DAB-JGM   Document 52-5   Filed 03/11/26   Page 33 of 48   TF-PA-565163

(c)     Dispute Resolution. If either Party believes that the other Party has breached this Agreement, or in the event of any dispute hereunder including, but not limited to, any dispute over the proper interpretation of the terms and conditions hereof, the following procedures shall be invoked:

(i)     The goal of the Parties shall be to resolve all disputes amicably and voluntarily whenever possible. The Party asserting breach or seeking an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provision alleged to have been violated or in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Representatives of the Parties shall meet within thirty (30) days of receipt of notice in an effort to resolve the dispute;

(ii)     Either Party may refer a dispute arising under this Agreement to arbitration under the rules of the American Arbitration Association ("AAA"), subject to enforcement or pursuant to review as provided in this Section 20(c) by a federal district court. The remedies available through arbitration are limited to enforcement of the provisions of this Agreement. The Parties consent to the jurisdiction of such arbitration forum and court for such limited purposes and no other, and each waives immunity with respect thereto. One (1) arbitrator shall be chosen by the Parties from a list of qualified arbitrators to be provided by the AAA. If the Parties cannot agree on an arbitrator within ten (10) Business Days, then the arbitrator shall be named by the AAA. The expenses of arbitration shall be borne equally by the Parties. The arbitrator shall apply the substantive laws of the State of Oklahoma as well as the Federal Rules of Civil Procedure;

(iii)     The Party asserting breach or seeking an interpretation of this Agreement under this Section 20(c) shall be deemed to have certified that to the best of such Party's knowledge, information, and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 20(c), then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to the other Party of its reasonable expenses incurred in having to participate in the arbitration; and

(iv)     Either Party may bring an action in a federal district court for the de novo review of any arbitration award under Section 20(c)(ii). The decision of the federal district court shall be subject to appeal. GP Lending also waives any obligation to participate in or exhaust any tribal court remedies. GP Lending agrees that it shall not initiate any action against GPLS, or its members or affiliates, in any tribal court or tribal forum, and waives to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue in the courts referenced above, including any claim that the action has been brought in an inconvenient forum.

(v)     To effectuate the provisions of Section 20(c)(iv), GPLS hereby waives any claim of immunity and consents to suit in the United States federal courts for such limited purposes. GP Lending waives any claim of immunity and consents to suit therein for such limited purposes pursuant to section (d) below. The Parties hereby acknowledge that this express waiver extends only to actions brought by GPLS, its successors and assigns (and not any other party) against GPL for claims of any kind arising under this Agreement. Nothing herein shall be construed to authorize a money judgment other than for damages for failure to comply with an arbitration decision requiring the payment of monies.

(d)     Limited Waiver of Tribal Sovereign Immunity. GP Lending irrevocably (i) waives any sovereign immunity and any other privilege that may be asserted from its status as an instrumentality or entity of the Tribe and any defenses associated with such immunity or privilege from unconsented

26

suit, and (ii) consents to any legal proceedings or alternative dispute resolution pursuant to this Agreement and the enforcement and collection of judgment or award, injunction, specific performance or declaratory relief, conditioned only upon following limitations: (a) this waiver is limited to the tribal entity, GP Lending, and does not extend to an action against the tribal government of the Tribe, and shall not be deemed a waiver of the rights, privileges and immunities of the tribal government of the Tribe, and (b) the waiver is limited to actions to (i) interpret or enforce the provisions of this Agreement, and (ii) enforce any agreement, order, judgment or ruling resulting from such an action including, but not limited to, any execution and collection of monetary damages.

(e)     Severability of Provisions. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(f)     Complete Agreement; Successors and Assigns. This Agreement constitutes the complete agreement between the Parties with respect to the subject matter hereof and supersedes all existing agreements and all oral, written, or other communications between the Parties concerning its subject matter. The Parties make no representations or warranties to each other, except as specifically set forth in or specified by this Agreement. All prior representations and statements made by any Party or its representatives, whether verbally or in writing, are deemed to have been merged into this Agreement. This Agreement shall be binding upon the Parties and their respective successors and permitted assigns; provided, that GP Lending may not assign any of its rights or obligations hereunder, and any such assignment by GP Lending shall be void *ab initio*. The provisions of this Agreement are applicable to only the Parties. There are no third party beneficiaries under this Agreement.

