# Exhibit 6

# LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement"), entered into as of November __, 2012, between RED ROCK TRIBAL LENDING, LLC, a limited liability company (the "Borrower") formed under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), with its chief executive office located at E23968 Pow Wow Trail, P.O. Box 249, Watersmeet, Michigan 49969, and ALPHA CREDIT RESOURCES LLC, a Delaware limited liability company (together with its successors or assigns, herein "Lender", with an address of 152 West 57th Street, 54th Floor, New York, New York 10019.

FOR VALUE RECEIVED, and in consideration of the granting by Lender of financial accommodations to or for the benefit of Borrower, including without limitation respecting the Obligations (as hereinafter defined), Borrower represents and agrees with Lender, as of the date hereof and as of the date of each loan, credit and/or other financial accommodation, as follows:

## 1. THE LOAN

1.1    Loan.  Subject to the terms and conditions of this Agreement, Lender hereby agrees to make a loan to or for the benefit of Borrower, on and after the date hereof, in one or more advances of principal hereunder in the aggregate amount of $10,000,000 (each, an "Advance"). All principal advanced hereunder is hereinafter referred to collectively as the "Loan".  The Loan shall be evidenced by that certain Promissory Note, dated as of the date hereof (the "Note") given by Borrower to the order of Lender, in the face amount of US$10,000,000.  This Agreement, the Note, and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing, including any guaranties of any obligation of Borrower are collectively hereinafter referred to as the "Loan Documents".

1.2    Credit Account.  An account shall be opened on the books of Lender which shall be designated on Lender's books and records as Borrower's "Credit Account" in which account a record will be kept of the Loan, all Advances hereunder, and all payments thereon and other appropriate debits and credits as provided by this Agreement.

1.3    Interest; Maturity.  Interest respecting the outstanding principal balance of the Loan will be charged to Borrower from time to time outstanding at the rate specified in the Note in accordance with the terms of the Note or as otherwise set forth in this Agreement.  Interest on the Loan will be based on the actual number of days elapsed in a given calendar month and an assumed 360-day year.  All outstanding principal and accrued and unpaid interest thereon shall be due and payable on the Maturity Date (as hereinafter defined).

1.4    Advances, Payments, and Prepayments.

(a)    For purposes of this Agreement, the "Advance Conditions" shall mean each of the following:

    (i)    each of the representations, warranties, and covenants contained herein shall be true and correct in all respects;

(ii)    Borrower shall have delivered to Lender all UCC-1 and other financing statements in favor of Lender pursuant to this Agreement, which shall be in a recordable form satisfactory to Lender, in its sole and absolute discretion, and Lender shall have received evidence satisfactory to it that, upon the filing and recording of such financing statements, Lender shall have a valid and perfected first priority security interest in the Collateral;

(iii)    Lender shall have received, in form and substance satisfactory to it, all releases, terminations and such other documents as it may request to evidence and effectuate the termination by any other lender (other than a holder of a Permitted Lien (as hereinafter defined)) of its respective financing arrangements with Borrower and the termination and release by such lender of any interest in and to any assets and properties of Borrower, duly authorized, executed and delivered by such lender, including, without limitation, (i) UCC termination statements for all UCC financing statements previously filed by it or its predecessors, as secured party, and Borrower or any of its affiliates, as debtor and (ii) satisfactions and discharges of any mortgages, deeds of trust or deeds to secure debt by Borrower or any of its affiliates in favor of any such lender, in form acceptable for recording with the appropriate governmental authority; and

(iv)    Borrower shall have submitted to Lender a request for Advance in the form attached hereto as <u>Exhibit 1.4(a)(iv)</u>.

(b)    On the date hereof, subject to the satisfaction or waiver by Lender of the Advance Conditions, Lender shall make an aggregate Advance of principal to Borrower in the amount of $500,000.00. From and after the date hereof, Borrower may request additional Advances by submitting to Lender a request for Advance in the form attached hereto as <u>Exhibit 1.4(a)(iv)</u>. No Advance may be requested by Borrower on or after the date which is twelve (12) months from the date of this Agreement.

(c)    For purposes of this Agreement, a "<u>Payment Date</u>" shall mean the first Business Day of each calendar month during the term of the Loan. On each of the first eighteen (18) Payment Dates subsequent to the date hereof, Borrower shall make a payment of interest only on the outstanding principal balance of the Loan, in arrears. Commencing on the nineteenth (19th) Payment Date subsequent to the date hereof, through and including the Payment Date immediately preceding the Maturity Date, Borrower shall make (i) a payment of interest (in arrears) on the outstanding principal balance of the Loan, and (ii) a payment of principal equal to one-eighteenth (1/18th) of the principal balance of the Loan outstanding on and as of the nineteenth (19th) Payment Date subsequent to the date hereof.

(d)    Except as otherwise expressly provided herein, the Loan may not be prepaid, in whole or in part, prior to the Maturity Date. The entire outstanding principal balance of the Loan, together with all accrued and unpaid interest thereon, shall be due and payable on November __, 2015 (the "<u>Maturity Date</u>").

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005766

(e)   In the event that Borrower wishes to prepay any portion of the principal balance of the Loan, Borrower shall give Lender not less than ten (10) days written notice of such prepayment, which notice shall specify the amount being prepaid. Except for any prepayment required or otherwise permitted under Section 6.4(c)(iii), hereof, any prepayment of principal hereunder shall be accompanied by a payment of interest on such principal amount (at the applicable rate provided for in the Note) which would, but for such prepayment, have accrued on such principal amount through the earliest date on which such principal would otherwise have been required to be paid pursuant to Section 1.4(c), above.

(f)   Lender hereby covenants and agrees that an amount equal to $2,500,000.00 is committed to Borrower under the Loan. Subsequent to the first Advance hereunder, Borrower may from time to time request that Lender make one or more further Advances under the Loan by submitting a Request for Advance, and upon receipt of such request, and upon the satisfaction of the Advance Conditions, Lender shall make such an Advance to Borrower, provided, however, that from and after the date on which Lender has made Advances under the Loan of, in the aggregate, not less than $2,500,000.00, any subsequent Advance under the Loan, to the extent (but only to the extent) that such Advance would cause the aggregate amount of Advances made at any time by Lender under the Loan (without giving effect to any prepayment or repayment of principal from time to time) to exceed $2,500,000.00, shall be in the sole and absolute discretion of Lender (i.e., if a requested Advance would cause the aggregate amount of Advances made under the Loan (without giving effect to any prepayment or repayment of principal from time to time) to equal $2,600,000.00, then only the last $100,000.00 of such requested Advance shall be in Lender's sole and absolute discretion), notwithstanding the satisfaction of the Advance Conditions or the submission of a Request for Advance.

1.5   Advances in Lender's Sole Discretion; Limitation on Liability. Each Advance shall, subject to Section 1.4(f) hereof, be in Lender's sole and absolute discretion. Lender's failure in its sole and absolute discretion to make any Advance hereunder shall not impact the repayment of any Advance previously made, which shall be in all instances in accordance with the terms and provisions of this Agreement. It is the intention of the parties hereto that, other than as set forth in Section 1.4(f), the credit facility evidenced hereby and by the Loan Documents shall be entirely discretionary. Borrower hereby acknowledges and agrees that the decision to loan funds under the credit facility evidenced by this Agreement, specifically including any Advance made or to be made hereunder (other than as set forth in Section 1.4(f)), are entirely within the sole and absolute discretion of Lender. Borrower, for itself and on behalf of its past, present and future representatives, partners, operators, members, shareholders, officers, directors, agents, employees, servants, affiliates, related companies, successors and assigns, hereby releases and forever discharges Lender from and against any and all liability, claims, causes of action, losses, costs, and damages (of whatever kind and nature, whether direct or indirect, foreseeable or unforeseeable, in law or in equity, whether known or unknown, whether or not concealed or hidden, or otherwise) that Borrower (or any representative, partner, operator, member, shareholder, officer, director, agent, employee, servant, affiliate, related company, successor or assign of Borrower) may have had, may now have or may incur arising out of or in any way connected to (i) Lender's decision not to make any Advance or otherwise loan funds under the credit facility evidenced by this Agreement in its sole and absolute discretion or (ii) any other

-3-

permissible discretionary action or inaction taken or not taken by Lender in compliance with the terms of this Agreement. The terms and provisions of this Section 1.5 shall survive the termination of this Agreement and the repayment in full of the Loan.

1.6    <u>Monthly Statement</u>.  At the option of Lender, at the end of each month, Lender will render to Borrower a statement of the Credit Account, showing all applicable credits and debits. Each statement shall be for informational purposes only and shall not be deemed binding on Lender or Borrower.

1.7    <u>Conduct of Business</u>.  Borrower is (and throughout the term of the Loan shall be) engaged solely in the business of, directly or indirectly, owning, purchasing, marketing, originating, and servicing unsecured, term loans (each, a "<u>Consumer Loan</u>") to consumers (each, a "<u>Consumer</u>") (the foregoing, herein the "<u>Business</u>"), and Borrower shall not conduct any business activities unrelated to the Business.  Each Consumer Loan is evidenced by form documents substantially in the form attached hereto as Schedule 1.7, or on such form or forms as may be approved by Lender in its sole discretion.  All documents evidencing or otherwise executed by a Consumer in connection with a Consumer Loan (the "<u>Consumer Loan Documents</u>") are and shall be, in their original form, electronic documents fully compliant with all federal and Tribal laws as may be applicable to such documents.

1.8    <u>Collateral Account</u>.