(g)     Waivers and Amendments. No delay on the part of a Party in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by such Party of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of any provision of this Agreement shall be effective unless in writing and signed by each of the Parties. Each Party may act or refrain from acting under this Agreement with the express written consent or direction of the other Party.

(h)     References to Sections and Agreement; Captions. Unless otherwise indicated either expressly or by context, any reference in this Agreement to a "Section" shall be deemed to refer to a Section to this Agreement. All references herein to this Agreement shall, as of any time after the date hereof, be deemed to include all amendments hereto which have been made prior to such time in accordance with Section 20(f). Section captions, headings and titles used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.

(i)     Confidentiality. All oral and written information about each of the Parties, their respective businesses and customers, and this Agreement (collectively, the "Records") are valuable and proprietary assets. Each of the Parties (and each of their respective employees and agents) shall treat the Records as strictly confidential and, except as expressly authorized hereunder, will not disclose such Records to any Person (other than its Affiliates and, in the case of GPLS, to proposed transferees of the Participation Interests) or use such Records other than in accordance with this Section 20(i) and the Laws, except that such Records may be disclosed (i) with each Party's consent, (ii) to Related Parties of a Party who are or have been advised of their obligation to keep such information confidential in accordance with this Section 20(i), (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 20(i) or (B) available to such Party or any of their Related Parties, as the case may be, from a source (other than the other Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable law or other legal process or requested or demanded by any Governmental Authority, (v) to current or prospective assignees, special

27

TF App. 0600

TF-PA-565165

purpose vehicles (including the investors or prospective investors therein) or participants and to their respective Related Parties (and such Party may disclose information to their respective Related Parties in accordance with clause (ii) above), (vi) to any other Party hereto, (vii) in related marketing and overview materials (which materials shall not be publicly disseminated) and (viii) in connection with the exercise or enforcement of any right or remedy hereunder, in connection with any litigation or other proceeding to which such Party or any of their Related Parties is a party or bound, or to the extent necessary to respond to public statements or disclosures by a Party referring to the other Party or any of its Related Parties. Each Party will use its best efforts to ensure that its employees and agents maintain such confidentiality. Each Party will notify the other Party immediately upon receiving a subpoena or other legal process about such Party's Records and will cooperate with the other Party to comply with or oppose the subpoena or legal process.

(j)  Jury Waiver. THE PARTIES HEREBY EACH WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. THE PARTIES EACH REPRESENT TO EACH OTHER THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL WITHOUT A JURY.

(k)  Compliance with Law and Regulation. The performance of each of the Parties under this Agreement is subject to all applicable Requirements and each Party covenants to comply with all applicable Requirements and the lawful and reasonable actions or requests of duly authorized Governmental Authorities in connection with the matters contemplated by this Agreement. If any Party becomes aware of any change in any Requirement affecting the performance of obligations by any Party under this Agreement, it shall promptly thereafter provide written notice of the same to the other Parties, provided that the failure to provide such notice shall not relieve any Party of its obligation to comply with all applicable Requirements as may change from time to time. Nothing in this Agreement shall be construed as compelling any Party to act in violation of any applicable Requirements.

(l)  Limitations on Liability/Waiver of Claims. The Parties knowingly, voluntarily and intentionally waive any right to claim for punitive damages in connection with any claim or dispute, action or proceeding against any other Party arising under or in connection with this Agreement, in tort, at law or in equity, or by virtue of any statute or otherwise.

(m)  Provision of Information. Until this Agreement shall have terminated, GP Lending shall, to the extent not prohibited by any applicable Requirement, in addition to the foregoing, furnish to GPLS upon reasonable advance request such additional reports or information, including, without limitation, updated financial data or credit reports or information required by any applicable Requirements, and copies of such documents as may be contained in the loan file for each Loan. All such reports, documents or information shall be provided by and in accordance with all reasonable written instructions and directions that GPLS may give.

(n)  Survival. Except as otherwise expressly provided herein, the provisions of Sections 1, 2(e), 2(g), 2(k), 5(a), 9, 10, 11, 12, 20 and 21 shall survive any termination or expiration of this Agreement.