(a)    Reference is hereby made to that certain Deposit Account Control Agreement (the "<u>DACA</u>"), dated November __, 2012, by and among Borrower, Lender, and Chippewa Valley Bank (the "<u>Account Bank</u>").  Pursuant to the DACA, the Account Bank has acknowledged Lender's security interest (as agent for Lender) in all funds or sums of money on deposit from time to time in the "<u>Collateral Account</u>" (as defined in the DACA and herein so-called).

(b)    Borrower has established with the Account Bank the Collateral Account.  Other than (i) an account established to maintain the "Regulatory and Litigation Reserve Fund" pursuant to Section 4.4 of that certain Servicing Agreement dated October 25, 2011, as amended (the "<u>Servicing Agreement</u>"), by and between Borrower and SourcePoint VI, LLC, a U.S. Virgin Islands limited liability company (the "<u>Sponsor</u>"), and (ii) an account established to deposit "Tribal Net Profits" payable to the Borrower pursuant to Section 6.4.1 of the Servicing Agreement, Borrower has no other deposit account.

(c)    In order to further secure the performance by Borrower of its obligations hereunder and under the Note, Borrower hereby acknowledges and confirms that: (i) the Account Bank has acknowledged the security interest of Lender in the Collateral Account, and all funds, checks, drafts, certificates, instruments and other investments or deposits therein and all other financial assets credited thereto shall constitute collateral to secure the payment of the Loan; (ii) absent an Event of Default hereunder, Borrower shall have the right (which right shall be delegated to Sponsor in accordance with the Servicing Agreement, who shall have sole signatory on behalf of Borrower with respect to the Collateral Account) to make deposits into, withdrawals from and otherwise control the Collateral Account; and (iii) to the extent it contains any Financial Assets (as that term is defined in Section 2.2(b)

-4-

herein), such Financial Assets shall be maintained as Investment Property (as that term is defined in Section 2.2(c) herein).

(d) <u>Deposits into the Collateral Account</u>.  Each Advance shall be deposited by Lender into the Collateral Account.  Borrower shall irrevocably instruct LST Financial, Inc. (or any such other automated clearinghouse service provider engaged by Borrower from time to time, herein the "<u>ACH Provider</u>") to direct all sums payable or otherwise due and owing to Borrower pursuant to that certain Master Application and Agreement Number 1000008670111108 (or other similar agreement governing Borrower's automated clearinghouse activities, collectively, the "<u>ACH Agreement</u>") between Borrower and ACH Provider to the Collateral Account, without such payments at any time being under the control of Borrower or any of its agents or employees.  Borrower represents, warrants and covenants that it shall, upon the request of Lender, deliver Lender such evidence as Lender may reasonably require to evidence the fact that the ACH Provider has been instructed by Borrower to remit such payments directly to the Collateral Account. Borrower shall not amend, revoke or alter such instructions in any way which would interfere with payments by Consumers being transmitted directly into the Collateral Account.  Without limiting the foregoing, within four (4) Business Days after receipt of any electronic payments or within seven (7) days after receipt of any personal checks or money orders by Borrower or any agent or Person acting on behalf of Borrower, Borrower or such agent shall directly deposit (or cause to be deposited) all such payments received by Borrower or such agent from any Consumer into the Collateral Account.  If Borrower or any such agent does receive any such payments from any Consumer, then Borrower and such agent agree not to commingle any such payments with other funds of Borrower, and Borrower and such agent agree that it is holding such payments in an express trust for the benefit of Lender until such payments are deposited into the Collateral Account.

(e) <u>Disbursements from the Collateral Account</u>.   So long as no Balancing Default (as hereinafter defined) or Event of Default has occurred, sums on deposit from time to time in the Collateral Account shall be disbursed by Sponsor (on behalf of Borrower) in the following order of priority:

(i) *First*, to the entities identified in Section 6.4.1 of the Servicing Agreement, in payment of the Tribal Net Profits to which they are entitled;

(ii) *Second*, to Sponsor in reimbursement of any and all amounts previously paid by Sponsor on Borrower's behalf to third parties to cover any Servicing Expenses (as defined in the Servicing Agreement) or other reasonable expenses incurred to operate the Business;

(iii) *Third*, to third parties and Sponsor in payment of any and all Servicing Expenses then due and owing; provided, however, that the only Servicing Expenses payable to Sponsor under this Section 1.8(e)(iii) shall be those attributable to the provision of call center services;

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005769

(iv) *Fourth*, to fund the Litigation Reserve Fund pursuant to Section 4.6 of the Servicing Agreement;

(v) *Fifth*, to Lender, in repayment of any sums, other than principal or interest, due and owing to Lender under the Loan;

(vi) *Sixth*, to Lender, in repayment of accrued and unpaid interest owed under the Loan;

(vii) *Seventh*, to Lender, in repayment of principal to the extent due under the Loan; and

(viii) *Thereafter*, to the extent not already paid pursuant to the foregoing waterfall provisions, in accordance with the terms of Section 6 of the Servicing Agreement.

1.9    <u>Rebalancing</u>.  In the event that, at any time and from time to time, the sum of (a) cash on deposit in the Collateral Account, plus (b) eighty-three percent (83%) of the then-outstanding principal balance of all Eligible Consumer Loans (as hereinafter defined) (the sum of which is referred to as the "<u>Threshold Amount</u>"), is less than the then-outstanding principal balance of the Loan (such circumstance, herein a "<u>Balancing Default</u>"), then in each such event Borrower, Sponsor or an affiliate of Sponsor shall deposit an amount into the Collateral Account sufficient to cure the Balancing Default.  Any failure to cure a Balancing Default as aforesaid within five (5) days following notice from Lender to Borrower that a Balancing Default exists, which notice may be made via telephone, electronic mail, facsimile or overnight delivery, shall constitute an Event of Default hereunder.

1.10    For purposes of this Agreement, the term "<u>Eligible Consumer Loans</u>" shall mean any Consumer Loan:

(a)    that is evidenced by the form documents substantially in the form attached hereto as Schedule 1.7; and

(b)    which the first regularly scheduled payment thereunder (including, without limitation, if such payment is a payment of accrued interest only) has been made by the applicable Consumer; and

(c)    that has not been charged-off or written-down by Borrower in the ordinary course of its business in accordance with Borrower's internal credit policies existing on the date hereof or as modified with the prior consent of Lender; and

(d)    under which the applicable Consumer has not instituted or become subject to any bankruptcy or insolvency proceeding and has not admitted its inability to pay its debts when they come due; and

(e)    for which the applicable Consumer has not challenged the validity, in whole or in part, of its Consumer Loan with Borrower; and

(f)    which has not been found to be fraudulent in any respect; and

4483165v8
CONFIDENTIAL                                                                ROSETTE_REVISED_005770

(g)     which does not represent, for any state of the United States, a concentration of Consumer Loans issued to Consumers in such state the aggregate outstanding principal balances of which exceed an amount equal to twenty percent (20%) of the outstanding principal balance of the Loan; and

(h)     was issued to the Consumer directly by Borrower.

## 2.     GRANT OF SECURITY INTEREST

2.1     <u>Grant of Security Interest</u>.   In consideration of Lender's extending credit and other financial accommodations to or for the benefit of Borrower, Borrower hereby grants to Lender a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined), including, without limitation, all claims against third parties (including Consumers) arising out of or related to the Collateral.  The security interest granted by this Agreement is given to and shall be held by Lender as security for the payment and performance of all Obligations (as hereinafter defined), including, without limitation, all amounts outstanding pursuant to the Loan Documents.

2.2     <u>Definitions</u>.  The following definitions shall apply:

(a)     "<u>Collateral</u>" shall mean all of Borrower's present and future right, title and interest in, to and under the following described property (unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the NYUCC (as hereinafter defined)):

        (i)     all now existing and hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Financial Assets, Deposit Accounts (including, without limitation, the Collateral Account), Chattel Paper (including, without limitation, Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, Letters of Credit, Letter-of-Credit Rights, Commercial Tort Claims, money, Equipment, Inventory, Fixtures, and Supporting Obligations, together with all products of and Accessions to any of the foregoing and all Proceeds of any of the foregoing (including without limitation all insurance policies and proceeds thereof);

        (ii)    to the extent, if any, not included in clause (i) above, each and every other item of personal property and fixtures, whether now existing or hereafter arising or acquired, including, without limitation, all licenses (but excluding the Consumer Loan License), contracts and agreements, and all collateral for the payment or performance of any contract or agreement, together with all products and Proceeds (including all insurance policies and proceeds) of any Accessions to any of the foregoing; and

        (iii)   all present and future business records and information relating to any of the foregoing, including computer tapes and other storage media containing the same and computer programs and software (including without limitation, source code, object code and related manuals and documentation and all licenses to use such software) for accessing and manipulating such information.

-7-

(b) "Financial Assets" shall mean any security for an obligation of a person or a share participation or other interest in a person or in property or an enterprise of a person which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area which it is issued or dealt in as a medium for investment, or any property that is held by a securities intermediary for another person in Investment Property if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset.

(c) "Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, contract, or commodity account.

(d) "Material Adverse Effect" shall mean, with respect to any Person, any event, occurrence, development, fact, condition or change that individually or in the aggregate is or would be reasonably likely to be materially adverse to the operations or financial performance of such Person; *provided*, *however*, that "Material Adverse Effect" shall not include any event, occurrence, development, fact, condition or change arising out of or attributable to: (i) any changes, conditions or effects in the United States or foreign economies or securities or financial markets in general; (ii) changes, conditions or effects that affect the industry in which the Person operates as a whole; (iii) any change, effect or circumstance resulting from an action required by this Agreement; (iv) the effect of any changes in applicable laws or accounting rules; (v) a Federal Regulatory Event (as defined in Section 6.4(a)(iii)); (vi) an Adverse Banking Event (as defined in Section 6.4(a)(i)); or (vii) conditions caused by acts of terrorism or war (whether or not declared) or any natural or man-made disaster or other acts of God.