(o)  Cooperation. Each Party shall cooperate in good faith regarding the implementation of the transactions contemplated by this Agreement.

28

Confidential  Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 36 of 48  TF-PA-565166

(p)     Partial Redemption.     The Parties acknowledge that as of the Effective Date (i) GP Lending redeemed two and one quarter percent (2.25%) of GPLS's Participation Interest in each of the Participated Loans for an aggregate amount equal to $597,195.06 which was paid in full by GP Lending to GPLS; (ii) GPLS continues to hold a ninety six and three quarters percent (96.75%) Participation Interest in each of the Participated Loans; and (iii) each Party has performed their respective obligations under this Agreement and neither Party is in default thereunder. On a monthly basis or as otherwise agreed upon by the Parties, the Parties also acknowledge that GP Lending may also redeem, in the aggregate, an additional sixteen and three quarters percent (16.75%) of GPLS's Participation Interest in each of the Participated Loans at a purchase price equal to such redeemed percentage of the aggregate Book Value with respect to all of the Participated Loans, multiplied by the GPLS Participation Percentage. If GP Lending elects to exercise the right set forth in the preceding sentence, then the Parties shall execute an agreement in substantially the same form as Exhibit D attached hereto with respect to each of such exercises and perform in accordance therewith.

(q)     Quarterly Review.  On a quarterly basis, the Parties agree to (i) review the performance of the Participated Loans, the Program and the respective terms and conditions of this Agreement and the Servicing Agreement, and (ii) agree upon any mutually acceptable revisions to this Agreement and/or the Servicing Agreement.

**21.    Indemnification Provisions.**

(a)     Indemnity.

(i)     By GP Lending. GP Lending (the "GP Indemnifying Party") shall indemnify and hold harmless GPLS, its Affiliates and their respective members, managers, officers, directors, trustees, agents and employees (collectively, " GPLS Indemnified Parties"), from and against any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorney's fees and costs of suits) that arise out of or relate to (A) any breach by the GP Indemnifying Party of its express representations, warranties, covenants or other responsibilities set forth in this Agreement or (B) any willful misconduct or gross negligence by the GP Indemnifying Party or any of its officers, directors, agents, employees, representatives or assignees with respect to the Participation Interests. The GP Indemnifying Party shall not be liable to any GPLS Indemnified Party for the foregoing to the extent the Losses arise from any such GPLS Indemnified Party's gross negligence or willful misconduct, as determined by final non-appealable order of a court of competent jurisdiction.

(ii)     By GPLS. GPLS ("GPLS Indemnifying Party" and, together with the GP Indemnifying Party, the "Indemnifying Parties" and each, individually, an "Indemnifying Party") shall indemnify and hold harmless GP Lending, its Affiliates and its members, managers, officers, directors, agents and employees (collectively, "GP Indemnified Parties" and, together with the GPLS Indemnified Parties, the "Indemnified Parties" and each, individually, an "Indemnified Party"), from and against any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorney's fees and costs of suits) that arise out of or relate to (A) any breach by such GPLS Indemnifying Party of its express  representations, warranties, covenants or other responsibilities set forth in this Agreement or any of its respective officers, directors, agents, employees, representatives or assignees with respect to the Participation Interests. GPLS Indemnifying Parties shall not be liable to any GP Indemnified Party for the foregoing to the extent the Losses arise from any such Indemnified Party's gross negligence or willful misconduct, as determined by final non-appealable order of a court of competent jurisdiction.

29

TF App. 0602

TF-PA-565167

(iii)    Limitations on GP Lending's Indemnification Obligations.    GPLS acknowledges that it has purchased the Participation Interests "AS IS," without reliance on any representations or warranties of GP Lending except as expressly provided herein, and that the Purchase Price reflects such fact. As a result, GPLS agrees that in no event shall GP Lending be liable for any damages or claims for lost profits or consequential, incidental, indirect or punitive damages of GPLS, GPLS' Affiliates or any purchaser or assignee of the Participation Interests, whether or not GP Lending has notice of the same. GPLS also agrees that no subsequent purchaser or assignee of the Participation Interests shall have a direct cause of action against, or right of indemnification from, GP Lending and that all purchase agreements with such Persons shall so provide.