(e) "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by Borrower to Lender at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by Borrower to Lender; or are due indirectly by Borrower to Lender as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Loan Documents. Said term shall also include all interest and other charges chargeable to Borrower or due from Borrower to Lender from time to time and all fees, costs and expenses referred to in this Agreement.

(f) "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

(g) "NYUCC" shall mean the Uniform Commercial Code in effect in the State of New York from time to time.

All words and terms used in this Agreement other than those specifically defined herein shall have the meanings accorded to them in the NYUCC, and if not defined therein, to it's normal

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005772

and customary use with the industry. Definitions referenced or used herein are for interpretation of this Agreement and the Loan Documents only.

2.3    Ordinary Course of Business.  Lender hereby authorizes and permits Borrower to receive from the Consumers all amounts due as proceeds of the Collateral at Borrower's own cost and expense, and also liability, if any; and Lender may, following an Event of Default which has not been cured or waived by Lender or on the Maturity Date, terminate all or any part of the authority and permission herein or elsewhere in this Agreement granted to Borrower with reference to the Collateral.  All proceeds of and collections of Collateral shall first be retained by Borrower and used for purposes of satisfying the requirements of Section 1.9 hereof, and thereafter may be utilized by Borrower for any lawful purpose to the extent not prohibited by the terms of this Agreement or any other Loan Document.  From and after an Event of Default which has not been cured or waived by Lender, all proceeds of and collections of the Collateral shall be held in trust by Borrower for Lender and shall not be commingled with Borrower's other funds or deposited in any bank account of Borrower other than the Collateral Account; and, from and after an Event of Default which has not been cured or waived by Lender, Borrower agrees to deliver to Lender on the dates of receipt thereof by Borrower, duly endorsed to Lender or to bearer, or assigned to Lender, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.

2.4    Allowances.  Borrower may grant such allowances or other adjustments to Consumers (exclusive of extending the time for payment of or forgiving any item which, during an Event of Default, shall not be done without first obtaining Lender's written consent in each instance) as Borrower may reasonably deem to accord with sound business practice and its ordinary course of business dealings, in each case subject to the terms, provisions, and covenants contained herein.

2.5    Records.  Borrower shall deliver to Lender from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of the rendering of services; and Borrower will deliver to Lender promptly at Lender's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of accounts and such other writings as Lender may in its sole discretion deem to be necessary or effectual to evidence any loan hereunder or Lender's security interest in the Collateral.

2.6    Legends.  Borrower shall promptly make, stamp or record such entries or legends on Borrower's books and records or on any of the Collateral (including, without limitation, chattel paper or electronic chattel paper) as Lender shall request from time to time, to indicate and disclose that Lender has a security interest in such Collateral.  Such books and records may be maintained in electronic form (provided that any Consumer Loan shall be evidenced by electronic records which at all times comply with the requirements of all applicable federal and Tribal laws) and the entries or legends indicating or disclosing Lender's security interest shall be made electronically on any such electronic records.

2.7    Search Reports.  Lender shall receive prior to the date of this Agreement search results under all names used by Borrower and any guarantor during the prior five (5) years, from the jurisdiction of Borrower's formation and/or chief executive office and/or address of primary

-9-

residence. The search results shall confirm that the security interest in the Collateral granted Lender hereunder is prior to all other security interests in favor of any other Person, subject only to Permitted Liens.

## 3. REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that the following are, and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents will be, true, correct and complete:

3.1     <u>Organization and Qualification</u>.  Borrower is a duly formed and existing limited liability company under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "<u>Tribe</u>") with the exact legal name set forth in the first paragraph of this Agreement.  Borrower is in good standing under the laws of the Tribe, has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted.

3.2     <u>Subsidiaries</u>.  Borrower has no subsidiaries, and Borrower has never consolidated, merged or acquired substantially all of the assets of any other entity or person.

3.3     <u>Corporate Records</u>.  Borrower's articles of organization have been duly filed and its articles of organization and operating agreement are in proper order.  All outstanding ownership evidence issued by Borrower was and is properly issued and all books and records of Borrower, including but not limited to its minute books, operating agreement, and books of account, are accurate and up to date and will be so maintained.

3.4     <u>Title to Properties; Absence of Liens</u>.     Borrower has good and clear record and marketable title to all of its properties and assets, and all of its properties and assets, including the Collateral (as defined herein) to the extent owned by Borrower, are free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs, other than the security interest therein granted to Lender hereby and the encumbrances and security interests, if any, set forth in the Servicing Agreement, and the encumbrances and security interest granted to the holder of any Permitted Indebtedness (as hereinafter defined), if any ("<u>Permitted Liens</u>").

3.5     <u>Places of Business</u>.  Borrower's principal place of business and chief executive office are correctly stated in the preamble to this Agreement, and Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each of its other places of business, and shall not change the location of any such principal place of business or open or close, move or change any existing or new place of business without giving Lender at least thirty (30) days prior written notice thereof.

3.6     <u>Valid Obligations</u>.  The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action and the Loan Documents represent the legal, valid and binding obligation of Borrower and are fully enforceable according to their terms, except as limited by (a) bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting creditors' rights (including, without limitation, the effect of statutory and other law regarding fraudulent conveyances, fraudulent transfers and preferential transfers), and (b) the exercise of judicial discretion and the application of principles of equity, good faith, fair

-10-

dealing, reasonableness, conscionability and materiality (regardless of whether the applicable agreements are considered in a proceeding in equity or at law).

3.7     Conflicts.  There is no provision in Borrower's organizational or charter documents, if any, or in any indenture, contract or agreement to which Borrower is a party which prohibits, limits or restricts the execution, delivery or performance of their respective obligations under the Loan Documents.

3.8     Approvals.  The execution, delivery and performance of the Loan Documents do not require any approval of or filing with any governmental agency or authority or any other Person.

3.9     Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against Borrower which would be reasonably expected to materially adversely affect the ability of Borrower to conduct its business or to pay or perform the Obligations.

3.10    Consumer Loans and Contract Rights.   All Consumer Loans arise out of legally enforceable and existing contracts, and represent unconditional and undisputed bona fide indebtedness by a Consumer, and are not and will not be subject to any discount (other than in the ordinary course of Borrower's business and subject to such discount not causing any Consumer Loan to fail to be an Eligible Consumer Loan as herein defined).

3.11    Title to Collateral.  At the date hereof Borrower is (and as to Collateral that Borrower may acquire after the date hereof, will be) the lawful owner of its assets constituting the Collateral, and the Collateral and each item thereof is, will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests (other than the security interest therein granted to Lender hereby), credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the Permitted Liens.  Borrower has and will have full power and authority to grant to Lender a security interest in the Collateral and Borrower has not transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's right, title or interest therein), to any person other than Lender or the holder of a Permitted Lien.  The Collateral is and will be valid and genuine in all respects. No part of the Collateral (or the validity or enforceability by Lender thereof) is or shall be contingent upon the fulfillment of any agreement or condition whatsoever.  Borrower will warrant and defend Lender's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.12    Third Parties.  Lender shall not be deemed to have assumed any liability or responsibility to Borrower or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to Borrower by Lender (which shall automatically be deemed to be without recourse to Lender in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and Lender, by accepting such security interest in the Collateral owned by Borrower, or by releasing any Collateral to Borrower, shall not be deemed to have assumed any obligation or liability to any Consumer or to any other third party, and Borrower agrees to

-11-

indemnify and defend Lender and hold Lender harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

3.13   Taxes.   Borrower has filed, or will file, all Federal, Tribe, state and other tax returns required to be filed (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from Borrower have been fully paid.   Borrower has established on its books reserves adequate for the payment of all Federal, Tribe, state and other tax liabilities (if any).

3.14   Use of Proceeds.   No portion of any principal advanced under the Loan is to be used for (i) the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the United States Federal Reserve System, 12 C.F.R. 221 and 224, (ii) primarily personal, family or household purposes, or (iii) for any purpose other than the conduct of the Business in the ordinary course.   The Collateral is not used or acquired primarily for personal, family or household purposes.

3.15   Compliance with Law; Licensing.   Borrower is in compliance with all applicable law. Each of the Consumer Loans has been originated by Borrower.   Borrower is lawfully entitled to originate such Consumer Loans (such lawful entitlement to issue Consumer Loans shall be deemed a "Consumer Loan License" hereunder), and such Consumer Loans comply with all applicable laws and regulations of the governmental entity having jurisdiction over Borrower (the "Governing Authority") and are valid and enforceable against the Consumer under the applicable laws and regulations of the Governing Authority.   The Consumer Loan License is valid and in full force and effect.   Each of the Consumer Loans has been issued pursuant to the Consumer Loan License, and each is valid and enforceable against the Consumer thereunder on the basis of the Consumer Loan License.

3.16   Disclosure.   This Agreement (together with all exhibits and schedules hereto), the other Loan Documents and the other agreements, certificates and other documents furnished to Lender by or on behalf of Borrower do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading.   There is no fact known to Borrower which has not been disclosed to Lender in writing which could reasonably be expected to have a Material Adverse Effect.

## 4.    AFFIRMATIVE COVENANTS

4.1   Payments and Performance.   Borrower will duly and punctually pay all Obligations becoming due to Lender and will duly and punctually perform all Obligations on its part to be done or performed under this Agreement.