(b)    Indemnification Procedure. Whenever any claim of the type which would occasion indemnification under this Section 21 is asserted or threatened by any Indemnified Party against any Indemnifying Party, the Indemnified Party shall promptly notify such Indemnifying Party of such claim. The notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of the amount of the liability arising therefrom. In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a Party to this Agreement, the Indemnifying Party shall have the right, at its option, at its expense and with its own counsel which counsel shall be reasonably satisfactory to the Indemnified Party to assume the defense of any such claim or any litigation resulting from such claim or to participate with its own counsel which counsel shall be reasonably satisfactory to the Indemnified Party in the compromise or defense thereof. If the Indemnifying Party undertakes to assume the defense of any such claim or litigation or participate in the compromise thereof, *it* shall promptly notify the Indemnified Party of its intention to do so, and, as a condition to the Indemnifying Party's indemnification obligation, the Indemnified Party shall cooperate reasonably with the Indemnifying Party and its counsel (but at the sole expense of the Indemnifying Party) in the defense against or compromise of any such claim or litigation. Anything in this Section 21(b) to the contrary notwithstanding, no Indemnified Party shall compromise or settle any such claim or litigation without the prior written consent of the applicable Indemnifying Party, which consent will not be unreasonably withheld; provided, however, that if the Indemnified Party shall have any potential liability with respect to, or may be adversely affected by, such claim or litigation, the Indemnifying Party shall not settle or compromise such claim or litigation without the prior written consent of the Indemnified Party.

(c)    Losses. For the purposes of this Agreement, the term "Losses" shall mean all out-of-pocket costs, damages, losses, fines, penalties, judgments, settlements, and expenses whatsoever, including, without limitation, (i) outside attorneys' fees and disbursements and court costs reasonably incurred by the Indemnified Party; and (ii) costs (including reasonable expenses and reasonable value of time spent) attributable to the necessity that any officer or employee (other than in-house attorneys) of any Indemnified Party spend more than twenty-five percent (25%) of his or her normal business hours, over a period of two (2) months, in connection with any judicial, administrative, legislative, or other proceeding.

[Signature Page Follows]

30

Confidential  Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 38 of 48  TF-PA-565168

IN WITNESS WHEREOF, the Parties, each intending to be legally bound hereby, have caused this Participation Agreement to be executed by its duly authorized officer as of the Effective Date.

Great Plains Lending, LLC

By: _____

Name:  Ted Grant

Its:    President


GPL Servicing Ltd.

By: _____

Name:  Scott R. Zemnick

Its:  Authorized Signatory

31

**TF App. 0604**

EXHIBITS

Exhibit A:      Master Participation Certificate

Exhibit B:      Participation Fee

Exhibit C:      Program Guidelines

Exhibit D:      Letter Agreement

32

TF App. 0605

Confidential   Case 1:25-cv-00794-DAB-JGM      Document 52-5      Filed 03/11/26      Page 40 of 48   TF-PA-565170

Exhibit A

Master Participation Certificate

THE PARTICIPATION INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE. THESE PARTICIPATION INTERESTS MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAW.

THE TRANSFER AND SALE OF THIS CERTIFICATE AND THE PARTICIPATION INTERESTS IT REPRESENTS ARE RESTRICTED AND MAY NOT BE ACCOMPLISHED EXCEPT IN ACCORDANCE WITH THE PARTICIPATION AGREEMENT (GREAT PLAINS LENDING) ENTERED INTO WITH GREAT PLAINS LENDING, LLC, A BUSINESS ENTITY DULY ORGANIZED UNDER AND RECOGNIZED BY THE LAWS OF THE OTOE-MISSOURIA TRIBE OF INDIANS, AND ANY AMENDMENTS THERETO, A COPY OF WHICH MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE FUND.