4.2   Books and Records; Inspection.   Borrower will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with its standard practices, consistently applied.   Borrower will at all reasonable times, and on reasonable advance notice, make its books, records, and accounting practices and procedures available in its offices for a field inspection and examination by Lender and/or Lender's representatives and will permit   inspection   of   the   Collateral   and   all   of   its   properties   by   Lender   and/or   Lender's

4483165v8
CONFIDENTIAL                                                    ROSETTE_REVISED_005776

representatives (a "<u>Field Inspection</u>").  Lender may, at its option, require a Field Inspection not more than one (1) time in any calendar quarter, unless an Event of Default shall occur which has not been cured or waived by Lender, in which case Lender shall be permitted to require a Field Inspection as frequently as Lender deems necessary.  All reasonable costs and expenses incurred by Lender in connection with any Field Inspection shall be borne by Borrower.  Borrower will from time to time furnish Lender with such information and statements as Lender may request in its sole discretion with respect to the Obligations or Lender's security interest in the Collateral.  Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights are kept, and shall not remove such records to another jurisdiction without giving Lender at least thirty (30) days prior written notice thereof.

4.3   <u>Financial Statements</u>.  Borrower will furnish to Lender or cause to be furnished to Lender by Sponsor:

(a)   real-time, online access to information concerning sums on deposit (including credits and debits) to the Collateral Account;

(b)   real-time, online access to the electronic portfolio management system pursuant to which Borrower or any of its affiliates or subsidiaries gathers and monitors all information concerning Consumer Loans owned or held by any of them;

(c)   not less frequently than weekly, a written report on all Consumer Loans then held by Borrower, which report shall include, for each Consumer Loan, (i) the outstanding principal balance, (ii) a consolidated aging report for all Consumer Loans (in increments of 30 days), (iii) a statement of the payments anticipated to be made within the next ensuing month, and (iv) from time to time, such other information as Lender may reasonably request;

(d)   as soon as available to Borrower, but in any event within thirty (30) days after the close of each month, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower, as at the end of such month, and statement of profit and loss of Borrower reflecting the results of its operations during such month and shall be prepared by Borrower or Sponsor and certified by a senior officer or principal of Borrower or Sponsor, as applicable, having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments and the absence of notes;

(e)   as soon as available to Borrower, but in any event within thirty (30) days after the close of each calendar quarter, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower, as at the end of such quarter, and statement of profit and loss of Borrower reflecting the results of its operations during such quarter and shall be prepared by Borrower or Sponsor and certified by a senior officer or principal of Borrower or Sponsor, as applicable, having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments and the absence of notes;

4483165v8
CONFIDENTIAL                                        ROSETTE_REVISED_005777

(f)     on or prior to the date which is nine (9) months from the date of this Agreement, financial projections and cash flow reports including projected borrowing through the current fiscal year; and

(g)     from time to time, such financial data and information about Borrower as Lender may reasonably request.

All information submitted pursuant to this Section 4.3 shall be certified as true, accurate, and complete in all material respects by Borrower or Sponsor on Borrower's behalf.

4.4     <u>Conduct of Business</u>.  Borrower will maintain its articles of organization and existence in good standing and materially comply with all laws and regulations of the Tribe and of any other governmental authority which may be applicable to it or to the Business; provided that this covenant shall not apply to (i) any tax, assessment or charge which is being contested in good faith and with respect to which reserves have been established and are being maintained or (ii) any litigation or action contemplated by Section 4.6 of the Servicing Agreement, which is being contested in good faith and with respect to which the Regulatory and Litigation Reserve Fund (as defined in Section 4.6 of the Servicing Agreement) is being used to pay for such litigation or action.

4.5     <u>Notice to Consumers</u>.  Borrower agrees, during an Event of Default, at the request of Lender, to notify all or any of the Consumers in writing of Lender's security interest in the Collateral in whatever manner Lender requests and hereby authorizes Lender to notify all or any of the Consumers of Lender's security interest in the Consumer Loans at Borrower's expense.

4.6     <u>Contact with Accountant</u>.  Borrower hereby authorizes Lender to directly contact and communicate with any accountant employed by Borrower in connection with the review and/or maintenance of Borrower's books and records or preparation of any financial reports delivered by or at the request of Borrower to Lender.  To the extent any accountant is so employed, Borrower shall provide Lender with full contact information for such accountant or any other accountant which may be employed by Borrower to replace such accountant.

4.7     <u>Taxes</u>.  Borrower will promptly pay all applicable real and personal property taxes, assessments and charges and all franchise, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith.  Lender may, at its option, from time to time, discharge any taxes resulting in a lien or encumbrance on the Collateral, or other charges resulting in liens or encumbrances on any of the Collateral, and Borrower will pay to Lender on demand or Lender in its sole discretion may charge to Borrower all amounts so paid or incurred by it.

4.8     <u>Indemnity</u>.  Borrower shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, shareholders, employees, affiliates, agents, attorneys, lessees, successors and assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, affiliates, agents, attorneys, lessees, successors and assigns (collectively, the "<u>Indemnitees</u>") from and against all liabilities (including sums paid in

-14-

settlement of claims), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine), penalties or damages arising as a direct or indirect result of any of the following with respect to Borrower, any affiliate of Borrower, Sponsor, or the Loan: (a) fraud, (b) intentional material misrepresentation, (c) failure to pay taxes, (d) misapplication of funds (including the Loan or any sums on deposit from time to time in the Collateral Account), (e) failure to apply funds to pay the Obligations following an Event of Default, (f) subordinate financing incurred by Borrower in violation of the terms of the Loan Documents or otherwise without Lender's consent, (g) transfer of assets, (h) gross negligence, (i) willful misconduct, (j) court costs and attorneys' fees, and (k) bankruptcy. In addition, Borrower shall indemnify and hold harmless the Indemnitees from and against any liabilities or costs incurred by any Indemnitee under the DACA.

4.9    Insurance.  Borrower will maintain (or cause to be maintained) in force insurance on Borrower's properties against risks customarily insured against by companies engaged in businesses similar to that of Borrower containing such terms and written by such companies as may be satisfactory to Lender, such insurance to be payable to Lender as its interest may appear in the event of loss and to cause Lender to be named as insured pursuant to a standard loss payee clause; no loss shall be adjusted thereunder without Lender's approval; and all such policies shall provide that they may not be canceled without first giving at least thirty (30) days' written notice of cancellation to Lender; provided, however, that if the policy does not provide at least thirty (30) days' written notice of cancellation to Lender, then Borrower shall, within five (5) days of the date of premium payment by Borrower, provide evidence to Lender that the premiums on any policy of insurance required to be maintained hereunder have been paid in full on or prior to the date on which such premium was due to the insurer.  In the event that Borrower fails to provide evidence of such insurance, Lender may, at is option, secure such insurance and charge the cost thereof to Borrower.  At the option of Lender, all insurance proceeds received shall be applied as a payment on account of the Obligations.  From and after the occurrence of an Event of Default which has not been cured or waived by Lender, Lender is authorized to cancel any insurance maintained hereunder and apply any returned or unearned premiums, all of which are hereby assigned to Lender, as a payment on account of the Obligations.

4.10    Notification of Default.  Within five (5) days of becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower shall give Lender written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.11    Notification of Litigation.  Borrower will promptly notify Lender in writing of any litigation or of any investigative proceedings of a governmental agency or authority commenced or threatened against it which would or might reasonably be expected to have a Material Adverse Effect, or which would cause the potential liability of Borrower under such litigation, when aggregated with all other active litigation, to exceed US$25,000.00, unless the potential liability of Borrower under such litigation is covered by a policy of insurance acceptable to Lender and Lender has been provided evidence satisfactory to Lender that such insurance coverage is in full force and effect.  Without limiting the foregoing, within two (2) Business Days of Borrower obtaining knowledge of the existence thereof, Borrower shall notify Lender of any investigation, audit, hearing, compliance inquiry, enforcement action, or any other type of communication from

-15-

any regulatory or other governmental authority (including, without limitation, any attorney general), and shall immediately forward to Lender, on receipt thereof by Borrower, a certified copy of any written communication or correspondence concerning the foregoing.

4.12    [Reserved.]

4.13    <u>Compliance</u>.  Borrower shall comply with all applicable requirements of governmental authorities having jurisdiction over Borrower, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, and those relating to money laundering and terrorism, in each case as amended from time to time, and the rules and regulations promulgated thereunder.

4.14    <u>Defense of Claims</u>.  Borrower or Sponsor shall diligently defend (and, with respect to Sponsor, in accordance with the terms of the Servicing Agreement) any investigation, audit, hearing, inquiry, proceeding, administrative action, or other action or claim related to the origination of, or Borrower's ownership of, any Consumer Loans, where Borrower's liability, if such action or claim is adversely determined, could reasonably be expected to exceed $25,000.

4.15    <u>Organizational Documents</u>.  Borrower shall comply in all respects with Borrower's articles of organization (or equivalent formation document) and Borrower's operating agreement (or equivalent operating document).

4.16    <u>Location of Collateral</u>.  Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights, including Consumer Loans, respectively, are kept, and shall not remove such records or any of them to another location without giving Lender at least thirty (30) days prior written notice thereof.

4.17    <u>Notification of Damage</u>.  Borrower will immediately notify Lender of any material loss or damage to, or material diminution in or any occurrence that would materially and adversely affect the value of any Collateral.