TF App. 0606

Confidential   Case 1:25-cv-00794-DAB-JGM   Document 52-5   Filed 03/11/26   Page 41 of 48   TF-PA-565171

GPL Servicing Ltd.

c/o Victory Park Capital Advisors, LLC

227 W. Monroe Street, Suite 3900

Chicago, Illinois 60606


Re: Participation Interest


Ladies and Gentleman:


Pursuant to and subject to the terms and conditions of that certain Participation Agreement (Great Plains Lending) by and between you and the undersigned dated as of May ____, 2011, as from time to time amended ("Participation Agreement"), we acknowledge receipt of the sum of $_____ and acknowledge your Participation Interest of __% (the "Participation Percentage") in the Participated Loans. Capitalized terms shall have the same meaning as defined in the Participation Agreement.


The Participation Interest is a registered obligation, transferable only upon notation in the Register, and no assignment hereof shall be effective until recorded therein.


GREAT PLAINS LENDING, LLC


By:_____

Name: _____

Title:_____


34

TF App. 0607

TF-PA-565172

<u>Exhibit B</u>

<u>Participation Fee</u>

| Aggregate Loan balance at end of prior month* | Percent of Net Cash Revenue received by GP Lending during the current month to be paid by GPLS to GP Lending** |
|---|---|
| $0-$10,000,000 | 14% |
| $10,000,001-$20,000,000 | 13.5% |
| $20,000,001 - $30,000,000 | 13.0% |
| $30,000,001 - $40,000,000 | 12.5% |
| $40,000,001 - $50,000,000 | 12.0% |
| $50,000,001 - $60,000,000 | 11.0% |
| $60,000,001-$70,000,000 | 10.5% |
| >$70,000,000 | 10.0% |

* Loan balances will be determined monthly as the aggregate principal loan balances less than 60 days past due for the loan portfolio originated by GP Lending.

**The Participation Fee shall consist of the amount(s) arising above multiplied by the GPLS Participation Percentage.

35

Exhibit C

Program Guidelines

Loan Amount:  The original principal balance shall be not less than $100 and not more than $3,000.

Annual Percentage Rate:  The annual percentage rate shall be not less than 179% and not more than 448%.

Loan Term:  The loan term shall be not less than four months and not more than 19 months.

Confidential

TF App. 0609

TF-PA-565174

Exhibit D

Letter Agreement

Great Plains Lending, LLC
8151 Highway 177
Red Rock, OK 74651

[Date]

GPL Servicing Ltd.
c/o Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone:   (312) 902-5297 and (312) 902-5495
Facsimile:    (312) 902-1061
Attention:    Mark R. Grossmann, Esq. and Scott E. Lyons, Esq.

     **Re:**    Participation Agreement dated as of May 25, 2011 between Great Plains Lending, LLC ("GP Lending") and GPL Servicing Ltd. ("GPLS") ("Participation Agreement")

Dear Gentlemen:

As set forth below, GP Lending would like (i) to redeem a portion of the outstanding Participation Interests, as such term is defined in the Participation Agreement, and (ii) to amend the Participation Agreement, in each case, as follows:

1. <u>Redemption of Participation Interests</u>. As of the date hereof pursuant to this letter agreement, (i) GP Lending hereby redeems from GPLS an undivided _____ percent (____%) portion of the Participation Interests held by GPLS as of the date hereof, and (ii) as consideration therefor, GP Lending shall pay GPLS an amount equal to _____ percent (____%) of the aggregate Book Value with respect to all of the Participated Loans, as such terms are defined in the Participation Agreement, in respect of such Participation Interests (which amount equals $_____ as of the date hereof).

2. <u>GPLS Participation Percentage</u>. Following the redemption described in Paragraph 1 above and notwithstanding any terms to the contrary in the Participation Agreement, the "GPLS Participation Percentage" as referred to in the Participation Agreement, shall mean (____%).

3. <u>Post-Redemption Purchases</u>. Following the redemption described in Paragraph 1 above and notwithstanding any terms to the contrary in the Participation Agreement, GPLS or one or more of its Affiliates, as such term is defined in the Participation Agreement, shall have the non-exclusive right, but not the obligation, to purchase up to an undivided _____(____%) participation interest in the Loans.

37

4. <u>GP Lending Participation Percentage</u>. Following the redemption described in Paragraph 1 above and notwithstanding any terms to the contrary in the Participation Agreement, the "GP Lending Participation Percentage" as referred to in the Participation Agreement, shall mean _____ (___%).