4.18    <u>Additional Indebtedness</u>.  In the event that Borrower wishes to incur any additional indebtedness other than indebtedness which Borrower has incurred as of the date hereof, indebtedness incurred hereunder and owed to Lender, trade payables incurred in the ordinary course of business, or Permitted Indebtedness ("<u>Financing</u>"), or Borrower is approached with a proposal for a Financing by a third party, Borrower shall provide Lender with notice of such fact and shall present Lender with such Financing request or a summary of the material terms of a third party Financing proposal.  Within ten (10) Business Days of receipt by the Lender of such Financing request or Financing proposal (which time period shall be extended by the number of Business Days (up to, but not to exceed, three (3) additional Business Days) during which an authorized officer of the Lender shall be unavailable to review such request or proposal), the Lender shall inform Borrower of its decision whether or not to proceed with negotiating terms for such Financing transaction.  If Lender and Borrower cannot agree on terms for such Financing transaction, then the last terms which Lender proposed, or the terms of the third party Financing proposal (if Lender does not match such terms) shall be deemed the "<u>Rejected</u>

-16-

Proposal", and a commercial affiliate of Borrower (but not Borrower) may consummate such financing transaction on either (a) terms and provisions Substantially Similar (as hereinafter defined) to the Rejected Proposal, or (b) terms and provisions more favorable to the proposed borrower (a transaction which meets the criteria set forth in (a) or (b), above, herein an "Allowed Financing"). If Borrower has not reached agreement on the terms and provisions of an Allowed Financing (as indicated by an agreed-upon indicative term sheet or other evidence of substantive agreement on terms) within sixty (60) days of the date on which Lender's most recently proposed terms or the terms of the third party Financing proposal became the Rejected Proposal hereunder, then Borrower may no longer seek agreement on an Allowed Financing, and must again present to Lender any intention to obtain a Financing. Any modification to the terms and provisions of an Allowed Financing that causes such terms and provisions to no longer be Substantially Similar to the Rejected Proposal shall constitute a new Financing proposal, which Borrower is required to submit to Lender in accordance with the provisions of this Section 4.18. Terms and provisions of any financing proposal shall be deemed "Substantially Similar" if (a) they do not increase by more than 2%, individually, either of the following terms over the terms rejected by Lender: (i) the stated interest rate, or (ii) the present value of all fees payable to the proposed lender (e.g., origination fee, termination fee, prepayment premium), or (b) an additional term or provision either (i) improves the internal rate of return attained by the proposed lender by more than 2% or (ii) substantially enhances the credit of the proposed borrowing entity.

## 5. NEGATIVE COVENANTS

5.1  <u>Limitations on Indebtedness</u>.  Borrower shall not, without the prior written consent of Lender in each instance, issue any evidence of indebtedness or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness in addition to indebtedness to Lender, other than Permitted Indebtedness and trade payables incurred in the ordinary course of Borrower's business (which trade payables shall not be evidenced by a promissory note, shall be paid within sixty (60) days of the date incurred, and shall be limited, in the aggregate, to an amount outstanding at any one time equal to or less than $25,000).  For purposes of this Agreement, "<u>Permitted Indebtedness</u>" shall mean (i) amounts loaned by Sponsor (or a wholly-owned affiliate of Sponsor) to Borrower to cure a Balancing Default or to cause Borrower to comply with the terms of Section 1.9 hereof in connection with the first Advance under the Loan, (ii) amounts loaned by Sponsor (or a wholly-owned affiliate of Sponsor) to the extent such loaned amounts constitute the direct or indirect lending by Sponsor to Borrower of Sponsor's earnings retained from its business relationship with the Borrower, (iii) amounts loaned by the Persons set forth on Schedule 5.1(iii) hereto, if any, or (iv) other amounts as may be reasonably approved by Lender, <u>provided</u>, that all Permitted Indebtedness shall be subject to such subordination and standstill agreements as Lender may require in its sole discretion, and <u>provided</u>, <u>further</u>, that in all instances the funds for Permitted Indebtedness held by Sponsor (or a wholly-owned affiliate of Sponsor) other than Permitted Indebtedness held under clause (ii), above, may only come from officers, directors or shareholders of Sponsor or affiliates of Sponsor or current debt investors in Sponsor, its affiliates or Obsidian Armor Fund, LLC and from no other Person.

5.2  <u>Sale of Interest</u>.  There shall not be any sale or transfer of ownership of any interest, whether direct or indirect, in Borrower without Lender's prior written consent, unless Lender is paid in full for all Obligations under the Loan Documents (subject to any notice period or

-17-

restriction contained herein regarding Borrower's right to prepay the Loan) in accordance with the provisions of this Agreement.

5.3     Loans or Advances.  Other than the Consumer Loans, Borrower shall not make any loans or advances to any individual, firm or corporation, including without limitation its officers and employees; provided, however, that Borrower may make advances to its employees, including its officers, with respect to expenses incurred or to be incurred by such employees in the ordinary course of business which expenses are reimbursable by Borrower.

5.4     Investments.  Borrower shall not make investments in, or advances to, any Person, other than the Consumer Loans.  Except for Consumer Loans, Borrower will not purchase or otherwise invest in or hold securities, non-operating real estate or other non-operating assets or purchase all or substantially all the assets of any entity other than in connection with an acquisition approved by Lender in writing.

5.5     Merger.  Borrower will not merge or consolidate or be merged or consolidated with or into any other entity, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Loan Documents (subject to any notice period or restriction contained herein regarding Borrower's right to prepay the Loan).

5.6     Capital Expenditures.  Borrower shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary and usual course of business for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in Borrower's business.

5.7     Sale of Assets.  Borrower shall not sell, lease or otherwise dispose of any of its assets, except in the ordinary and usual course of business, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Loan Documents (subject to any notice period or restriction contained herein regarding Borrower's right to prepay the Loan) or except for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in Borrower's business, provided that fair cash consideration is received therefor.  Borrower shall not sell, transfer, convey, encumber, or otherwise alienate any of its right, title, or interest in or to any Consumer Loan that constitutes "Collateral" hereunder except in the ordinary and usual course of business (e.g., sale of defaulted Consumer Loans).

5.8     Restriction on Liens.  Borrower shall not grant any security interest in, or mortgage of, its respective properties or assets including the Collateral, other than Permitted Liens or such liens as are in favor of Lender.  Borrower shall not agree with any person other than Lender to not grant any security interest in, or mortgage of, any of its properties or assets including the Collateral.

5.9     Other Business.  Borrower shall not engage in any business other than the Business.

5.10     Change of Name.  Borrower shall not change its legal name or the state or jurisdiction of its organization, without giving Lender at least thirty (30) days' prior written notice thereof.

-18-

5.11   ACH Provider.   Borrower shall not modify or permit the modification of the ACH Agreement without the prior written consent of Lender.  In the event of the termination of the ACH Agreement by the ACH Provider, Borrower shall cause a new ACH Provider to enter into a new ACH Agreement with Borrower within five (5) Business Days of such termination.

5.12   Servicing Agreement.   Borrower shall not amend, modify, or terminate the Servicing Agreement during the term of the Loan without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed.

5.13   Credit Policies.  Borrower shall not make a material change in its internal credit policies with respect to Eligible Consumer Loans without the prior consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed, unless required by applicable law (other than Tribal law) in which case Lender consent shall not be required.

5.14   Organizational Documents.   Borrower shall not modify, alter, amend, or restate in any way Borrower's articles of organization (or equivalent formation document) nor Borrower's operating agreement (or equivalent operating document) without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed, unless such modification, alteration, amendment or restatement is clerical, administrative, ministerial, or *de minimis* in nature, including any change in permitted management thereunder.

## 6.   DEFAULT

6.1   Default.  An "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a)      (i) failure to pay principal or interest hereunder when due, whether at maturity, by acceleration or otherwise, or (ii) failure to pay, within (10) Business Days of the date due (as used herein, "Business Day" shall mean any day other than a Saturday, Sunday or day that is or shall be in the State of New York a legal holiday or a day on which banking institutions are required or authorized to close), any other amounts due hereunder, or (iii) any breach or default by Borrower under Sections 5.1, 5.2, 5.5, 5.7, 5.8, or 5.10 hereof; or

(b)      default of any other liability, obligation or undertaking of Borrower or any guarantor or other surety for the Loan, hereunder or under any other Loan Document or otherwise, which failure continues after ten (10) Business Days' written notice thereof (provided that if such default is not reasonably susceptible of cure within said ten (10) Business Day period, and Borrower commences a cure of such default within said ten (10) Business Day period, and thereafter diligently pursues such cure, then Borrower shall have an additional period of thirty (30) days in which to effect such cure prior to an Event of Default arising hereunder); or

(c)      if any statement, representation or warranty heretofore, now or hereafter made by Borrower or any affiliate of Borrower in connection with this Agreement or in any supporting financial statement of Borrower shall be determined to have been intentionally false in any material respect when made; or

-19-

(d)     the liquidation, termination or dissolution of Borrower, or the merger or consolidation of Borrower into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property; or

(e)     the institution by or against any of Borrower or any guarantor of the Loan of any insolvency proceedings, whether under the United States Bankruptcy Code 11 USC §101 *et seq.* or any other law, in which Borrower or any guarantor of the Loan is alleged to be insolvent or unable to pay its debts as they mature, or the making by Borrower or any guarantor of the Loan of an assignment for the benefit of creditors or the granting by Borrower or any guarantor of the Loan of a trust mortgage for the benefit of creditors and, if such proceeding is instituted against Borrower or any guarantor of the Loan, such proceeding shall not have been dismissed in sixty (60) days; or

(f)     the service upon Lender of a writ in which Lender is named as trustee of Borrower or of any guarantor of the Loan; or

(g)     a final, non-appealable judgment or judgments for the payment of money shall be rendered in excess of US$25,000.00 against Borrower or any guarantor of the Loan, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; or

(h)     the occurrence of any Material Adverse Effect; or

(i)     any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any material portion of the property of Borrower, and such lien or levy shall not be removed within sixty (60) days; or

(j)     Borrower fails to cure a Balancing Default in accordance with Section 1.9 hereof.