5. <u>GP Lending Retained Interest</u>. Following the redemption described in Paragraph 1 above and notwithstanding any terms to the contrary in the Participation Agreement, GP Lending's ownership in the Participated Loans shall continue to be subject to the participation interests of GPLS arising under the Participation Agreement and as expressed by the GPLS Participation Percentage.

6. <u>Investment Representation</u>. GP Lending hereby represents and warrants to GPLS that: (i) the redemption of Participation Interests hereunder is a legal investment for GP Lending under applicable laws; (ii) GP Lending has redeemed and is redeeming the Participation Interests hereunder for its own account and not with a view to the sale, transfer or other distribution thereof; (iii) GP Lending realizes that the Participation Interests hereunder are not registered under any securities laws; (iv) GP Lending understands that its redemption of Participation Interests hereunder involves a high degree of risk; (v) GP Lending has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of the redemption of Participation Interests hereunder; (vi) GP Lending can afford a complete loss of the sums advanced and to be advanced hereunder; (vii) GP Lending acknowledges that it has been offered an opportunity to ask questions of and receive answers from officers of GPLS concerning all material aspects of this letter agreement, the Participation Interests hereunder and the corresponding Participated Loans, and that any request for such information has been fully complied with to the extent GPLS possesses such information or can acquire it without unreasonable effort or expense; and (viii) GP Lending recognizes that no governmental agency has passed upon the Participation Interests hereunder, the corresponding Participated Loans or this letter agreement or made any finding or determination as to their fairness.

7. <u>GP Lending Accepts As-Is Condition</u>. EXECUTION OF THIS AGREEMENT SHALL CONSTITUTE AN ACKNOWLEDGEMENT BY GP LENDING THAT THE REDEMPTION OF THE PARTICIPATION INTERESTS HEREUNDER WAS ACCEPTED WITHOUT REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR OTHERWISE IN AN "AS-IS", "WITH ALL FAULTS" CONDITION BASED SOLELY ON GP LENDING'S OWN INSPECTION. GP LENDING acknowledges and agrees that GPLS has not represented, warranted or covenanted and does not represent, warrant or covenant as to the nature, accuracy, completeness, enforceability or validity of any of the Participation Interests redeemed hereunder, the corresponding Participated Loans or the corresponding Loan Documents, as such terms are defined in the Participation Agreement. All documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned or conveyed to GP Lending with respect to any and all Participation Interests hereunder, the corresponding Participated Loans or the corresponding Loan Documents are done so on an "as-is" basis with all faults.

38

Confidential Case 1:25-cv-00794-DAB-JGM Document 52-5 Filed 03/11/26 Page 46 of 48

8. <u>Due Authorization; Enforceability</u>. GPLS represents and warrants to GP Lending, and GP Lending represents and warrants to GPLS that: (i) it has the full power and authority to execute and deliver this letter agreement and to perform all its obligations hereunder; (ii) the execution, delivery and performance of this letter agreement have been duly authorized by all action, corporate or otherwise, and do not and will not violate any provision of its organizational documents or any contractual obligations or requirement of law binding on it; and (iii) this letter agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

9. <u>Full Force and Effect</u>. Except as expressly modified by this letter agreement, all of the terms and conditions included in the Participation Agreement shall remain in full force and effect.

[Remainder of page intentionally left blank]

39

Confidential   Case 1:25-cv-00794-DAB-JGM   Document 52-5   Filed 03/11/26   Page 47 of 48   TF-PA-565177

If you agree with these terms, then please execute this letter agreement in the space provided below and return an executed original to me.

Thanks for your cooperation.

Very truly yours,


**GP Lending, LLC**

By: _____

Name: _____

Title: _____

Date: _____

Acknowledged and Agreed By:

**GPL Servicing Ltd.**

By:  GPL Servicing Agent, LLC
Its: Sole Director

By: _____
Name: Scott R. Zemnick
Title: Authorized Signatory

SJC1215145D

Confidential  Case 1:25-cv-00794-DAB-JGM    Document 52-5    Filed 03/11/26    Page 48 of 48  TF-PA-565178