6.2     Acceleration.

(a)     If an Event of Default under Section 6.1(e) shall have occurred, all Obligations shall become immediately due and payable without notice or demand.  If any other Event of Default shall have occurred which, to the extent capable, has not been cured or waived by Lender, at the election of Lender, all Obligations shall become immediately due and payable without notice or demand.

(b)     Lender is hereby authorized, at its election, after an Event of Default shall have occurred which has not been cured or waived by Lender, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at public or private sale; and Lender may also exercise any and all other rights and remedies of a secured party under the NYUCC or which are otherwise accorded to it in equity or at law, all as Lender may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral.  If notice of a sale or other action by Lender is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Borrower

-20-

agrees that ten (10) days' written notice to Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which Borrower shall waive and release after default upon Lender's request therefor, and may be free of any warranties as to the Collateral if Lender shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. Any balance of the net proceeds of sale remaining after paying all Obligations of Borrower to Lender shall be returned to such other party as may be legally entitled thereto; and if there is a deficiency, Borrower shall be responsible for the same, with interest. Upon demand by Lender, Borrower shall assemble the Collateral and make it available to Lender at a place designated by Lender which is reasonably convenient to Lender and Borrower. Borrower hereby acknowledges that Lender has extended credit and other financial accommodations to Borrower upon reliance of Borrower's granting Lender the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default which has not been cured or waived by Lender and Borrower hereby acknowledges that Lender is entitled to such equitable and injunctive relief to enforce any of its rights and remedies hereunder and Borrower hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to Lender.

(c)     No Lender shall be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guarantees shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Borrower hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed, and to the extent that it lawfully may do so, Borrower hereby irrevocably waives the benefits of all such laws. Except as otherwise provided by applicable law, Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

6.3     Power of Attorney.     Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney, with full power of substitution, at the sole cost and expense of Borrower but for the sole benefit of Lender, upon the occurrence of an Event of Default which has not been cured or waived by Lender, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the Collateral (subject to the notice and other terms provided in Section 6.2, above); to enforce collection of the Collateral, either in its

-21-

own name or in the name of Borrower, including, without limitation, executing releases or waivers, compromising or settling with any Consumers and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to Borrower and to take therefrom any remittances or proceeds of Collateral in which Lender has a security interest; to notify applicable postal authorities to change the address for delivery of mail addressed to Borrower to such address as Lender shall designate; to endorse the name of Borrower in favor of Lender upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of Borrower on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to sign the name of Borrower on any notice of the Consumers or on verification of the Collateral; and to sign, if necessary, and file or record on behalf of Borrower any financing or other statement in order to perfect or protect Lender's security interest. No Lender shall be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if Lender elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be entitled to collect more than an amount equal to the then outstanding Obligations, and any sums received in excess of the then-outstanding Obligations shall be returned to Borrower, and it shall not be responsible to Borrower or to any other party (and shall be and is hereby indemnified by Borrower against any such responsibility to any other party) except in the event that Lender has been determined, with finality, by a court of competent jurisdiction, that Lender has committed gross negligence or willful misconduct. All powers conferred upon Lender by this Agreement, being coupled with an interest, shall be irrevocable so long as any Obligation of Borrower or any surety to Lender shall remain unpaid or Lender is obligated under this Agreement to extend any credit to Borrower.

6.4    <u>Suspension and Wind Down of Facility</u>.

(a)    For purposes of this Agreement:

(i)    an "<u>Adverse Banking Event</u>" shall mean (A) any decision by the Account Bank or the ACH Provider, including any of their respective successors, to no longer support the Business and provide banking or ACH services, as applicable, to Borrower, and (B) the inability of Borrower to locate any replacement provider of such services at all or on terms that would not, in either party's reasonable determination, materially and adversely affect Borrower's ability to conduct the Business or timely repay the Loan.

(ii)    an "<u>Adverse Industry Event</u>" shall mean any event, including any changes, conditions or effects (a) in the United States or foreign economies or the securities or financial markets in general or (b) that affect the sovereign model pay-day lending industry as a whole (other than an Adverse Banking Event and a Federal Regulatory Event), that could, in either party's reasonable determination, materially and adversely affect Borrower's ability to conduct the Business or timely repay the Loan;

-22-

(iii)     a "<u>Federal Regulatory Event</u>" shall mean the enactment of any law, rule or regulation by the United States federal government (or any agency or instrumentality thereof), or the issuance of any rule or decision by the United States federal government (or any agency or instrumentality thereof) or any United States federal court, the effect of which is to regulate the origination or limit the enforceability of Consumer Loans in a manner that could, in either party's reasonable determination, materially and adversely affect Borrower's ability to conduct the Business or timely repay the Loan;

(iv)     the "<u>Cumulative Consumer Loan Default Rate</u>" shall mean the ratio, expressed as a percentage, which the total aggregate outstanding principal balance of defaulted Consumer Loans constituting Collateral (excluding any defaulted Consumer Loans that have been sold or "charged off" in the ordinary course) bears to the total aggregate outstanding principal balance of all Consumer Loans constituting Collateral (excluding any defaulted Consumer Loans that have been sold or "charged off" in the ordinary course);

(v)     the "<u>Cumulative Consumer Loan Delinquency Rate</u>" shall mean the ratio, expressed as a percentage, which the total aggregate outstanding principal balance of delinquent Consumer Loans constituting Collateral (excluding any delinquent Consumer Loans that have been sold or "charged off" in the ordinary course) bears to the total aggregate outstanding principal balance of all Consumer Loans constituting Collateral (excluding any delinquent Consumer Loans that have been sold or "charged off" in the ordinary course);

(vi)     a "<u>Material Consumer Loan Event</u>" shall mean:

(A)     a Cumulative Consumer Loan Default Rate equal to or greater than thirty percent (30%) occurring at any time within the six (6) calendar month period commencing on the date hereof; or

(B)     a Cumulative Consumer Loan Default Rate equal to or greater than forty percent (40%) occurring at any time within the twelve (12) calendar month period commencing on the date hereof; or

(C)     a Cumulative Consumer Loan Default Rate equal to or greater than fifty percent (50%) occurring at any time within the eighteen (18) calendar month period commencing on the date hereof; or

(D)     at any time when the unpaid principal balance of the Consumer Loans constituting the Collateral is greater than twenty-five percent (25%) of the maximum face principal amount of the Note, a Cumulative Consumer Loan Delinquency Rate equal to:

(1)     with respect to all Consumer Loans which are more than thirty (30) and less than sixty-one (61) days past due, thirty-five percent (35%); or

-23-

(2)     with respect to all Consumer Loans which are more than sixty (60) and less than ninety-one (91) days past due, twenty-eight percent (28%); or

(3)     with respect to all Consumer Loans which are more than ninety (90) and less than one hundred twenty-one (121) days past due, twenty-six percent (26%); or

(4)     with respect to all Consumer Loans which are more than one hundred twenty (120) days past due, twenty-four percent (24%).

(vii)   a "<u>Wind-Down Event</u>" shall mean the occurrence of any one or more of an Adverse Banking Event, an Adverse Industry Event, a Federal Regulatory Event, or a Material Consumer Loan Event.

(b)     Without limiting and in addition to Lender's rights and remedies hereunder, if an Adverse Banking Event, Adverse Industry Event, or Federal Regulatory Event occurs, then Borrower and Lender may mutually agree to conduct an orderly liquidation of the Collateral and repayment of the Loan, upon such terms and conditions as may be acceptable to the parties.

(c)     Without limiting and in addition to Lender's rights and remedies hereunder, if a Wind-Down Event occurs, then:

(i)     Lender may with immediate effect by written notice to the Account Bank and Borrower suspend or terminate the right of Borrower (and Sponsor on behalf of Borrower) to make withdrawals from the Collateral Account pursuant to Section 1.8(c) and the right of Borrower (or Sponsor or an affiliate of Sponsor) to cure a Balancing Default pursuant to Section 1.9;

(ii)    all sums on deposit from time to time in the Collateral Account shall be applied by Borrower (or Sponsor on behalf of Borrower) or Lender, as applicable, in accordance with Section 1.8(e):

(iii)   Borrower shall have the right, within sixty (60) days, to repay the Loan in full, which repayment shall be accompanied by all accrued and outstanding interest on the outstanding principal balance of the Loan at the otherwise applicable rate of interest through the date on which such repayment is made, but shall be without prepayment premium or penalty of any kind.

(d)     The occurrence of a Wind-Down Event shall not, in and of itself, constitute an Event of Default hereunder.

6.5     <u>Nonexclusive Remedies</u>.   All of Lender's rights and remedies not only under the provisions of this Agreement but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by Lender at such time or times and in such order of preference as Lender in its sole discretion may determine.

-24-

6.6   <u>Post-Default Reporting Requirements</u>.  From and after the occurrence of an Event of Default, in addition to any other information required to be submitted by Borrower to Lender from time to time hereunder (regardless of whether an Event of Default has occurred), Borrower shall deliver to Lender, within five (5) days of receipt by Borrower of notice requesting same, an electronically readable tab-delineated spreadsheet or other data document containing the following information, in all cases in a form acceptable to Lender:

(a)   all information in Borrower's possession concerning Consumers under Consumer Loans;

(b)   all information in Borrower's possession concerning Consumer Loans;

(c)   all information in Borrower's possession concerning payment history on Consumer Loans, whether such payment was made to Borrower directly by the applicable Consumer or whether such payment was drawn by Borrower from an account held in such Consumer's name as authorized by such Consumer; and

(d)   all information in Borrower's possession concerning the history of a Consumer's account(s) with Sponsor, including all annotations made to, on, or in connection with, such Consumer's account(s) with Sponsor.

Each of the foregoing categories of information reporting shall include, with respect to the relative subject matter of such information, and with respect to (i) each outstanding Consumer Loan, (ii) each Consumer Loan the collection of which by Borrower has been prevented due to there being insufficient funds in any account owned by the respective Consumer, and (iii) each Consumer Loan which has been written off Borrower's books by Borrower, the following information:  (A) the outstanding principal balance, (B) the balance of accrued and unpaid finance charges, (C) the balance of any fees (other than finance charges) due and owing to Borrower, and (D) the overall balance of all sums due and owing to Borrower from the respective Consumer under the outstanding Consumer Loan.  Such electronically readable spreadsheet or other data document shall contain, in a form satisfactory to Lender, evidence of any underlying calculations or other data manipulations showing how Borrower arrived at each of the items of data contained within such document(s).  In addition, from and after the occurrence of an Event of Default, Borrower shall deliver to Lender, within five (5) days of receipt by Borrower of notice requesting same, all information in Borrower's possession concerning any electronic signature files relative to Consumers, together with detailed information with respect to each Consumer concerning the method by which Borrower was authorized by the applicable Consumer to automatically draw funds from any account(s) in the name of such debtor.

## 7.   MISCELLANEOUS

7.1   <u>Waivers</u>.  Borrower waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

7.2   <u>Severability</u>.  If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or

-25-

unenforceable, the remainder of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

7.3 <u>Set-Off</u>. Borrower hereby grants to Lender a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from Lender (or any of its banking or lending affiliates, or any bank acting as a participant under any loan arrangement between Lender and Borrower, or any third party acting on Lender's behalf, including the Account Bank (collectively, the "<u>Lender Affiliates</u>")) to Borrower and any cash, securities, instruments or other property of Borrower in the possession of Lender or any Lender Affiliate, whether for safekeeping or otherwise, or in transit to or from Lender or any Lender Affiliate (regardless of the reason Lender or Lender Affiliates had received the same or whether Lender or Lender Affiliates has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of Borrower to Lender or any Lender Affiliate and such deposits and other sums may be applied or set off against such liabilities and obligations of Borrower to Lender or any Lender Affiliate as are then due and unpaid, whether or not demand has been made and whether or not other collateral is then available to Lender or any Lender Affiliate.

7.4 <u>Indemnification</u>. Borrower shall protect, defend (by counsel selected by Lender), indemnify and hold harmless Lender and Lender's officers, directors, partners, shareholders, employees, affiliates, agents, attorneys, lessees, successors and assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, affiliates, agents, attorneys, lessees, successors and assigns (collectively, the "<u>Indemnitees</u>") from and against all liabilities (including sums paid in settlement of claims), claims brought or threatened against Lender (as well as from reasonable attorneys' fees and expenses in connection therewith), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine, penalty or damages) arising as a direct or indirect result of (a) Borrower's failure to perform any of the agreements, terms or conditions of this Agreement or the Loan Documents required to be performed by Borrower, or for the breach by Borrower of any representation, warranty, or covenant contained herein or in any other Loan Document (including, without limitation any third party claims arising therefrom), (b) any present or future illegality (whether civil or criminal) in Borrower's business of making Consumer Loans, or (c) as a direct or indirect result of any investigation by any governmental entity into Borrower's business of making Consumer Loans. The indemnification provided by this Section 7.4 shall survive payment of the Obligations, any termination of this Agreement, and/or release or discharge executed by Lender in favor of Borrower.

7.5 <u>Costs and Expenses</u>. Borrower shall pay to Lender any and all costs and expenses (including, without limitation, reasonable attorneys' fees, and disbursements, court costs, litigation and other expenses) incurred or paid by Lender in establishing, maintaining, protecting or enforcing any of Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by Lender in defending Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

7.6 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005790

7.7  <u>Complete Agreement</u>.  This Agreement and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes, all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

7.8  <u>Binding Effect of Agreement</u>.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and Lender shall be entitled to rely thereon) until all commitments of Lender hereunder are terminated and all Obligations hereunder are fully paid.  Lender may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights of Lender; and such assigning Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement, and the Collateral.  Borrower may not assign or transfer any of its rights or obligations under this Agreement.  Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.  Notwithstanding the foregoing, Lender may only assign this Agreement to an entity that is licensed by the Tribe or subject to an exemption from licensing by the Tribe under applicable law.

7.9  <u>Further Assurances</u>.  Borrower will from time to time execute and deliver to Lender, and take or cause to be taken, all such other or further action as Lender may reasonably request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Agreement and the other Loan Documents or to vest more fully in or assure to Lender the security interest in the Collateral granted to Lender by this Agreement or to comply with applicable statute or law and to facilitate the collection of the Collateral (including, without limitation, the endorsement of promissory notes and instruments and notifications to obligors on the Collateral).  To the extent permitted by applicable law, Borrower authorizes Lender to file financing statements, continuation statements or amendments without Borrower's signature appearing thereon, and any such financing statements, continuation statements or amendments may be signed by Lender on behalf of Borrower, if necessary, and may be filed at any time in any jurisdiction.  Lender may at any time and from time to time file financing statements, continuation statements, debentures, mortgage, and any other documents allowed under the laws of the Tribe or any other applicable jurisdiction, and amendments thereto which contain any information required by the laws of the Tribe or any other applicable jurisdiction for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower.  Borrower agrees to furnish any such information to Lender promptly upon request.  In addition, Borrower shall at any time and from time to time take such steps as Lender may reasonably request for Lender (i) to obtain an acknowledgement, in form and substance satisfactory to Lender, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Lender, (ii) to obtain possession and control of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Lender, and (iii) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and the preservation of its rights therein.  Borrower hereby constitutes Lender its attorney-in-fact to execute, if necessary, and file

4483165v8
CONFIDENTIAL                                                    ROSETTE_REVISED_005791

all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are paid in full and the Collateral is released. Lender shall use commercially reasonable efforts to deliver to Borrower a copy, on receipt by Lender from the applicable filing jurisdiction, of any such financing statements.

7.10    Amendments and Waivers. This Agreement may not be amended, or the obligations of the parties hereto modified, except in a writing executed by all of the parties. No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

7.11    Terms of Agreement. This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Lender shall be outstanding, or Lender shall have any obligation to extend any financial accommodation hereunder, and is supplementary to each and every other agreement between Borrower and Lender and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower under any such agreement, nor shall any contemporaneous or subsequent agreement between Borrower and Lender be construed to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

7.12    Notices. Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record. Any such notice shall be deemed duly received and effective (i) if delivered in hand or by telecopier to, or received by, any officer or agent of Borrower or Lender, upon such delivery or receipt, or (ii) if sent by overnight courier, on the next business day after being so sent, or (iii) if mailed by registered or certified mail, return receipt requested, postage prepaid, and properly addressed to Borrower or Lender, two (2) business days after being so mailed. A party's proper address is that set forth for such party in this Agreement or such address as that party may from time to time hereafter designate by notice to the other party.

7.13    Governing Law. This Agreement, and all transactions thereunder or pursuant thereto shall be governed as to interpretation, validity, effect, rights, duties and remedies of the parties thereunder and in all other respects by the domestic laws of the State of New York without reference or giving effect to any choice of law or conflicts of law principles thereof.

7.14    Reproductions. This Agreement and all documents which have been or may be hereinafter furnished by Borrower to Lender may be reproduced by Lender by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

7.15    Limited Waiver of Sovereign Immunity. Borrower hereby grants to Lender a limited waiver of sovereign immunity with respect to the following purposes and for no others:

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005792

(a)     For the purpose of allowing Lender to take any and all actions necessary to enforce the provisions of this Agreement and the other Loan Documents pursuant to Section 7.16 below, including those which seek injunctive or declaratory relief, damages (limited solely to recover from the personal property assets and future revenues of Borrower), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted therein;

(b)     Subject to this Section 7.15 pursuant to its limited waiver and Section 7.16 hereof, Borrower expressly waives its immunity from suit and consents to be sued in any of the following: the Lac Vieux Desert Band of Lake Superior Chippewa Tribal Court, the courts of the State of Michigan, the United States District Court for the Western District of Michigan and appellate courts therefrom as to all three jurisdictions for (i) the limited purpose of compelling or enforcing arbitration under Section 7.16, or (ii) to the extent that the arbitration provision in Section 7.16 is invalid or unenforceable as a result of any challenge by Borrower, the Tribe, the Servicer, or any of their respective affiliates, the litigation of any claims by Lender arising out of this Agreement and the other Loan Documents;

(c)     Borrower agrees that it shall not plead or raise as a defense the requirement of exhaustion of tribal court remedies as to any claims brought by Lender in any of the forums identified in Section 7.15(b) above; and

(d)     The limited waiver of sovereign immunity granted herein does not include any waiver, either express or implied, to any third party. The limited waiver of sovereign immunity granted here is of Borrower only and does not include a waiver, either express or otherwise, by the Tribe, any other enterprise of the Tribe or otherwise.

7.16    <u>Arbitration</u>.  In the event of a dispute between Borrower and Lender, then Borrower and Lender shall each have the right to submit such dispute to arbitration.  If Lender is the party initiating such arbitration, then such arbitration shall be conducted in Marquette, Michigan.  If Borrower is the party initiating such arbitration, then such arbitration shall be conducted in New York County (New York).  Any arbitration hereunder shall be conducted in accordance with the Commercial Arbitration Rules (Expedited Procedures) of the American Arbitration Association, except that the provisions of this Section 7.16 shall supersede any conflicting or inconsistent provisions of said rules.  The laws of the State of New York shall govern any dispute arising between the parties under this Agreement or any other Loan Document.  The party initiating arbitration shall do so by giving notice to that effect to the other party, specifying in said notice the nature of the dispute, and that said dispute shall be determined by a panel of three (3) arbitrators in accordance with this Section 7.16.  Each party to such arbitration shall appoint an arbitrator within five (5) days after the giving of notice by the other party.  If any party shall fail timely to appoint an arbitrator, the appointed arbitrator shall select the arbitrator in such party's stead, who shall be impartial, within five (5) days after such party's failure to appoint.  The arbitrators so appointed shall, within ten (10) days, meet and appoint a third arbitrator (the "<u>Deciding Arbitrator</u>").  The Deciding Arbitrator shall, among other things, have demonstrable knowledge of Indian law, as well as demonstrable expertise in the subject matter(s) of the dispute(s) submitted for resolution.  If for any reason such arbitrators fail to appoint a Deciding Arbitrator within such period of ten (10) days, then any party hereto may request any arbitration

-29-

or mediation organization, including, without limitation, the American Arbitration Association, which will provide an impartial arbitrator) to appoint an arbitrator who shall be the Deciding Arbitrator within seven (7) days of such request and all parties shall be bound by any appointments so made within such seven (7)-day period. The Deciding Arbitrator only shall subscribe and swear or affirm to an oath fairly and impartially to determine such dispute. Within seven (7) days after the Deciding Arbitrator has been appointed, each of the first two arbitrators shall submit their respective determinations to the Deciding Arbitrator who must select one or the other of such determinations (whichever the Deciding Arbitrator believes to be correct or closest to a correct determination) within seven (7) days after the first two arbitrators shall have submitted their respective determinations to the Deciding Arbitrator, and the selection so made shall in all cases be binding upon the parties, and judgment upon such decision may be entered into any court of the Lac Vieux Desert Band of Lake Superior Chippewa Tribal Court, the courts of the State of Michigan, or the United States District Court for the Western District of Michigan, or in the courts of any jurisdiction where the party against whom such judgment is entered may have assets to the extent the award relates to the assets found in such jurisdiction. In the event of the failure, refusal or inability of an arbitrator to act, a successor shall be appointed within ten (10) days as herein before provided. The Deciding Arbitrator shall schedule a hearing where the parties and their advocates shall have the right to present evidence, call witnesses and experts and cross-examine the other party's witnesses and experts. Either party shall have the right, at any time, to make a motion to the Deciding Arbitrator to grant summary judgment as to any question of law. The arbitrators conducting any arbitration shall be bound by the terms of this Agreement and shall not have the power to add to, subtract from, or otherwise modify such provisions in this Agreement. Each party hereto agrees to sign all documents and to do all other things necessary to submit any such matter to arbitration and further agrees to, and hereby does, waive any and all rights they or either of them may at any time have to revoke their agreement hereunder to submit to arbitration and to abide by the decision rendered thereunder. The non-prevailing party(ies) in such arbitration shall, upon demand from the prevailing party(ies) detailing the actual out-of-pocket costs and expenses (including reasonable attorneys fees) incurred by the prevailing party(ies) in prosecuting or defending the resolution of such dispute, pay over to such prevailing party(ies) the amount of such costs and expenses.

7.17   <u>Service of Process</u>. Borrower and Lender hereby consent to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Lender and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

7.18   **<u>JURY WAIVER</u>. BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE LAWS OF THE STATE OF NEW YORK, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER**

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005794

**ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER CERTIFIES THAT NEITHER LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

7.19   No Partnership.  Nothing contained in this Agreement or the other Loan Documents shall be deemed to create an equity investment in Borrower on the part of Lender or a partnership between Lender and Borrower, it being the intent of the parties hereto that only the relationship of lender and borrower shall exist with respect to the Loan.  Borrower agrees that it shall report this transaction for income tax purposes, and file all related tax returns, in a manner consistent with the form of this transaction as a loan.

7.20   Lender is not in Control; Lender-Creditor Relationship.

(a)      None of the covenants or other provisions contained in this Agreement or any of the other Loan Documents shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower, the power of Lender being limited to the right to exercise the remedies provided for in this Agreement and the other Loan Documents and applicable law.

(b)      The relationship between Lender, on the one hand, and Borrower and any guarantor of the Loan, on the other hand, is solely that of creditor and debtor.  Lender shall not have (or be deemed to have) any fiduciary relationship or duty to any of Borrower or any guarantor of the Loan, arising out of or in connection with, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrower or any guarantor of the Loan, on the other hand, by virtue of, any Loan Document or any transaction contemplated therein.

7.21   Attorneys Fees.  In the event of any dispute between the parties to this Agreement, the prevailing party in any arbitration or litigation resulting from such dispute shall be entitled to collect, *inter alia*, its reasonable attorneys' fees and out-of-pocket expenses.

7.22   Certification.   The individual(s) signing this Agreement on behalf of Borrower, by affixing a signature(s) hereon, hereby certify(ies) for the benefit of Lender, that all information submitted to Lender in connection with the underwriting of the Loan is true and correct in all material respects on and as of the date of this Agreement.

7.23   Publicity.  Except as may be required by applicable law, none of the parties hereto shall issue a publicity release or announcement or otherwise make any public disclosure concerning this Agreement or the transactions contemplated hereby, without prior approval by the other parties hereto.  If any announcement is required by law to be made by any party hereto, prior to making such announcement such party will deliver a draft of such announcement to the other parties and shall give the other parties an opportunity to comment thereon.  Notwithstanding the foregoing, Lender or any of its affiliates may disclose a general description of transactions arising under the  Loan Documents for advertising, marketing or other similar purposes.

[NO FURTHER TEXT ON THIS PAGE]

-31-

Executed as of November __, 2012.

BORROWER:

RED ROCK TRIBAL LENDING, LLC, a limited liability company formed under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians

By: _____
Name:  Craig Mansfield
Title:  Co-Manager

By: _____
Name:  Michelle Allen
Title:  Co-Manager

LENDER:

ALPHA CREDIT RESOURCES LLC, a Delaware limited liability company

By: _____
Name:  Brian D. Jedwab
Title:  President

STATE OF _____ )
                                                    ) ss:
COUNTY OF _____ )

    On the __ day of _____ in the year 20__ before me, the undersigned, personally appeared _____, personally known to me or prove to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person(s) upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC

Signature Page

**EXHIBIT 1.4(a)(iv)**
**FORM OF REQUEST FOR ADVANCE**

[LETTERHEAD OF BORROWER]

[DATE]

*Via electronic mail only*

Alpha Credit Resources LLC
152 West 57th Street, 54th Floor
New York, New York 10019
Attention: Brian D. Jedwab

> **Re:** **Loan from Alpha Credit Resources LLC, to Red Rock Tribal Lending LLC, dated as of _____, 2012, in the maximum principal amount of $10,000,000.00**

Ladies and Gentlemen:

The undersigned is the "Borrower" (and herein so-called) under that certain Loan and Security Agreement, dated _____, 2012 (the "<u>Loan Agreement</u>"), by and among Borrower and Alpha Credit Resources LLC. Capitalized terms used and not herein defined shall have the respective meanings ascribed thereto in the Loan Agreement.

Borrower hereby requests that Lender advance the amount of $_____.00, pursuant to the terms of the Loan Agreement. Borrower hereby directs that such advance be transmitted, by wire transfer, to the following account:

> Bank:
> ABA No.:
> Account No.:
> Further credit to:

To induce Lender to make the advance requested above, Borrower hereby certifies to Lender as follows:

1. All information, including without limitation, all representations, exhibits, financial statements and other materials, submitted to Lender by Borrower or any affiliate of Borrower in connection with or in support of the Loan continues to be correct and accurate as of the date hereof; and

2. Except as may have been previously disclosed to Lender in writing, there is no outstanding, pending or threatened litigation against the undersigned or affecting Borrower or any surety of any of Borrower's obligations to Lender, or the collateral for the Loan which would affect any such person or entity or said collateral in any material adverse way; and

Schedule 1.4(a)(iv) – Page 1

3.      Neither Borrower nor any surety of any of Borrower's obligations to Lender, has suffered or incurred any material adverse financial change since the date of the last financial statement submitted by such person or entity to Lender; and

4.      Borrower has not breached any term, provision, representation, warranty, or covenant contained in any Loan Documents, each of the representations, warranties, and covenants of each such person contained in each of the Loan Documents is true and correct as of the date hereof and

5.      No event or series of events has or have intervened since the date Borrower initially executed and delivered the Note, which would either individually or collectively adversely affect the collateral for the Loan in any material way.

[NO FURTHER TEXT ON THIS PAGE]

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005798

Very truly yours,

RED ROCK TRIBAL LENDING, LLC, a limited iabiity company formed under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians


By: _____
    Name:
    Title:

## <u>SCHEDULE 1.7</u>
## <u>FORM OF CONSUMER LOAN DOCUMENTATION</u>

See attached ___ pages.

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005800

## SCHEDULE 4.14(a)
## FORM OF SERVICING AGREEMENT

See attached ___ pages.

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005801

**SCHEDULE 5.1(iii)**
**CERTAIN HOLDERS OF PERMITTED INDEBTEDNESS**

4483165v8
CONFIDENTIAL

ROSETTE_REVISED_005802